RAVEN & KOLBE, LLP
Keith A. Raven, Esq. (KR-8086)
Attorneys for Defendant
ECKERD CORPORATION d/b/a RITE AID
and RITE AID CORPORATION, s/h/a
RITE AID CORPORATION d/b/a "RITE AID"
126 East 56th Street, Suite 202
New York, New York 10022
Tel. (212) 759-7466

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CHRISTOPHER STEVENS,                          :    Civil No.: 13-CV-783 (TJM/DEP)
                                              :
                 Plaintiff,                   :    **ATTORNEY CERTIFICATION OF**
                                              :    **KEITH A. RAVEN IN SUPPORT**
        -against-                             :    **OF DEFENDANTS' MOTION FOR**
                                              :    **SUMMARY JUDGMENT**
RITE AID CORPORATION d/b/a RITE AID           :
PHARMACY, a/k/a ECKERD CORPORATION            :
d/b/a RITE AID,                               :
                                              :
                 Defendants.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        KEITH A. RAVEN, ESQ., being duly admitted to practice before the United States

District Court, Northern District of New York, and the Courts of the State of New York, hereby

affirms, certifies and says the following under penalty of perjury:

        1.      I am a member of the firm of RAVEN & KOLBE, LLP, attorneys for

defendants, ECKERD CORPORATION d/b/a RITE AID and RITE AID CORPORATION,

s/h/a RITE AID CORPORATION d/b/a "RITE AID"  ("moving defendants" or "Rite Aid"),

and as such, I am fully familiar with the facts, circumstances and procedural history heretofore

had herein.

        2.      This Certification is respectfully submitted in support of moving defendants'

Motion for Summary Judgment and Complete Dismissal of plaintiff's Complaint, pursuant to

Rule 56 of the Federal Rules of Civil Procedure; and for such other and further relief as this Honorable Court deems just and proper.

3.      Annexed hereto as Exhibit "A" is a true and correct copy of plaintiff's Charge of Discrimination, which was filed with the Equal Employment Opportunity Commission (EEOC) on January 11, 2012.  Annexed hereto as Exhibit "B" is a true and correct copy of plaintiff's Amended Complaint in this action, which was filed with this Court on July 22, 2013.

4.      Annexed hereto as Exhibit "C" is a true and correct copy of moving defendants' Answer to plaintiff's Complaint, which was filed with this Court on August 13, 2013.

5.      Annexed hereto as Exhibit "D" is a true and correct copy of moving defendants' Rule 26 Disclosure, which includes, *inter alia*, moving defendants' Ethics Policy, Nondiscrimination Policy, Harassment in the Workplace Policy, Associate Complaint Resolution Policy and Anti-Retaliation Policy, as set forth in moving defendants' "An Associate Atlas," as well as moving defendants' Immunization Program, dated February 2011.

6.      Annexed hereto collectively as Exhibit "E" are true and correct copies of moving defendants' Responses to plaintiff's First Set of Interrogatories and First Request for Production of Documents, dated February 14, 2014.

7.      Annexed hereto collectively as Exhibit "F" are true and correct copies of moving defendants' Responses to plaintiff's Second Set of Interrogatories and Second Request for Production of Documents, dated June 13, 2014.

8.      Annexed hereto collectively as Exhibit "G" are true and correct copies of the Exhibits marked at the deposition of plaintiff, CHRISTOPHER STEVENS, dated March 12, 2014, which include, *inter alia*, moving defendants' written job description for Pharmacy Manager.

9.      Annexed hereto as Exhibit "H" is a true and correct copy of plaintiff, CHRISTOPHER STEVENS' deposition transcript, dated March 12, 2014.

10.     Annexed hereto as Exhibit "I" is a true and correct copy of the deposition transcript of WILLIAM FARLEY, who appeared on behalf of moving defendants, dated March 13, 2014.

11.     Annexed hereto as Exhibit "J" is a true and correct copy of the deposition transcript of WILLIAM SPINK, who appeared on behalf of moving defendants, dated March 13, 2014.

12.     Annexed hereto as Exhibit "K" is a true and correct copy of the deposition transcript of JAMES CARPENTER, who appeared on behalf of moving defendants, dated March 14, 2014.

13.     Annexed hereto as Exhibit "L" is a true and correct copy of the deposition transcript of KYLE ORTLIEB, who appeared on behalf of moving defendants, dated March 14, 2014.

14.     Annexed hereto as Exhibit "M" is a true and correct copy of the deposition transcript of TRACI BURCH, who appeared on behalf of moving defendants, dated May 15, 2014.

15.     Annexed hereto as Exhibit "N" is a true and correct copy of the deposition transcript of JAMES WICKENS, who appeared on behalf of moving defendants, dated May 15, 2014.

16.     Annexed hereto as Exhibit "O" is a true and correct copy of the deposition transcript of RICHARD MOHALL, who appeared on behalf of moving defendants, dated June 27, 2014.

17.     Annexed hereto as Exhibit "P" is a true and correct copy of the deposition transcript of non-party witness, Dr. MARK WARFEL, dated July 2, 2014.

18.     Annexed hereto as Exhibit "Q" is a true and correct copy of the report of moving defendants' pharmacy expert, Dr. HENRY COHEN, dated May 18, 2014, as well as an Affidavit incorporating same.  Annexed hereto as Exhibit "R" is a true and correct copy of the report of Frank M. Dattilio, Ph.D., ABPP, dated March 21, 2014, who is plaintiff's identified psychological expert.

