UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER STEVENS,<br><br>                                    Plaintiff,<br><br>v.<br><br>RITE AID CORPORATION d/b/a RITE AIDE PHARMACY, a/k/a ECKERD CORPORATION, d/b/a RITE AID,<br><br>                                    Defendant. | **RESPONSE AND COUNTERSTATEMENT OF MATERIAL FACTS**<br><br>Civil Action No.:<br>6:13-CV-783 (TJM/DEP) |

Pursuant to N.D.N.Y. L.R. 7.1 (a)(3), Plaintiff, Christopher Stevens, hereby submits his Response and Counterstatement of Material Facts in response to Defendant's Statement of Material Facts [Dkt. 44-1] in support of its motion for summary judgment:

    1.    **STATEMENT**: Plaintiff was hired by moving defendants' corporate predecessor in 1977 Plaintiff was hired by moving defendants' corporate predecessor in 1977, and continued to work as a pharmacist for moving defendants, or one of its corporate predecessors, up until August 23, 2011, at which point he was terminated. [Exhibit "H" at 8-9, 10-13], Plaintiff first became aware that Rite Aid pharmacists were administering immunizations in 2007. [*Id.* at 14-15].

          **RESPONSE**: Plaintiff **DOES NOT DISPUTE** the truth and accuracy of this statement except with respect to the portion in which it is alleged that "Plaintiff first became aware that Rite Aid pharmacists were administering immunizations in 2007," which Plaintiff **DISPUTES**. Plaintiff's testimony was "I heard there was one pharmacist in the area who became an immunizer." (Dkt. 44-12 (Ex. H), p. 15).

{H2401755.2}

2.      **STATEMENT**: Plaintiff was never diagnosed with any type of phobia, including trypanophobia ("needle phobia"), plaintiffs alleged disability herein, at any point prior to learning that he would be required to become certified as an immunizer as a pharmacist for Rite Aid. [*Id.* at 16]. Plaintiff began treating with Dr. Warfel, his family doctor, at some point in his mid-40s (he is now 59 years old), and plaintiff has had blood drawn via a needle at least ten (10) times thereafter. [*Id.* at 20]. Plaintiff denied ever passing out as a result of having blood drawn; denied ever having to be hospitalized as result of having blood drawn or receiving an injection; and denied ever having any conversations with anyone concerning him actually having a phobia with regard to needles until March of 2011. [*Id.* at 21].

**RESPONSE**: Plaintiff **DISPUTES** the truth or accuracy of this statement to the extent that it is alleged that Plaintiff was "never diagnosed with any type of phobia, including trypanophobia ("needle phobia") . . . at any point prior to learning that he would be required to become certified as an immunizer." Dr. Warfel states in his declaration submitted in opposition to Plaintiff's motion, "[t]his contention, though technically true (if a writing is required to constitute a formal diagnosis), is exceptionally misleading. I have been aware of Mr. Stevens' needle phobia for many years prior to the events at issue in this case, despite the fact that I never documented his condition. (Warfel Decl., ¶ 6, Ex. 1; Warfel Dep., Dkt. 44-20 (Ex. P), p. 9, 1. 22-25, p. 10, 1. 5-21, and p. 28, 1. 2-8). Plaintiff **DOES NOT DISPUTE** the statement to the extent that it alleges that "Plaintiff has had blood drawn via a needle at least ten (10) times" and denied "having passed out" or being "hospitalized as a result of having blood drawn or receiving an injection," but **DISPUTES** the statement to the extent that he "denied ever having any conversation with anyone concerning him actually having a phobia with respect to needles until March 2011." In fact, Plaintiff testified that he probably had conversations regarding his fear of

needles with the nurses at Dr. Warfel's office each time he had blood drawn. (Warfel Dep., Dkt. 44-20 (Ex. H), p. 20, l. 19 - p. 21, l. 7).

3. **STATEMENT**: Plaintiff first learned that immunization training would be necessary to continue working as a pharmacist for Rite Aid in March of 2011, when he received an e-mail from Rite Aid Pharmacy District Manager, William Spink. [*Id.* at 33-34]. At that time, plaintiff was working at the Rite Aid store located at 1711 Genesee Street in Utica, New York, where he had been working since December of 2010. [*Id.* at 34].