TESTIMONY OF PLAINTIFF, CHRISTOPHER STEVENS:

19.     At his deposition, plaintiff, CHRISTOPHER STEVENS (hereinafter "plaintiff") testified that he became a pharmacist in 1977 after having graduated from Albany College of Pharmacy. [Exhibit "H" at 10-11].   He began working for Carl's Drugs, which was subsequently bought out by Fay's Drugs, where he continued to work as a pharmacist until that entity was acquired by Eckerd Drugs and, thereafter, by Rite Aid after its acquisition of Eckerd in 2007. [*Id.* at 12-13].   Suffice it to say, plaintiff has been working continuously as a pharmacist for moving defendants, or one of its corporate predecessors, from 1977 until August 23, 2011, on which date his employment with Rite Aid as a Pharmacy Manager was terminated. [*Id.* at 8-9, 11-13].   He denied giving injections or immunizations as part of his pharmacist responsibilities whilst working for any of Rite Aid's corporate predecessors. [Id. at 13-14].

20.     Plaintiff first became aware of the fact that certain pharmacists were certified to give immunizations shortly after the Rite Aid acquisition in 2007, at which point he learned that a Rite Aid pharmacist in his area had become an immunizer. [*Id.* at 14-15].  Plaintiff also testified that his family doctor is Dr. Mark Warfel, who has been his primary care physician for at least the last ten (10) years. [*Id.* at 15].

21.     Significantly, plaintiff testified that, prior to being told by Rite Aid that he would have to be an immunizer in order to be a pharmacist at Rite Aid, he had never been diagnosed with any type of phobia, including the alleged phobia herein, trypanophobia, commonly referred to as "needle phobia." [*Id.* at 16]. Furthermore, plaintiff testified that, since he began treating with Dr. Warfel at some point in his mid-40s (he is now 59 years old), he has had blood drawn via a needle at least ten (10) times. [*Id.* at 20]. Plaintiff denied ever passing out as a result of having blood drawn; denied ever having to be hospitalized as result of having blood drawn or receiving an injection; and denied ever having any conversations with anyone concerning him actually having a phobia with regard to needles until March of 2011, which, tellingly, is <u>after</u> he learned that he would need to become an immunizer as a pharmacist for Rite Aid. [*Id.* at 21]. In fact, plaintiff did not recall ever being told that he had a "needle phobia" by any medical care provider prior to that time in March of 2011, when he learned he would need to become certified as an immunizer for Rite Aid. [*Id.* at 21-22].

22.     Plaintiff first became aware that immunization training would be necessary to continue working as a pharmacist for Rite Aid in March of 2011, when he received an e-mail from Rite Aid Pharmacy District Manager, William Spink. [*Id.* at 33-34]. At that time, plaintiff was working at the Rite Aid store located at 1711 Genesee Street in Utica, New York, where he had been working since December of 2010. [*Id.* at 34]. On this point, plaintiff acknowledged that he had been transferred to this store location in conjunction with poor work performance at his prior store, for which he had been formally written-up. [*Id.* at 35-36]. In any case, plaintiff explained that the Pharmacy District Manager, William Spink, was his direct supervisor, while the front end District Manager was James Carpenter. [*Id.* at 36-37].

23.     Upon receiving the aforementioned e-mail from Mr. Spink concerning immunization training, plaintiff could not recall immediately attempting to speak with anyone at Rite Aid concerning his purported phobia, though he did contact Mr. Spink "within a couple weeks." [*Id.* at 39].  In this regard, plaintiff sent Mr. Spink a letter after first conferring with his physician, Dr. Warfel. [*Id.* at 40].  Specifically, plaintiff testified as follows:

Q.     What was the purpose of going to Dr. Warfel's office?
A.     Well, I saw the mandate from Rite Aid.  I knew I would not be able to do this because of my phobia.  I still wanted to practice pharmacy so I was hoping to get a doctor's release so I could perform – still remain working.
*  *  *  *  *
Q.     Okay.  What did you tell the nurse?
A.     I told – I can't remember exactly but I must have told her that the company is mandating everyone perform immunizations and that with my phobia, I would not be able to comply with that.
Q.     Is that the first time that you ever used the term phobia?
A.     No.  No.
Q.     When is the first time you ever used the word phobia in connection with a conversation with a healthcare provider or healthcare provider's office?
A.     That probably was but I probably had said the word phobia in my life prior to that.
Q.     But this was the first time you had mentioned the word phobia in a healthcare setting, correct?
A.     Dealing with me?
Q.     That's a word that you used, not Dr. Warfel's office, correct?
A.     I can't remember.
Q.     And when you had that conversation, did you tell them that you'd need some type of documentation as to this phobia?
A.     Yes.
Q.     Has Dr. Warfel or anyone from his office ever told you that they themselves diagnosed you with a needle phobia?
Mr. Berman:   Form of the question.
A.     Could you repeat that, please?
Q.     Sure.  Did Dr. Warfel – break it up.  Did Dr. Warfel ever tell you that he diagnosed you with needle phobia or anything similar to that?
A.     I can't recall. [*Id.* at 42-44][Emphasis added].

24.     Interestingly, plaintiff could not recall telling Dr. Warfel's office what would allegedly occur when he would receive injections; could not recall telling Dr. Warfel's office

whether he would feel nauseous or shaky around injections; could not recall telling Dr. Warfel's office what he suspected might happen if he gave injections; and could not recall telling Dr. Warfel's office that he "isn't sure if he'll have a problem giving shots," notwithstanding the notation to that effect in Dr. Warfel's records. [*Id.* at 44-47]. Yet, plaintiff did recall asking for a note from Dr. Warfel [*Id.* at 42], a copy of which he provided to Mr. Spink under cover of his March 21, 2011 letter. [*Id.* at 48].