**RESPONSE**: Plaintiff **DOES NOT DISPUTE** the statement technically reports his testimony in response to specific questions, but affirmatively states that he expected that Rite Aid would engage in the interactive process required to discuss and evaluate reasonable accommodation for Plaintiff's condition, and did not learn until August 2011 that Rite Aid would not engage in the interactive process, and would instead terminate his employment unless he received immunization certification. (Stevens Dep., Dkt. 44-12 (Ex. H), pp. 84-86; Stevens Decl., ¶¶ 19-20, 26-27).

4. **STATEMENT**: In response, plaintiff contacted Dr. Warfel's office and requested a note stating that he is "needle phobic" and, therefore, that he cannot administer injections. [*Id.* at 40-47]. Subsequently, plaintiff sent Rite Aid a March 21, 2011 letter, wherein plaintiff proclaims: "I have a disability that will prevent me from becoming an immunizing pharmacist." [*Id.* at 50]. Plaintiff could not recall any healthcare provider ever telling him he had a "disability" in this regard, and he admitted that that term was his and his alone, which he had come up with after researching the Americans with Disabilities Act online. [*Id.* at 51, 55]. Furthermore, plaintiff wrote in the aforesaid letter that "because of this condition I would never even consider trying to become an immunizing pharmacist" and "I believe the Americans with

Disabilities Act and Rite Aid HR 1.3 would direct the company to provide accommodation for me in this situation." [*Id.*]

**RESPONSE**: Plaintiff **DOES NOT DISPUTE** the statement.

5.  **STATEMENT**: In response to plaintiff's letter, Rite Aid engaged in the interactive process with plaintiff, which involved a list of questions concerning what restrictions plaintiff claims to have; what accommodations, if any, plaintiff was seeking; and what essential job functions plaintiff claims to be restricted or limited in performing. [Exhibit "N" at 12]. Plaintiff identified immunizing as his only restriction, and that he wanted to be excused from this essential job function altogether. [*Id.* at 22]. With regard to possible or proposed accommodations, neither plaintiff, nor his doctor offered any, simply stating that plaintiff would be unable to administer immunizations under any circumstances, without more. [*Id.*].

**RESPONSE**: Plaintiff **DISPUTES** the statement to the extent that it alleges that Rite Aid engaged in the "interactive process," and specifically **DISPUTES** that eventually submitting five (5) questions to Plaintiff's physician, (Dkt. 44-9 (Ex. E), pp. 21-23 (of 163)), and waiting for Plaintiff or his physician to suggest accommodations constitutes engagement in the interactive process.

6.  **STATEMENT**: After plaintiff had been repeatedly urged to undergo the requisite training, and since plaintiff was simply unwilling to attend any classes, or to become certified as an immunizer, let alone administer injections, it was determined that plaintiff would have to either accept another position within the company, such as a pharmacy technician, or his employment as a pharmacist would have to be terminated by virtue of his inability to perform this essential job function. [*Id.* at 34]. Plaintiff did not want to work as a technician due to the

{H2401755.2}                                       4

rate of pay [*Id.* at 35], and in the absence of any other viable accommodation, there was no other choice but to terminate plaintiffs employment. [*Id.* at 41].

**RESPONSE**: Plaintiff **DISPUTES THIS STATEMENT.** James Wickens, whose testimony (Dkt. 44-18 (Ex. N)) is cited in support of this statement, is testifying with respect to conversations he recalled having with William Farley, and his understanding of the communications which took place between Mr. Farley and Plaintiff (*id.* at pp. 33-35). Mr. Wickens never testified as to having had any direct contact with Plaintiff, and a review of the evidence in this case does not demonstrate that Mr. Stevens was ever offered a lab technician position or any other no-pharmacist position at Rite Aid. (Stevens Aff., ¶ 28; Farley Dep., Dkt. 44-13 (Ex. I), pp. 38-39; Spink Dep., Dkt. 44-14 (Ex. J), pp. 79-81; Carpenter Dep., Dkt. 44-15 (Ex. K), pp. 35-36; Ortlieb Dep., Dkt. 44-16 (Ex. L), pp. 19-20; Burch Dep., Dkt. 44-17 (Ex. M), pp. 32, 59-60).