25.    Plaintiff denied having any conversations with Mr. Spink, or anyone else at Rite Aid, before mailing the March 21, 2011 letter, wherein plaintiff proclaims: "<u>I have a disability that will prevent me from becoming an immunizing pharmacist.</u>" [*Id.* at 50]. Notably, plaintiff could not recall any healthcare provider ever telling him he had a "disability" in this regard, and he admitted that that term was his and his alone, which he had come up with after researching the Americans with Disabilities Act online. [*Id.* at 51, 55]. Furthermore, plaintiff wrote in the aforesaid letter that "<u>because of this condition I would never even consider trying to become an immunizing pharmacist</u>" and "<u>I believe the Americans with Disabilities Act and Rite Aid HR 1.3 would direct the company to provide accommodation for me in this situation.</u>" [*Id.*] Plaintiff acknowledged that he was unaware of any other Rite Aid pharmacist receiving an exemption or exception from the immunization program. [*Id.* at 57].

26.    Plaintiff further testified that, after sending the aforesaid letter, he spoke with Mr. Spink within a month, at which point Mr. Spink expressed to him that he wanted him to attempt to go through the process of becoming an immunizer; to give it a try. [*Id.* at 62, 68]. More specifically, plaintiff testified as follows:

> Q.    What did he say to you and what did you say to him?
> A.    Other than general business, he – I believe he mentioned that everyone has to be an immunizer, and I told him of my concerns and anxiety and disability and he said that he really wants me to try it and go through

with it, the training.  And he was, you know, trying to convince me that
it wasn't bad and I could do it.

Q.   That was at the store where you worked?

A.   Yes.

Q.   And what did you say to him?

A.   I said I couldn't. [*Id.* at 68-69].

27.   Nonetheless, plaintiff further testified that he did not sign up for any of the

immunization training classes, which took place in April, May and June of that year. [*Id.* at 69-

70].  Thereafter, plaintiff recalled being approached by the front end District Manager, James

Carpenter, in August of 2011, which he described as follows:

Q.   When he took you in the break room to talk to you, was anyone else
present?

A.   Possibly Mr. Spink.  I can't remember.

Q.   Okay.  What did Jim Carpenter say to you and what did you say to him?

A.   He said that – I can't remember verbatim – He says, "Chris, we like you.
We want you to stay.  We want you to be able to – but you're going to
have to go through this training, you got to at least try."

Q.   Did Mr. Carpenter tell you that if you did not become certified, you
would not be able to keep your job as a pharmacist?

A.   I don't believe – I think it was intimated but I can't remember him
actually saying that.

Q.   Okay.  Was it your understanding when that conversation took place,
that <u>immunization was an essential job function</u> for a Rite Aid
pharmacist as that time?

Mr. Berman: Form of the question.

A.   <u>I -- I believe Rite Aid had made that as one of their duties.</u> [*Id.* at 71-72]
[Emphasis added].

28.   On the subject of pharmacist responsibilities, plaintiff admitted that in early

2011, Rite Aid had provided him with a copy of the pharmacist job description, entitled

"Essential Duties and Responsibilities," <u>which specifically identified administering</u>

<u>immunizations and required immunization certification as an essential job function.</u> [*Id.* at 60-

62].  Indeed, plaintiff testified as follows:

Q.   Mr. Stevens, can you take a look at that document?  Can you recognize
it?

A.    Yeah, I believe I saw this from Mr. Farley.

Q.    That's F-A-R-L-E-Y. Is that the <u>Rite Aid job description</u> that came out sometime during the late winter, early spring of 2011?

A.    I believe so. I believe this accompanied one of his e-mails, faxes.

Q.    Would you read number 2 on page 67 which is – what did we mark that as, C-1?

A.    <u>Build profitable business and script growth through recommended clinical programs including appropriate immunization</u> and when available, MTM Medical – Medication Therapy Management; DCS, Diabetes Care Specialist, and all ongoing other programs as identified.

Q.    Would you agree with me that pursuant to that <u>job description that a pharmacist had, that an essential job function for a pharmacist at Rite Aid would be administering immunizations</u>?

A.    Well, they – <u>the company did write that in there</u>. [*Id.* at 60-61] [Emphasis added].

\*   \*   \*   \*   \*

Q.    What was the heading above number 2? Read the heading for that section. What does it say?

A.    <u>Essential Duties and Responsibilities</u>. [Id. at 62] [Emphasis added].

29.    In any case, after providing Rite Aid with a form, at Rite Aid's request, containing additional information from Dr. Warfel as to his alleged phobia [*Id.* at 79-82], plaintiff testified that he met again with William Spink, James Carpenter, William Farley and Kyle Ortlieb at his store on August 18, 2011. [*Id.* at 83]. Plaintiff described this meeting, in pertinent part, as follows:

Q.    There were four gentlemen who were there and what transpired during that meeting? What did they say to you, what did you say to them?

A.    I believe Mr. Farley was pretty much the only one was speaking and he said that they, Rite Aid, had reviewed my claim and basically they did not – <u>Rite Aid did not believe that my disability qualified under the ADA, and also that no accommodation was necessary on their part, and it is a mandatory function as a pharmacist.</u>

Q.    Okay. Is it your position that up until this time no one from Rite Aid told you that you would be terminated if you did not undergo the program?

A.    I don't recall the actual wordage like that. I had received pressure from Mr. Spink and Mr. Carpenter to go through the training. They were quite insistent but I honestly can't recall them saying that if you don't do it, you're going to get fired.

Q.     All right.  And were you offered, during that meeting by Mr. Farley of
       anyone else, another chance to undergo the classes or to participate in
       the classes in order to keep your job?

A.     Yes.  I believe that was like an ultimatum; that I had to go through the
       training.

Q.     And what was your response to that?

A.     I said, "I don't think I can do it but I'll think about it," and – "I'll think
       about it."  I'll get --

Q.     Were you terminated during that meeting?

A.     No. [*Id.* at 84-85] [Emphasis added].

30.    Thereafter, plaintiff testified that he called Mr. Spink and left a voicemail
message on August 19, 2011 indicating that he would neither administer immunizations, nor go
through the requisite training program, which he clarified with Mr. Spink via a telephone
conversation on August 22, 2011. [*Id.* at 89].  On the next day, August 23, 2011, plaintiff again
met with Mr. Spink and Mr. Carpenter at the store, whereupon he was formally given a letter of
termination from Rite Aid. [*Id.* at 90].