7.  **STATEMENT**: Contrary to plaintiffs testimony otherwise, Dr. Warfel never told plaintiff that he could not undergo immunization training, and never advised the plaintiff that attending such classes would present an adverse health effect. In fact, Dr. Warfel refused to give plaintiff a note stating that he could not attend Rite Aid's immunization training classes, despite plaintiffs request for same. [*Id.*].

**RESPONSE**: Plaintiff **DISPUTES THIS STATEMENT,** to the extent that it alleges that Plaintiff testified that Dr. Warfel told him he could not undergo immunization training, and notes that there is no citation for this statement other than "[Id.]" which refers to Exhibit N (see Statement 5) which is the transcript of Mr. Wickens' testimony, Dkt. 44-18.

8.  **STATEMENT**: Prior to the events giving rise to plaintiff's lawsuit, Rite Aid's immunization program began in 2007, and such training had been completed for all Rite Aid

{H2401755.2}                                                5

pharmacists to administer immunizations in 2011. [Exhibit "O" at 9, 11-12], Rite Aid pharmacists had already begun administering immunizations prior to 2007 in certain geographic localities [*Id.* at 14], and being certified as an immunizing pharmacist became a mandatory corporate policy in early 2011, prior to training that commenced in April of that year. [*Id.* at 17-18].

**RESPONSE**: Plaintiff **DOES NOT DISPUTE** the statement.

9.   **STATEMENT**: Rite Aid decided that immunizing was going to be an essential job function and requirement for all pharmacists across the country, and anyone that could not perform that essential job function would not be able to be a pharmacist. [Exhibit "M" at 7-8]. Rite Aid's job description for Pharmacy Manager specifically identified administering immunizations and required immunization certification as an essential job function, which plaintiff acknowledged receiving prior to the events giving rise to this lawsuit. [Exhibit "D" "Immunization Program" dated February 2011; Exhibit "G" "Rite Aid Job Description for Pharmacy Manager;" Exhibit "H" at "60-62"].

**RESPONSE**: Plaintiff **DISPUTES THIS STATEMENT,** to the extent that the term "essential job function" is meant to refer to the term as used in the ADA, as amended, and accompanying regulations. Plaintiff further **DISPUTES THIS STATEMENT** based upon a review of "Rite Aid Job Description for Pharmacy Manager" (Dkt. 44-9 (Ex. E), pp. 26-28 (of 163)), which lists 16 "Essential Duties and Responsibilities" and does not include administering injections or performing immunizations,[1] and the other factors to be considered for determining the "essential functions" of the job. (*See* Plaintiff's MOL, Part II(A)(2)).

---

[1] The only mention of immunization in the "Essential Duties and Responsibilities" listed in the "Rite Aid Job Description for Pharmacy Manager" is in item "2" – "Build profitable business and script growth through recommended clinical programs including appropriate immunization and when available MTM (Medication Therapy Management), DCS (Diabetes Care Specialist), and all ongoing other programs as identified."

{H2401755.2}   6

10.     **STATEMENT**: Plaintiff never sought help or treatment for his "needle phobia," either before or after his termination from Rite Aid. [Exhibit "H" at 82, 90]. In fact, plaintiff is aware of "desensitization" therapy to help overcome "needle phobia," notwithstanding the fact that he has no intention of trying such treatment. [*Id.* at 115-116].

**RESPONSE**: Plaintiff **DISPUTES THIS STATEMENT,** to the extent that he did not learn of the availability of treatment until he consulted with Dr. Dattilio earlier this year, and is in the process of attempting to undergo treatment, although as a result of having lost his health insurance and income, may have difficulty paying for treatment. (Stevens Decl., ¶¶ 36-38).