31.    Plaintiff admitted that he never sought help or treatment for his "needle phobia,"
either before or after his termination from Rite Aid. [*Id.* at 82, 90].  In fact, plaintiff admitted
that he "didn't even think that it was something that was, quote, treatable" at the time [*Id.* at
82], and to date he has not received any treatment for "needle phobia." [*Id.* at 115].  However,
plaintiff did testify that he has recently become aware of "desensitization" therapy to help
overcome "needle phobia," notwithstanding the fact that he has no intention of trying such
treatment. [*Id.* at 115-116].

TESTIMONY OF WILLIAM SPINK:

32.    William Spink testified in his capacity as Pharmacy District Manager for Rite
Aid, with whom he has been employed for 15 years. [Exhibit "J" at 6-7].  He testified that he
was responsible for the pharmacy operations of the stores within his district, including staffing,

maintaining adequate customer service levels, inventory levels, payroll management, and pharmacy stock. [*Id.* at 27]. Mr. Spink further indicated that Rite Aid's Human Resources department would evaluate whether a claim of disability constituted a disability requiring an accommodation under Rite Aid's policy, and that William Farley was the Human Resources Manager for his district at the relevant time. [*Id.* at 37]. In his capacity as Pharmacy District Manager, Mr. Spink explained that he would implement decisions made by the Human Resources Department after they had made a determination. [*Id.* at 38].

33.     Mr. Spink testified that Rite Aid began offering immunizations in the pharmacy department in 2011 [*Id.* at 39], and that, as part of the new program, all pharmacists would be receiving training in order to perform immunizations. [*Id.* at 41, 45]. He confirmed that Pharmacy District Managers were responsible for implementing this new corporate policy, advising the individual pharmacists of same, and arranging for the requisite training. [*Id.* at 45].

34.     With regard to plaintiff, Mr. Spink testified that he was a Pharmacy Manager within his district, whom he had first met in 2010, about a year prior to Rite Aid's implementation of the immunization program within his district. [*Id.* at 45-46]. Mr. Spink confirmed that he had given the plaintiff a counseling development write-up in December of 2010 for poor performance with prescription volume as a Pharmacy Manager at that time [*Id.* at 51-52], but, apart from that one issue, that plaintiff was a highly respected Pharmacy Manager that did a great job. [*Id.* at 55].

35.     Mr. Spink confirmed that on March 4, 2011, he sent an e-mail to all of the pharmacists within his district, including plaintiff, advising of the aforesaid immunization program and indicating that Rite Aid would be signing up each pharmacist for training as an immunizing pharmacist. [*Id.* at 58-59]. Moreover, Mr. Spink testified as follows:

> Q.    Turning to the second page of Exhibit 7, you write: "Hi, team. I'm sure you're all aware by now that it's become industry standard." Tell me what you meant by that?
>
> A.    All of our clinical pharmacists probably were already aware, either through the reports that they read and drugstore news magazines that every store gets or CEs they've completed, done, as this was a topic among pharmacists for a while now; that immunization was going to become part of the industry standard or industry norm." [*Id.* at 61-62].

36.    Subsequently, Mr. Spink recalled receiving a doctor's note which indicated that plaintiff had "needle phobia" [*Id.* at 64-65]; that plaintiff told him he felt "very unable" to give immunizations [*Id.* at 66]; and that he recalled telling the plaintiff that he would turn it over to the Human Resources department. [*Id.*]. More specifically, Mr. Spink testified as follows:

> Q.    What did you do after you learned that Mr. Stevens had a claim that he was unable to give immunizations? What did you do?
>
> A.    Well, there was the letter or the doctor's note, I would have forwarded that onto the Human Resources manager.
>
> Q.    Who would that be?
>
> A.    Bill Farley.
>
> Q.    Did you have any discussions with Mr. Farley regarding Mr. Stevens' claim of disability?
>
> A.    Nothing more other than he had provided me with a letter or a note and I was forwarding it on to Bill Farley to proceed from there.
>
> Q.    Why were you forwarding it onto Mr. Farley to proceed?
>
> A.    Because any situations like this would have been handled through Human Resources. [*Id.* at 67-68].

37.    Mr. Spink denied having any conversations with Mr. Farley, or anyone else at Rite Aid for that matter, regarding whether plaintiff's purported "needle phobia" qualified as a disability, or whether he had such a condition in the first place. [*Id.* at 69-70]. Mr. Spink further testified that plaintiff was the only pharmacist that had not signed up for the immunization training [*Id.* at 75], and that he had met with plaintiff and Jim Carpenter at some point in July or August in order to advise plaintiff that they wanted him to at least attempt to go through the training program. [*Id.* at 79]. Thereafter, another meeting was held on August 18, 2011, which Bill Farley attended, wherein they again stressed that plaintiff should attempt the

training program, and that if he refused, he would not be permitted to remain with the company. [*Id.* at 80]. Ultimately, however, plaintiff refused to participate in the training [*Id.* at 83], and plaintiff was subsequently terminated from his employment with Rite Aid by virtue of his refusal to attend class training to perform immunizations. [*Id.* at 78].

TESTIMONY OF JAMES CARPENTER:

38.     James Carpenter testified in his capacity as District Manager, and indicated that he has been employed by Rite Aid for 31 years. [Exhibit "K" at 4, 9-10]. He has known of the plaintiff since the early '90s, and has been familiar with plaintiff since 2000, when he became District Manager of the district within which plaintiff worked as a pharmacist. [*Id.* at 11-12].