11.     **STATEMENT**: Plaintiffs own expert, Dr. Dattilio, opines in his report, dated March 21, 2014 [Exhibit "R"], that plaintiffs "needle phobia" is "treatable with an intervention know as Cognitive Behavior Therapy and exposure de-sensitization," which he states is both affordable and "would not require long-term therapy." [Exhibit "R" at 16], On this point, Dr. Dattilio notes in his report that up to 90 percent of individuals with such "phobias" "achieve clinically significant long-lasting improvement in as little as one session of behavioral treatment, namely exposure therapy," and that such phobias are among the most treatable of anxiety disorders. [*Id.*].

**RESPONSE**: Plaintiff **DOES NOT DISPUTE** the statement.

12.     **STATEMENT**: Plaintiff filed a Charge of Discrimination with the EEOC on January 11, 2012 [Exhibit "A"], and plaintiff filed his Amended Complaint with this Honorable Court on July 22, 2013 [Exhibit "B"].

**RESPONSE**: Plaintiff **DOES NOT DISPUTE** the statement.

## ADDITIONAL MATERIAL FACTS

1. Immunization certification is not a requirement for a pharmacist license in New York State. (Stevens Dep., Dkt. 44-12 (Ex. H), p. 11, 1. 10-11; Berman Decl., ¶ 3, Ex. 1).

2. On February 22, 2013 the United States Equal Employment Opportunity Commission ("EEOC") issued a Determination on Charge No: 525-2012-00208 brought by Plaintiff against Rite Aid, finding that: (1) Plaintiff "suffers from trypanophobia, commonly referred to as 'needle phobia'" as a result of which "[w]hen exposed to needles this condition may cause severe physical reactions of high blood pressure, an elevated heart rate, a fast pulse a feeling of panic and fainting that would substantially limit him while working in the event that he had an attack while administering flu vaccine injections"; (2) Plaintiff "submitted documentation from his healthcare provider to support his request for an accommodation"; (3) "[a]fter [Plaintiff] submitted his request for an accommodation, [Rite Aid] mad a determination that he is not a qualified individual as defined by the ADA and denied his (4) Plaintiff "provided credible evidence . . . that he meets the criteria of a qualified individual with a disability and that he is protected by the ADA"; and (5) "there is reasonable cause to believe that [Rite Aid] has discriminated against Plaintiff based on his disability by denying him reasonable accommodation and discharging him in willful violation of the ADAA. (Berman Decl., ¶ 3, Ex. 1).

3. Mr. Stevens' condition, trypanophobia, is a formal diagnosis on Axis I of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) published by the American Psychiatric Association. (Dattilio Report, Dkt. 44-22 (Ex R), p. 15). It is listed under the category of "Specific Phobias," indicated as "Blood-injection-injury" (300.29) (F40.231) and is a bona fide disability affecting anywhere from 20 to 23 percent of the general population. (Id.; Dattilio Decl., ¶ 3).

4. The diagnosis of trypanophobia is a diagnosis which exists in the context of another disorder, namely Obsessive-Compulsive Personality Disorder ("OCD"), which is also a bona fide diagnosis under the DSM-V. (Dattilio Report, Dkt. 44-22 (Ex. R), pp. 15-16; Dattilio Decl., ¶ 6).

5. Mr. Stevens' specific condition of trypanophobia significantly restricts, if not all together precludes, him from performing any job that requires giving injections or drawing blood. (Dattilio Decl., ¶ 4). The vocation Mr. Stevens is unable to pursue encompasses numerous job classes within the field of medicine, including but not limited to the following jobs therein: physician, nurse, dentist, veterinarian, phlebotomist, ophthalmologist, anesthesiologist, oncologist, and paramedic. (*Id.*)

6. Upon observing injections or blood drawn, Mr. Stevens "is usually very anxious and distressed . . . and experiences diminished concentration and a general feeling of malaise." (Dattilio Report, Dkt. 44-22 (Ex. R), p. 11)

7. Mark E. Warfel, D.O., Mr. Stevens' primary care physician for almost two decades, was aware of Mr. Stevens' needle phobia for many years prior to the events at issue in this case. (Warfel Decl., ¶ 6, Ex. 1; Warfel Dep., Dkt. 44-20 (Ex. P), pp. 9-10, 28).