39.     Mr. Carpenter testified that he first learned plaintiff was alleging a disability in July of 2011 through discussions with Mr. Spink, which concerned a fear of needles. [*Id.* at 20, 22, 29]. As it happens, Mr. Carpenter had been out of work between April of 2011 and July of 2011 due to a medical leave of absence. [*Id.*]. Thereafter, Mr. Carpenter testified that he spoke with the plaintiff in an effort to encourage him to take the immunization training, as failing to do so could result in him losing him job. [*Id.* at 24]. He later became aware that plaintiff was claiming an ADA disability on or about August 18, 2011 [*Id.* at 26], and that Human Resources had a note from plaintiff's doctor regarding his fear of needles, on which they were working. [*Id.* at 29].

40.     Mr. Carpenter confirmed that a meeting was held with plaintiff, Mr. Spink, Mr. Ortlieb and Mr. Farley on August 18, 2011, the purpose of which was to again encourage plaintiff to undergo the mandatory immunization training. [*Id.* at 31-33, 35]. Plaintiff advised that he was going to think about it, though Mr. Carpenter later learned that he had decided not to take the training and, as a consequence, that he would be leaving the company. [*Id.* at 36-37].

TESTIMONY OF WILLIAM FARLEY:

     41.     William Farley testified that he was working for Rite Aid as the Human Resources Manager in 2011, and that he first met with the plaintiff on August 18, 2011. [Exhibit "I" at 7, 19]. Prior to that, he recalled receiving a letter that plaintiff had submitted to Mr. Spink, which essentially stated that he was not able to do immunizations. [*Id.* at 19]. He recalled first learning of Rite Aid's immunization program at some point in 2011, though he played no role in implementing same. [*Id.* at 25-26]. Mr. Farley further testified as follows:

> Q.    At the time – at that time what was Rite Aid's policy for dealing with claims under the ADA?
> A.    To gather information for the interactive process and submit it to corporate HR for review.
> Q.    That would be – that was your role?
> A.    To gather information, correct.
> Q.    Do you know what Rite Aid's policy was for dealing with the information you gathered, what did they, who did it?
> A.    They would research and do analysis to determine whether or not it was covered under the ADA.
> Q.    Do you know who did that?
> A.    Yes.
> Q.    Who?
> A.    It was Traci Burch and Jim Wickens.
> Q.    Do you know what their jobs were, job titles?
> A.    They were legal counsel.
> * * * * *
> Q.    What procedures did Rite Aid have in place to determine what, if any, accommodations could be made – could be made upon receipt of a request under the ADA?
> A.    We – I would receive a request and send it to our corporate HR for review.
> Q.    Who at corporate HR?
> A.    Traci Burch, Jim Wickens. [*Id.* at 21-22].

     42.     Mr. Farley confirmed that he forwarded all information from plaintiff to corporate HR via e-mail, as per the aforementioned procedure [*Id.* at 23], and he later received a response as to what actions to take via e-mail from Traci Burch. [*Id.* at 24]. Mr. Farley

further testified that, at the request of Ms. Burch, he had forwarded to plaintiff a set of questions to ask his physician, as part of the interactive process, which he received back from plaintiff and forwarded on to Ms. Burch. [*Id.* at 27, 29]. Thereafter, he recalled receiving a response from Traci Burch advising that plaintiff was not being excused from this essential job function [*Id.* at 29], and a meeting was arranged with the plaintiff, Mr. Spink, Mr. Carpenter and Mr. Ortlieb. [*Id.* at 32]. Specifically, Mr. Farley testified as follows:

> Q.   Tell me what you recall about that meeting, who said what, as best you can?
> A.   As I recall, when we went – we met with Mr. Stevens, Bill Spink informed him that he – the information that he was not being excused. It was not considered ADA. He asked him if he would then attend a future immunization (training).
> Q.   What did Mr. Stevens say?
> A.   I don't recall his exact words. I do believe he said he wanted to think about it. [*Id.* at 33].

43.   Furthermore, Mr. Farley denied having any conversations with anyone at Rite Aid regarding the basis for determining that plaintiff did not have an ADA-qualified disability, whether he thought plaintiff was disabled, or what accommodations, if any, could be provided. [*Id.* at 36]. Mr. Farley confirmed that plaintiff was given a letter of termination after he again refused to give immunizations or take a different position as a pharmacy technician. [*Id.* at 39]. Lastly, Mr. Farley testified that he recalled another pharmacist in this area being terminated by virtue of refusing to undergo immunization training, and that this other pharmacist was not claiming a disability. [*Id.* at 31].

TESTIMONY OF TRACI BURCH:

44.   Traci Burch testified in her capacity as Vice President of Labor Relations and Employment Counsel for Rite Aid. [Exhibit "M" at 5]. She described her duties as involving labor relations, HR compliance, associate relations, immigration and HR policy [*Id.*], as well as

providing legal advice and counsel. [*Id.* at 6]. As regards the plaintiff, Ms. Burch confirmed

that she provided legal advice, while Bill Farley handled the HR function. [*Id.*]. Notably, Ms.

Burch testified as follows:

> Q.   Are you aware that Mr. Farley testified that he merely conveyed
>       information to you and Mr. Wickens and received instructions and made
>       no decisions?
> A.   I am aware that he testified that I made the decision to terminate Mr.
>       Stevens' employment.
> Q.   Is that correct?
> A.   No.
> Q.   Who did?
> A.   The decision regarding Mr. Stevens was made prior to Mr. Stevens. And
>       let me explain what I mean by that.  <u>The company decided that
>       immunizing was going to be a requirement for all pharmacists across the
>       country.  So anyone who couldn't perform that essential job function
>       wouldn't be able to be a pharmacist.</u>  So there was a job requirement that
>       was established by the organization. [*Id.* at 7-8][Emphasis added].

45.     Furthermore, Ms. Burch testified that she provided legal advice to Mr. Farley on

how to engage in the interactive process with the plaintiff, which involved exchanging

communications with the plaintiff, both verbally and in writing. [*Id.* at 9].