8. Mr. Stevens has always had difficulty with having his blood drawn which causes him to become nauseated, and shaky and apprehensive with increased heart rate and cold sweats. His symptoms start prior to the actual blood draw. (Warfel Decl., ¶¶ 6-7).

9. Administering injections is not among the 16 listed "Essential Duties and Responsibilities" in Rite Aid's April 2011 Pharmacy Manager job description. (Dkt. 44-9 (Ex. E), pp. 26-28 (of 163)).

10. Mr. Stevens was been a licensed pharmacist, employed by Rite Aid or its predecessors for over 30 years, and never once had to administer an injection. (Stevens Dep., Dkt. 44-12 (Ex. H), p. 11, l. 10-11).

11. Rite Aid's decision not to provide any accommodation to a pharmacist who was unable to administer injections was made before Mr. Stevens informed Rite Aid of his disability and request for accommodation. (Burch Dep., Dkt. 44-17 (Ex. M), p. 7, l. 19-25).

12. Rite Aid's alleged "interactive process" with Mr. Stevens regarding his disability and request for accommodation was limited to:

    a. After the immunization program was announced, William Spink, Rite Aid Pharmacy District Manager, received a letter dated March 21, 2011, together with a note from Dr. Warfel, from Mr. Stevens, asserting his claim of disability and requesting an accommodation under the ADA. (Spink Dep., Dkt. 44-14 (Ex. J), pp. 65-67; Dkt. 44-9 (Ex. E), pp. 19-20 (of 163));

    b. Mr. Spink then forwarded the information he received from Mr. Stevens to William Farley, Human Resources Manager. (Spink Dep., Dkt. 44-14 (Ex. J), pp. 65-67);

    c. Mr. Farley received the information from Mr. Spink and forwarded same to Traci Burch, Vice President of Labor Relations, and James Wickens, Associate Counsel Human Resources. (Farley Dep., Dkt. 44-13 (Ex. I), pp. 19-23);

    d. Approximately two months after Mr. Stevens first advised Rite Aid of his disability and request for accommodation, Mr. Farley signed and sent a letter to Mr. Stevens, which had been authored by Ms. Burch, asking Mr. Stevens to follow-up with Dr. Warfel to obtain answers to five questions regarding the doctor's note. (*Id.* at pp. 27-30); and

e. On August 18, 2011, four of Rite Aid managers (Mr. Spink, Mr. Farley, James Carpenter, District Manager, and Kyle Ortlieb, Human Resources Manager) met with Mr. Stevens to relay Rite Aid's determination that it did not consider Mr. Stevens' condition a disability under the ADA and that Mr. Stevens would not be excused or otherwise exempted from Rite Aid's immunization program. (*Id.* at pp. 28-33, 36).

13. There were several Rite Aid stores in Central New York between 2010 and 2012 staffed by more than one pharmacist at a time on certain days of the week. (Spink Dep., Dkt. 44-14 (Ex. J), pp. 20-27).

14. At the time of Mr. Spink's deposition on March 13, 2014, Rite Aid stores in Liverpool, Baldwinsville, Mattydale, and Massena all received similar overlap coverage throughout the week. (*Id.*).

15. Rite Aid considered attempting to reassign plaintiff to a larger volume store where staffing would necessitate assigning more than one pharmacist at a time, thereby obviating the need for plaintiff to immunize, but it chose not to do so. (*See* Raven Decl., Dkt. 44-2, ¶ 48 (citing Burch Dep., Dkt. 44-17 (Ex. M), pp. 57-59)).

Dated: November 7, 2014

HANCOCK ESTABROOK, LLP

By: _____
Daniel B. Berman, Esq. (Bar Roll No. 101149)
Robert J. Thorpe, Esq. (Bar Roll No. 517411)
*Attorneys for Plaintiff*
1500 AXA Tower I
100 Madison St.
Syracuse, New York 13202
Telephone: (315) 565-4500