46.     Ms. Burch confirmed that Jim Wickens is an attorney for Rite Aid that works on

her team, and she described his responsibilities as involving HR policy, immigration matters,

and HR Compliance. [*Id.* at 17]. She testified that Mr. Wickens also provided legal advice

relative to the ADA, as well as the interactive process in the field, in response to plaintiff's

ADA accommodation request. [*Id.* at 18]. With regard to the interactive process, Ms. Burch

testified that Rite Aid adheres to a policy of non-discrimination and non-harassment concerning

employees with disabilities, and that her role typically involves providing advice and counsel

about the Americans With Disabilities Act and engaging in the interactive process. [*Id.* at 19].

Along these lines, Ms. Burch testified as follows:

Q.   Tell me what you can tell me?

A.   Okay.  Mr. Farley reached out for assistance because he received a letter and a doctor's note from Mr. Stevens.  So Mr. Farley sought advice on how to proceed based upon the communication with Mr. Stevens.  I provided Mr. Farley advice and counsel on how to engage in the interactive process based on the letter and doctor's note that was received from Mr. Stevens by way of questions for him the engage Mr. Stevens in the interactive process.  And then Mr. Stevens again obtained another doctor's note in response to those questions that Mr. Farley shared with Mr. Stevens.  From there, Mr. Wickens, who you referenced before, really was the primary contact moving forward from there. [*Id.* at 20-21].

47.   Mr. Burch further explained that the purpose of engaging with plaintiff in the interactive process, upon receipt of his request, was to determine "whether or not there was any reasonable accommodation that could be provided in order for Mr. Stevens to perform the essential functions of the job as a pharmacist."  [*Id.* at 30].  More specifically, Ms. Burch testified as follows:

Q.   What reasonable accommodations were offered to Mr. Stevens?

A.   Going back to the earlier memo that was shared with Mr. Stevens by Mr. Farley, we asked Mr. Stevens that question relative to potential reasonable accommodations which I believe he gave to his doctor, that memo. <u>Mr. Stevens, again, declined to engage in any reasonable accommodation conversation.  He indicated he wasn't going to immunize.</u> [*Id.* at 52][Emphasis added].

48.   Nevertheless, Ms. Burch testified that Rite Aid considered attempting to reassign plaintiff to a larger volume store where staffing would necessitate assigning more than one pharmacist at a time, thereby obviating the need for plaintiff to immunize, but ultimately, due to location of plaintiff's region, overlapping dual pharmacists was not a reasonable option and would have required a reduction in plaintiff's hours that would have prevented him from staying with the company as full time employee. [*Id.* at 57-59].

49.   As regards plaintiff's termination, Ms. Burch testified as follows:

Q.    Going back to the decision to terminate Mr. Stevens, is it my understanding from you that the decision was made by Mr. Farley?

A.    Mr. Farley communicated the termination decision.  Again going back to the rollout of immunization as a business strategy and job requirement, as an organization, we determined that all of our pharmacists need to be able to immunize.  So it was a company decision.

Q.    Who specifically had the final say that Mr. Stevens was going to be fired?

A.    Mr. Farley.

* * * * *

Q.    Who made the decision that in Mr. Stevens' case no accommodation could be made?

A.    Mr. Wickens.

Q.    Mr. Wickens made the decision or gave legal advice?

A.    Mr. Wickens gave legal advice.

* * * * *

Q.    And is it your testimony that ultimately, the decision was Mr. Farley's to make?

A.    No.  It is my testimony that as an organization, we decided that immunization was a job requirement, and Mr. Stevens could not perform the essential functions of the job. [*Id.* at 64-66] [Emphasis added].

* * * * *

Q.    Were his performance reviews or his work history or anything that was discussed with you in connection with the processing of his requests for an accommodation?

A.    No.

Q.    Do you know if it was considered in making the determination to let him go?

A.    No.

Q.    You don't know?  I asked a bad question.  Was it considered in the determination of whether or not to let him go?

A.    Ultimately, the conclusion relates to his ability to perform the essential job functions of the job.  Of course, given his tenure with the organization,   we wanted to be thoughtful and careful and communicate respectfully.  So from that perspective, we want to have positive associate relations.  But ultimately his performance doesn't matter when he can't perform the essential function of the job. [*Id.* at 68-69].

TESTIMONY OF JAMES WICKENS:

50.    James Wickens testified in his capacity as Associate Counsel in Human Resources for Rite Aid. [Exhibit "N" at 4].  He became aware of plaintiff in 2011 upon receiving information and a doctor's note from the Human Resource Manager indicating that

plaintiff was refusing to attend "company sponsored and required immunization training classes and wanted to be excused from attending those classes." [*Id.* at 9]. Mr. Wickens reiterated that Rite Aid had made a company decision requiring all pharmacists to attend training and to become certified immunizing pharmacists. [*Id.* at 11].

51.   Mr. Wickens recalled instructing Bill Farley on how to engage in the interactive process with plaintiff, which involved a list of questions concerning what restrictions plaintiff claims to have; what accommodations, if any, plaintiff was seeking; and what essential job functions plaintiff claims to be restricted or limited in performing. [*Id.* at 12]. In response, Mr. Wickens recalled that plaintiff identified immunizing as his only restriction, and that he wanted to be excused from this essential job function altogether. [*Id.* at 22]. With regard to possible or proposed accommodations, Mr. Wickens testified that neither plaintiff, nor his doctor offered any, simply stating that plaintiff would be unable to administer immunizations under any circumstances, without more. [*Id.*].

52.   Ultimately, Mr. Wickens recalled that, after plaintiff had been repeatedly urged to undergo the requisite training, and since plaintiff was simply unwilling to attend any classes, or to become certified as an immunizer, let alone administer injections, it was determined that plaintiff would have to either accept another position within the company, such as a pharmacy technician, or his employment as a pharmacist would have to be terminated by virtue of his inability to perform this essential job function. [*Id.* at 34]. However, Mr. Wickens recalled that plaintiff did not want to work as a technician due to the rate of pay [*Id.* at 35], and in the absence of any other viable accommodation, there was no other choice but to terminate plaintiff's employment. [*Id.* at 41].

53.     With regard to the possible accommodation of overlapping pharmacists, consistent with Ms. Burch's testimony, Mr. Wickens recalled that this option was explored, but that due to the constraints of this region, there would be no way to ensure that plaintiff would not be working alone for at least part of his shift, in which case Rite Aid would not have an available immunizing pharmacist, as advertised. [*Id.* at 38-39]. As such, it was determined that overlapping was not a viable accommodation. [*Id.*].

54.     With regard to plaintiff's termination, Mr. Wickens testified as follows:

> Q.     Who made the decision to terminate Mr. Stevens?
> A.     That was a discussion that Bill Farley and I had after we sat down and discussed what responses from the doctor's note, the unwillingness of Mr. Stevens to attend any training class, that the only accommodation that he was requesting was to be excused from becoming a certified immunizing pharmacist, and, therefore, would not be able to immunize. I discussed with Bill Farley essentially three things. One is whether or not Mr. Stevens in my legal opinion was disabled as defined by the ADA. The second issue discussed was during the course of the interactive process, what restrictions did he have, and what accommodations was he seeking. And then the third part of that was with regard to giving him various opportunities to either go back to training, assume another position as a pharmacy technician, or if he didn't want the technician position and was unwilling to become a certified immunizing pharmacist, then we had no other alternative than to terminate his employment. I was involved in that decision with Bill Farley. [*Id.* at 40-41].

55.     Lastly, Mr. Wickens testified that he advised Mr. Farley that plaintiff's "needle phobia" did not constitute a recognizable disability under the American with Disabilities Act. [*Id.* at 43].

TESTIMONY OF RICHARD MOHALL:

56.     Richard Mohall testified in his capacity as Senior Director of Clinical Services for Rite Aid. [Exhibit "O" at 4]. He described his job responsibilities in this position as involving designing, executing, operating and training for clinical programs at Rite Aid [*Id.* at

5], and he explained that clinical programs "are the expansion of professional services and for the lack of a better term the new norm for the practice of pharmacy." [*Id.* at 7]. On this point, Mr. Mohall stated that the pharmacy profession is an ever-evolving endeavor, and that this evolution has seen pharmacists become more involved with "dispensing patient counseling and drug interaction," as well as into areas of "professional services including immunizations and around mediation therapy management, which includes things like a comprehensive medication review, medication action plan provided to patients, etcetera." [*Id.*]. Mr. Mohall further stated that the Centers for Disease Control and the American Pharmaceutical Association worked together on the initiative to have pharmacists trained and certified as immunizers nationwide insofar as there was "an unmet need and low immunizations rates in the United States." [*Id.* at 14-15].

57. Mr. Mohall testified that Rite Aid's immunization program began when he became Director of Clinical Services in 2007, and that training had been completed for all Rite Aid pharmacists to administer immunizations in 2011. [*Id.* at 9, 11-12]. He also recalled that Rite Aid pharmacists had already begun administering immunizations prior to 2007 in certain geographic localities [*Id.* at 14], and that being certified as an immunizing pharmacist became a mandatory corporate policy in early 2011, prior to training that commenced in April of that year. [*Id.* at 17-18].

TESTIMONY OF DR. MARK WARFEL:

58. Dr. Warfel testified that he practices family medicine, which involves the general care of patients of all ages [Exhibit "P" at 6], and that the plaintiff has been his patient since July of 2001. [*Id.* at 9]. Dr. Warfel confirmed that his medical chart for the plaintiff was devoid of any notations indicating plaintiff had a fear of needles, or any purported of "needle

phobia," until March 8, 2011, when plaintiff contacted his office to request a note concerning

symptoms associated with being needle phobic. [*Id.* at 10]. Nonetheless, while he did recall

that plaintiff had mentioned to him that "he did not like to get needles," Dr. Warfel confirmed

that plaintiff had had his blood drawn on multiple occasions; in fact, on a yearly basis, during

the course of treating plaintiff for screening health maintenance and PSA tests. [*Id.* at 11-12].

59.   Dr. Warfel recalled that plaintiff requested to see him in March of 2011

regarding his purported "needle phobia" in connection with his employment with Rite Aid. [*Id.*

at 16]. Tellingly, Dr. Warfel confirmed that the notation in plaintiff's chart, dated March 8,

2011, indicates that plaintiff, via his wife, wanted to know if his chart reflected that he gets

"very ill when he sees a needle." [*Id.* at 18]. Perhaps more tellingly, with regard to the next

notation in plaintiff's chart, Dr. Warfel testified as follows:

> Q.   Could you read that note for me?
> A.   Certainly, "Needs a doctor's note saying he is needle phobic. Has job
>       now requiring him to give flu shots. Could we provide this for him
>       saying he's unable to give flu shots because needles make him shake
>       when he gives blood, is nauseated and shaky? Isn't sure if he'll have a
>       problem giving shots." [*Id.* at 19].

60.   Interestingly, Dr. Warfel confirmed that he did not physically see and/or

examine the plaintiff in response to these notations, notwithstanding that he issued the plaintiff

a note stating "Mr. Stevens is needle phobic and cannot administer immunizations by

injection." [*Id.* at 21-22]. Furthermore, Dr. Warfel admitted that he never conducted any

formal testing of the plaintiff, despite the existence of such testing, to confirm that he was, in

fact, needle phobic, prior to issuing the aforesaid note. [*Id.* at 25-26].

61.   Thereafter, when Dr. Warfel examined the plaintiff for his yearly physical in

May of 2011, there was no discussion concerning any treatment for plaintiff's purported

"needle phobia," nor was there any testing conducted to confirm the existence of this condition.

[*Id.* at 27-28].  Dr. Warfel further testified that, in response to Rite Aid's request for further information concerning plaintiff's "needle phobia," as part of its interactive process, he wrote an additional note on May 24, 2011 stating "Mr. Stevens has a fear associated with receiving or watching bloods draws, hypodermic injections; he cannot watch surgical procedures or bleeding;" claiming he would become "diaphoretic, hypotensive and probably faint (vagal response;" and concluding "he cannot safely administer (immunizations)," despite never actually observing plaintiff react in this manner, or testing the plaintiff in order to elicit such a response. [*Id.* at 31-32].

62.    Perhaps more importantly, Dr. Warfel further testified as follows:

Q.    And then the note continues, correct?
A.    It's a new note.
Q.    And who wrote the note?
A.    That was also Theresa Lonczak –
Q.    Could you read it for us slowly?
A.    -- RN.  The note says: "Company wants him to at least attend a seminar on immunizations.  Wants a note stating Dr. Warfel feels going to a seminar on immunizations would have an adverse effect on his health status."
Q.    Does it go over to the second page?
A.    It does not.
Q.    That's a separate entry?
A.    Yes.
Q.    All right.  Now, did you review that – these notes?
A.    Yes.
Q.    And then did you, in your handwriting, add to this note going kind of up the side of it?
A.    I do.
Q.    Could you read that for us, please?
A.    It states: "I cannot do that.  Attending the seminar should not have a negative effect.  Giving shots **might**. [*Id.* at 43-44] [Emphasis added].
*  *  *  *  *
Q.    I'll represent to you that he did not attend any of the classes.  Would that be contrary to the advice that you would have given to your nurse to give to Mr. Stevens?
Mr. Berman: Form of the question.

      A.    <u>I did not direct him not to go to the class.  I indicated that I would not provide a note that said he could not go to the class.</u> [*Id.* at 44-45] [Emphasis added].

<u>RITE AID'S PHARMACY EXPERT, DR. HENRY COHEN:</u>

63.    Dr. Henry Cohen states in his report, dated May 18, 2014   [Exhibit "Q"][1] that immunization is taught at all colleges of pharmacy within New York State, and that immunization training is a basic requirement for graduation upon obtaining the Doctorate of Pharmacy Degree.   Furthermore, Dr. Cohen states that students of Albany College of Pharmacy, where plaintiff obtained his pharmacy degree, complete immunization training courses, which utilize the "American Pharmacist's Associations Pharmacy-Based Immunization Delivery Certificate," as part of the pharmacy curriculum and, notably, that "students cannot graduate without successfully completing this certificate-based course."  Dr. Cohen also notes that the two other largest pharmacy colleges in New York State – St. John's University College of Pharmacy and Health Sciences, and the Arnold and Marie Schwartz College of Pharmacy and Health Sciences – both require mandatory training and certification in administering injections. [*Id.* at 1].

64.    Dr. Cohen opines in his report that "[i]mmunization administration is part of the scope of practice of a licensed pharmacist in NY State," and that "[i]n present day contemporary pharmacy practice in NY State, immunization administration by a licensed pharmacist is a standard of care, and occurs routinely in almost all chain pharmacies and many independent community pharmacies." [Id. at 2-3].  Lastly, Dr. Cohen notes in his report that pharmacists in all fifty (50) States are permitted by law to administer immunizations, and that this has been the law of the State of New York since 2008. [*Id.*].

---

[1] Incidentally, plaintiff has failed to retain an expert witness in this matter to rebut the opinions and conclusions rendered by Rite Aid's pharmacy expert, Dr. Henry Cohen.

PLAINTIFF'S EXPERT, DR. FRANK M. DATTILIO, Ph.D., ABPP:

65.     Lastly, plaintiff's own expert, Dr. Dattilio, opines in his report, dated March 21, 2014 [Exhibit "R"], that plaintiff's "needle phobia" is "treatable with an intervention know as Cognitive Behavior Therapy and exposure de-sensitization," which he states is both affordable and "would not require long-term therapy." [Exhibit "R" at 16].   On this point, Dr. Dattilio notes in his report that up to 90 percent of individuals with such "phobias" "achieve clinically significant long-lasting improvement in as little as one session of behavioral treatment, namely exposure therapy," and that such phobias are among the most treatable of anxiety disorders. [*Id.*].

66.     Put simply, the testimony and evidence in record, coupled with the accompanying Memorandum of Law, eliminates any legitimate dispute as to whether moving defendants are entitled to summary judgment and, therefore, summary judgment and complete dismissal of plaintiff's Complaint should be entered in favor of the moving defendants pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

**WHEREFORE**, by virtue of the reasons set forth herein, as well as in the accompanying Memorandum of Law and Rule 7.1(a)(3) Statement, it is respectfully submitted that moving defendants' Motion for Summary Judgment be, in all respects, granted.   I hereby certify that the foregoing statements made by me are true.

Dated: New York, New York
       October 1, 2014

                                    Respectfully submitted,

                                    **RAVEN & KOLBE, LLP**

                        By:     _____
                                    Keith A. Raven (KR-8086)
                                    Attorneys for Defendants

ECKERD CORPORATION d/b/a RITE AID
and RITE AID CORPORATION s/h/a RITE AID
CORPORATION d/b/a "RITE AID"
126 East 56th Street, Suite 202
New York, New York 10022
Tel.: (212) 759-7466
Fax (212) 759-0166
File No.: 904-280-01

TO:

**HANCOCK ESTABROOK, LLP**
Attorneys for Plaintiff
CHRISTOPHER STEVENS
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202
Tel.: (315) 565-4500
Fax (315) 565-4600