1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF NEW YORK

3  ----------------------------------------------------------

4  CHRISTOPHER STEVENS,

5          -versus-                        13-CV-783

6  RITE AID CORPORATION d/b/a RITE AID PHARMACY,

7  a/k/a ECKERD CORPORATION, d/b/a RITE AID.

8  ----------------------------------------------------------

9            TRANSCRIPT OF JURY TRIAL

10  held in and for the United States District Court, Northern

11  District of New York, at the Federal Building, 445 Broadway,

12  Albany, New York, on January 15, 2015, before

13  the HON. THOMAS J. McAVOY, Senior United States District

14  Court Judge, PRESIDING.

15

16  APPEARANCES:

17  FOR THE PLAINTIFF:

18  HANCOCK, ESTABROOK LAW OFFICE

19  BY:  DANIEL BERMAN, ESQ.

20        ROBERT WHITAKER, ESQ.

21        ROBERT THORPE, ESQ.

22  FOR THE DEFENDANT:

23  RAVEN, KOLBE LAW OFFICE

24  BY:  KEITH RAVEN, ESQ.

25        RYAN DEMPSEY, ESQ.

1                    (Jury present)

2          THE COURT:  Morning, ladies and gentlemen.  Who do

3  you got for us?

4          MR. BERMAN:  Thank you.  I have Dr. Warfel for you.

5  He's live this time so I won't be reading his testimony.

6          THE COURT:  We're all thankful for that.

7          MR. BERMAN:  Doctor Mark Warfel.

8          THE CLERK:  Please come forward to be sworn.  Would

9  you tell us your name for the record, please.

10          THE WITNESS:  Mark E. Warfel.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Warfel – Direct

1   M A R K   W A R F E L, having been called as a witness, being

2   duly sworn, testified as follows:

3           THE COURT:  Mr. Berman.

4           MR. BERMAN:  Thank you.

5   DIRECT EXAMINATION

6   BY MR. BERMAN:

7   Q    Good morning, Dr. Warfel.

8   A    Good morning.

9   Q    Would you state your name and business address for the

10  record, please?

11  A    Mark E. Warfel, 4401 Middle Settlement Road,

12  New Hartford, New York 13413.

13  Q    What is your profession, sir?

14  A    I'm a family physician.

15  Q    Where?

16  A    In New Hartford, New York.

17  Q    Can you tell us your educational background?

18  A    I have a Bachelor of Science in pharmacy from

19  Massachusetts College of Pharmacy.  I have Doctorate of

20  Osteopathic Medicine from the University of New England,

21  College of Osteopathic Medicine.  I'm a graduate of the Saint

22  Elizabeth Family Medicine Residency Program and I've been

23  Board certified in family medicine since 1991.

24  Q    When did you get your osteopathic degree?

25  A    1988.

Dr. Warfel – Direct

```
 1   Q      Your pharmacy degree?

 2   A      1977.

 3   Q      Can you tell us about your work background, what you do

 4   today?

 5   A      Starting from when?

 6   Q      Well, starting from when you got your osteopathic

 7   degree.  When you became a doctor.

 8   A      Initially, I worked in the emergency department of one

 9   of the local hospitals in Utica for two-and-a-half years.

10   Q      Which one was that?

11   A      That was at Faxton Hospital at that time and then I

12   entered into a private practice with a group of three other

13   physicians and then I moved to the Saint Elizabeth Medical

14   Center employment in 2000.  At that time I became program

15   director for the family medicine residency program there

16   where we educate the last three years or the residency

17   training for graduate physicians in family medicine.

18   Q      And is that the position you still hold today?

19   A      It's one of them.  I'm also the director for medical

20   education for Mohawk Valley Health Systems and am the program

21   director for the residency program for family medicine and I

22   also practice.

23   Q      Did you ever work as a pharmacist?

24   A      I did.

25   Q      For how long?
```

Dr. Warfel - Direct

```
 1   A      Eight years.

 2   Q      And where was that?

 3   A      Alaska, in Vermont, Massachusetts and New York.

 4   Q      What type of pharmacy did you practice?

 5   A      I did hospital pharmacy, retail pharmacy.  I was a

 6   clinical consultant pharmacist and I was also director of

 7   pharmacy at a hospital.

 8   Q      How long have you been -- well, strike that.

 9          Do you treat Christopher Stevens?

10   A      I do.

11   Q      How long have you been treating Christopher Stevens?

12   A      I believe about two decades.

13   Q      When did you first become aware that Chris -- well,

14   strike that.

15          Do you have an opinion within a reasonable degree

16   of medical certainty with respect to whether Chris is afraid

17   of needles?

18   A      I do.

19   Q      And how did you form that opinion?

20   A      It was based on providing his care over those 20 years.

21   Chris never or was often resistant to having blood work done.

22   Did not want to receive immunizations himself because of fear

23   associated with needles, which he explained to me and so I've

24   known about it since that time.

25   Q      Have you had conversation, did you have conversations
```

Dr. Warfel – Direct

```
 1   with Chris about it?

 2   A     Yeah, we talked about it at his annual appointment when

 3   I would see him.

 4   Q     Was this something that you have noted in his records?

 5   A     I did note it in his records.

 6   Q     When was that?

 7   A     I would have to look but I believe it was around 2011.

 8   Q     Prior to 2011, you'd been treating him for how long?

 9   A     I guess about 15 years.

10   Q     Did you note it in his records before that?

11   A     No, I don't believe so.

12   Q     Were you aware of it before that?

13   A     Yes.

14   Q     When did you first become aware and make this diagnosis

15   with Chris?

16   A     I can't tell you the exact date but I can tell you it

17   was during the course of taking care of him and trying --

18   normally we recommend people getting screening lab work or to

19   receive immunizations, such as flu vaccinations.

20   Q     Is there a reason why you didn't note it in his record

21   prior to 2011?

22   A     It really did not, was not acquired to interfere

23   essentially with his function at that point.  It was

24   something we could manage and so I did not write it in there.

25   Q     Did you recommend treatment for Chris?
```

Dr. Warfel – Direct

1    A    I did not.

2    Q    Why not?

3    A    Because, in general, Chris is a healthy individual, did

4    not require interventions in terms of blood work very

5    frequently and the decision of vaccination is an individual

6    one.

7    Q    Are you aware what symptoms Chris suffered when faced

8    with needles?

9    A    Yes, I am.

10   Q    What symptoms were those?

11   A    He would become lightheaded, dizzy, he'd have an

12   increased heart rate and he'd get very anxious.

13            MR. BERMAN:  May I approach the witness, your

14   Honor?

15            THE COURT:  Yes, you may.

16   BY MR. BERMAN:

17   Q    Doctor, I'm going to show you what's in evidence as

18   Plaintiff's Exhibit 5.  Do you recognize that?

19   A    Once I get my glasses on I could.  Yes, I do.

20   Q    What is it?

21   A    It's a statement from a self written on a prescription

22   dated March 10, 2011 and it states Mr. Stevens is needle

23   phobic and cannot administer immunizations by injection.

24   Q    Why did you write this note?

25   A    He requested it for his employer.

Dr. Warfel – Direct

```
 1    Q      Do you know why?

 2    A      I believe at that time he was being asked to -- I think

 3    attend a course related to immunization administration.

 4    Q      Doctor, I'm going to show you --

 5           MR. BERMAN:  May I approach the witness?

 6           THE COURT:  Sure.

 7    Q      I'm going to show you Plaintiff's Exhibit 9 that's also

 8    in evidence and ask you to turn to the second page of that

 9    document, tell me if you recognize the second page?

10    A      I do.

11    Q      And what is that?

12    A      It's a memo to William Farley.  It was from Christopher

13    Stevens.  It asked to provide information which I did provide

14    as Mr. Stevens treating physician.

15    Q      Okay.  Now the handwriting on that document, is that

16    your handwriting?

17    A      That is.

18    Q      Did you complete that?

19    A      I did.

20    Q      Was Mr. Stevens with you or did you speak with

21    Mr. Stevens before completing that?

22    A      He was not with me when this form was completed, no.

23    Q      Can you read us the question, first the question and

24    then your answer starting with number one.

25    A      Sure.  First question is are there any other
```

Dr. Warfel – Direct

```
 1    restrictions or limitations resulting from your term
 2    trypanophobia?  And I put Mr. Stevens has a fear associated
 3    with receiving or watching blood draws, hypodermic
 4    injections.  He cannot watch surgical procedures or bleeding.
 5    Q     And the second question.
 6    A     Are there any other tasks, other than delivering
 7    immunizations by injection, that Christopher cannot do?
 8    Please see the attached pharmacist job description for
 9    summary of task.  I put heavy lifting can cause pain related
10    to his spermatocele and low back pain.
11    Q     And question three and your answer?
12    A     Does Christopher have any other phobias other than
13    delivering immunization by injection?  The answer is, he's
14    afraid of heights.
15    Q     Question number four.
16    A     What would the effects on Christopher be if he were to
17    administer an immunization by injection?
18    Q     What was your answer to that?
19    A     He would become diaphoretic, hypotensive and probably
20    faint and in parentheses, vagal response.
21    Q     Can you explain to us what those terms mean?
22    A     It would mean that diaphoresis becomes sweaty and
23    hypotensive, his blood pressure would drop and fainting is I
24    think understood.
25    Q     And then question number five and your answer to that?
```

Dr. Warfel – Direct

```
 1   A      Are there any accommodations that would enable
 2   Christopher to perform the essential pharmacy function of
 3   administering immunization by injection?  Please be specific
 4   so we can consider any reasonable suggestions you propose.
 5   My response was he cannot safely administer.  Consider the
 6   scenario of Christopher Stevens trying to inoculate a person
 7   and fainting as the needle is placed into the skin.  This
 8   would be unsafe for the patient and for Mr. Stevens.
 9   Q      Now, was that -- what did you base that conclusion on?
10   A      This is based on my history of treating Mr. Stevens and
11   discussions that we had had over the years that I did treat
12   him.
13   Q      When -- strike that.  When did you next have any
14   contact with Mr. Stevens regarding his needle phobia, do you
15   know?
16   A      I'd have to look at the record.  I can't recall dates
17   and times.  I treat too many patients.
18          MR. BERMAN:  May I hand him our binder?
19          THE COURT:  Yes, you may.
20   Q      Dr. Warfel, I'm going to show you what's has been
21   marked for identification as Defendant's 12.  Do you
22   recognize that as your records?
23   A      Yes, I do.
24   Q      Would referring to those help you refresh your
25   recollection?
```

Dr. Warfel – Direct

```
 1   A      It does.
 2   Q      Would you take a look through those and see if that
 3   refreshes your recollection?
 4   A      The next time I actually saw Mr. Stevens was 5/18/2012.
 5   Q      Did you have any communication with Mr. Stevens
 6   regarding his needle phobia in August of 2011?
 7   A      I did.
 8   Q      Okay.
 9   A      I should say the office did.
10   Q      The office did.  And you got a message from him, did
11   you not?
12   A      Yes.
13   Q      And you responded to that message?
14   A      I did.
15   Q      At least you wrote a note on the message, is that
16   correct?
17   A      That's right.  The normal process in the office would
18   be a patient would call.  This type of question would go to a
19   nurse.  The nurse would communicate to the patient, probably
20   would communicate with me directly and then I would issue a
21   response, unless I felt it was something I needed to speak
22   directly with the patient about.
23   Q      And does that refresh your recollection as to what the
24   communication was and what your response was?
25   A      Yes.
```

Dr. Warfel – Direct

1  Q      Can you tell us what the communication was and what

2  your response was?

3  A      Basically, Mr. Stevens called with a question about his

4  disability stating he would need a statement, would like to

5  speak to a nurse about this.  The nurse wrote the company

6  wants him to at least attend the seminar on immunizations,

7  wants a note stating Dr. Warfel feels going to a seminar on

8  immunizations would have an adverse effect on his health

9  status.  And I entered a response that I cannot do that.

10 Attending the seminar should not have a negative effect.

11 Q      Did you say something else?  Did you conclude with

12 something about administering?

13 A      I say then on the next line, giving shots might.

14 Q      Was it your opinion at that time that Christopher

15 Stevens could not give shots?

16 A      Yes.

17 Q      And was that an opinion you had within a reasonable

18 degree of medical certainty?

19 A      Yes.

20 Q      And for the same reasons that you articulated in your

21 response to those five questions?

22 A      Yes.

23 Q      Are you familiar with -- you did not recommend

24 treatment for Christopher, is that correct?

25 A      I did not.

Dr. Warfel – Cross

```
1   Q     Are you familiar with desensitization --

2   A     I am.

3   Q     -- training?  Tell me what you know about that?

4   A     I can't say I'm an expert on the actual desensitization

5   treatment itself.  I know it's available but I have not, in

6   my practice, had a patient with successful desensitization

7   treatment.

8   Q     At least for needle phobia?

9   A     Well, for most any phobia.

10  Q     So that was not a treatment you considered necessary,

11  necessary or effective for Chris at the time?

12  A     I did not.

13         MR. BERMAN:  Thank you, Doctor.

14         THE COURT:  All right.  Mr. Raven, you may

15  cross-examine.

16         MR. RAVEN:  Thank you, your Honor.

17  CROSS-EXAMINATION

18  BY MR. RAVEN:

19  Q     Take a second to set up here.  Good morning, Doctor.

20  A     Good morning.

21  Q     We've met before, correct?

22  A     Yes.

23  Q     We met in your office back on July 2, 2014?

24  A     Correct, I believe.

25  Q     And that's the time I took your deposition, correct?
```

Dr. Warfel - Cross

1   A      Correct.

2   Q      All right.  Now, Doctor, Mr. Berman gave to you a copy

3   of your office records for Mr. Stevens, correct?

4   A      Yes.

5   Q      Okay.  And those are in front of you now?

6   A      Yes.

7   Q      All right.

8          MR. RAVEN:  I do not believe that Mr. Berman

9   offered those into evidence, your Honor.  At this time I'm

10  going to, pursuant to stipulation, offer those records into

11  evidence.  It's Defendant's 12.

12         MR. BERMAN:  No objection, your Honor.

13         THE COURT:  Receive Defendant's 12 in evidence.

14         MR. RAVEN:  Could I give the original copy to the

15  witness?

16         THE COURT:  Sure.

17         MR. RAVEN:  Is it okay to take this one away from

18  him?

19         THE COURT:  Okay.

20  BY MR. RAVEN:

21  Q      Dr. Warfel, I've handed you a copy of your office chart

22  for Mr. Stevens.  It's the same one we used for your

23  deposition, okay?

24  A      Okay.

25  Q      It's the same one that Mr. Berman just showed you but

Dr. Warfel - Cross

```
 1   now they're in evidence, okay.  Let me just backup for a
 2   moment.  You were Chris Stevens doctor since 2001, correct?
 3   A    I believe it predates that as well.  Those records were
 4   related to the private practice I was in so I don't have
 5   access to those.
 6   Q    You've known him quite a while?
 7   A    I have.
 8   Q    And he has come to you from time to time for annual
 9   visits, checkups?
10   A    Yes.
11   Q    And perhaps if he had an illness, a cold, flu,
12   something like that?
13   A    Yes.  For any episodic care that might occur.
14   Q    And, Doctor, would it be fair to say that, and I think
15   your records start with us at 2001, that's what we received
16   from you.  From 2001 up until March of 2011, is there any
17   single notation before March 8 of 2011 in your notes
18   indicating that Mr. Stevens has a fear of needles?  It
19   actually says that?
20   A    I don't believe there is, no.
21   Q    And the first time that you ever made a notation in
22   your records as to Mr. Stevens fear of needles was on March 8
23   of 2011, is that correct?  If you can turn to P 718.  Make it
24   a little quicker.
25   A    I appreciate that.  Yes.  I believe that's correct.
```

Dr. Warfel – Cross

1   Q     And that's your first notation and that's after

2   Mr. Stevens called your office and spoke to your staff saying

3   that he needed a note indicating that he had a fear of

4   needles, correct?

5   A     That's correct.

6   Q     So there's nothing before that?

7   A     Not that I know of.

8   Q     All right.  Now, you've indicated that in your opinion,

9   with a reasonable degree of medical certainty, that

10  Mr. Stevens has needle phobia, correct?

11  A     That's correct.

12  Q     All right.  You are not a psychologist, correct?

13  A     No.

14  Q     You are not a psychiatrist?

15  A     No.

16  Q     All right.  And you don't treat needle phobia, correct?

17  A     I do not.

18  Q     All right.

19  A     That's not to say that I don't have patients that have

20  phobias.  It means I don't provide specific treatment for

21  those phobias.

22  Q     And if you did suggest treatment, you'd refer them to

23  somebody else?

24  A     That's correct.

25  Q     You didn't refer Mr. Stevens to anybody?

Dr. Warfel - Cross

```
 1    A      I did not.
 2    Q      Now, over the years between 2001, up until March of
 3    2011, you sent your patient for certain laboratory tests,
 4    correct?
 5    A      Yes.
 6    Q      And some of those tests included on an annual basis
 7    PSAs, correct?
 8    A      There would be, depending on his age at the time, there
 9    might have been a PSA test.
10    Q      Keep your voice up.
11    A      Depending on his age, there might have been PSA.  I
12    would have the to look.
13    Q      Just take a look through.  Could you explain to the
14    jury what PSA is?
15    A      Prostate-Specific Antigen.  It's a blood marker that
16    may have an association with prostate cancer screening.  It's
17    not a perfect test but it is routinely used.
18    Q      Okay.  Does it require the withdrawing of blood?
19    A      It does.  Since these are not in the order I keep them
20    in the paper chart, maybe you can refer.
21    Q      I think we found that out at the deposition.  This is
22    the order we got them from your office though.
23    A      There's a PSA test which is on page 669 which is dated
24    July 6, 2006.  There's one also dated July 18, 2007.
25    July 15, 2008.  There was blood work on July 1, 2009 although
```

1  it's obscured by a piece of paper on the copy.

2  Q    Doctor, I know you're reading at the same time, if you

3  can keep your voice up so the jury can hear you.

4  A    July 7, 2010, there's a PSA test.  May 5, I'm sorry.

5  May 18, 2011, a PSA test.

6  Q    All right.  Doctor, you can stop right there.  Would it

7  be fair to say from approximately 2006 onward, Mr. Stevens

8  was sent for a PSA test that required the drawing of blood?

9  A    Yes.

10  Q    And that wasn't done in your office, that was done in

11  an outside lab, Saint Elizabeth, the lab?

12  A    Well, depending which draw station, there is a draw

13  station in my office so....

14  Q    Did you ever draw blood from Mr. Stevens to perform a

15  PSA test, you personally?

16  A    Personally, no.

17  Q    Did you ever observe Mr. Stevens have his blood drawn

18  for a PSA test in your office?

19  A    I did not.

20  Q    All right.  Now, in addition to the PSA test, did you

21  also send Mr. Stevens to have his blood drawn for a CBC, for

22  a blood count?

23  A    This was through that lab work, there was more than

24  just a PSA test on some occasions.

25  Q    All right.  So that required also the drawing of blood

Dr. Warfel - Cross

1   from Mr. Stevens, correct?

2   A      Same process, yes.

3   Q      All right.  And you personally did not do that,

4   correct?

5   A      That's correct.

6   Q      And that wasn't done in front of you.  It was done

7   someplace else, correct?

8   A      Correct.

9   Q      Now, would it be fair to say that from at least 2001 up

10  through and before March 8 of 2000 and including March 8 of

11  2011, when Mr. Stevens asked you for the note about being

12  needle phobic, that you never personally observed him get an

13  injection, is that correct?

14  A      That's correct.

15  Q      You never injected him?

16  A      I did not.

17  Q      And you never saw him have his blood drawn for any

18  reason whatsoever?

19  A      Not to my knowledge.

20  Q      All right.  So on March 8, 2011 Mr. Stevens called your

21  office, correct?

22  A      He did.

23  Q      And he spoke to somebody who answers your phone,

24  correct?

25  A      He did.

Dr. Warfel – Cross

```
 1   Q     And I want to take you to that March 8 note.  If you
 2   could turn to P 718, please.
 3   A     Okay.
 4   Q     Now, first of all, on March 8 of 2011, does that note
 5   indicate who called?
 6   A     Yes, it does.
 7   Q     And who called?
 8   A     Elinor called.
 9   Q     Who is Elinor?
10   A     Mr. Stevens' wife.
11   Q     All right.  And what does the message say?  If you
12   could read that slowly to the jury.
13   A     Question about having blood work done, gets very ill
14   when he sees a needle.  Is this in his chart?
15   Q     All right.  Now was it, in fact, in his chart?  I think
16   you told it wasn't before March 8.
17   A     There is an entry on his summary of care sheet that
18   does show needle phobia but there is no date on that.  I
19   can't tell you specifically on that.  That was when we were
20   still paper lords.
21   Q     You can't say before March 8, 2011?
22   A     I cannot.
23   Q     Is there an indication that your nurse called
24   Mr. Stevens on that same day?
25   A     Yes.
```

Dr. Warfel - Cross

1  Q     All right.  And is that in the response section of that

2  note of March 8?

3  A     That is.

4  Q     All right.  And could you read that to the jury,

5  please?

6  A     Needs a doctor's note saying he is needle phobic.  Has

7  job now requiring him to give flu shots.  Could we provide

8  this for him saying he's unable to give a shot because

9  needles make him anxious when he gives blood.  I'm not sure

10  what the word is actually.  When he gives blood.  Is

11  nauseated and shaking.  Isn't sure he'll -- isn't sure if

12  he'll have a problem giving shots.

13  Q     Now, Doctor, I want you to focus for a moment on that

14  last sentence.  Isn't sure if he'll have a problem giving

15  shots.  Now, you told this jury based upon your recollection

16  in your notes that you believe that he was needle phobic in

17  terms of himself getting shots, correct?

18  A     Correct.

19  Q     All right.  And in that note it specifically says from

20  your nurse that he isn't sure if he'll have a problem giving

21  shots.  That information came directly from Mr. Stevens to

22  your nurse, correct?

23  A     I can't confirm it came from Mr. Stevens.  It came from

24  the caller, in this case it was Elinor, unless the nurse

25  talked directly to Mr. Stevens at that time.  The note

Dr. Warfel – Cross

```
1    doesn't indicate that.

2    Q    But it was communicated to your office, correct?

3    A    It was communicated, yes.

4    Q    And after that notation was put in your chart, you then

5    issued a short letter on a prescription pad which I think you

6    have in front of you indicating that Mr. Stevens could not

7    administer immunizations, correct?

8    A    On March 10?

9    Q    On March 10.

10   A    Yes.

11   Q    And, Doctor, that note seems to contradict the last

12   sentence on P 719, correct?  Because whoever called in says

13   isn't sure if he'll have a problem giving shots.

14        MR. BERMAN:  Objection, your Honor.

15        THE COURT:  Basis?

16        MR. BERMAN:  Contradicts.

17        THE COURT:  Well, it's up to the jury to decide

18   whether or not those statements contradict one another.  He

19   used that word in asking the question.  I've instructed the

20   jury that the lawyers' questions are not the evidence but the

21   witnesses' answers are.  So he characterizes it that way.

22   The jury's going to hear what the doctor knew and what was

23   told in the note.  They can decide whether or not there's

24   contradiction or not as they feel.

25        MR. RAVEN:  Was it sustained, Judge?
```

Dr. Warfel - Cross

```
 1              THE COURT:  No.  I apologize.  I'll give you a

 2   quick one if you want from now on.

 3              MR. RAVEN:  That's fine.  I think I get it.

 4   BY MR. RAVEN:

 5   Q    All right.  Doctor, could you answer that question?

 6   A    Could you repeat the question, please.

 7   Q    Sure.  The note that you gave on behalf of Mr. Stevens

 8   that he could not immunize, does that contradict what is

 9   written in your chart, that last sentence on P 719, isn't

10   sure if he'll have a problem giving shots.  Does it

11   contradict it?

12   A    I don't believe it contradicts it, no.

13   Q    So you went ahead and you issued the note saying he

14   can't immunize, correct?

15   A    I did.

16   Q    And when you did that, you did not examine Mr. Stevens

17   on that date, correct?

18   A    Not on that day.

19   Q    So from the time that phone call came in on March 10 to

20   the time you issued the note on March 10, you didn't see

21   Mr. Stevens?

22   A    Between March 8 and March 10, no.

23   Q    You didn't talk to Mr. Stevens, correct?

24   A    I did not talk to him personally.

25   Q    And you knew that his job was now requiring him to
```

Dr. Warfel – Cross

1   attend classes for immunizations, correct?

2   A     I did not know that was required.  I know he had sent

3   the message about a -- he was asked to go to a course.

4   Q     Okay.  Well, if he was asking you for a note excusing

5   him from the classes, did you assume that he was being

6   required to go to the classes?

7   A     I really didn't think that was my concern.  He's asking

8   me whether he should be giving immunizations and from our

9   prior history, I did not think he should be giving

10  immunizations.  Simply because it's not in the record does

11  not mean we haven't discussed it.  There are many things I

12  discuss with patients behind closed doors that do not go into

13  their medical records of a personal nature, some other issues

14  that would not be germane to their actual --

15  Q     My only question is:  You didn't see him, you didn't

16  talk to him before you issued that note?

17  A     I had been seeing him and talking to him for 20 years.

18  Q     I'm only asking between those two dates.

19  A     I did not see him between those two dates.

20  Q     All right.  Now, after you issued that note and

21  indicated he couldn't immunize, and you're of the opinion he

22  had needle phobia, did you send your patient for any

23  treatment?

24  A     I did not.

25  Q     Okay.  Did Mr. Stevens ever call you and say hey, look,

Dr. Warfel - Cross

```
 1   my job's now requiring me to have, to do the immunizations
 2   and my job's at stake, can you send me for treatment?  Is
 3   there treatment?  Did he ever ask you?
 4   A     I don't have any phone messages to that regard.
 5   Q     Okay.  Have you ever referred any other patients for
 6   treatment for needle phobia?
 7   A     I have not.
 8   Q     Okay.  Have you sent any of your patients for treatment
 9   for any phobias?
10   A     Yes.
11   Q     What type of phobias?
12   A     For snakes.
13   Q     I'm sorry?
14   A     Snakes.
15   Q     Anything else?
16   A     No.  Snakes.
17   Q     By the way, this needle phobia that you diagnosed, I
18   think I heard you correctly, you told the jury it doesn't
19   affect him in his daily life unless he's exposed to a needle,
20   correct?
21   A     That's part of a definition of phobia.
22   Q     So this doesn't affect him on a daily basis, would you
23   agree?
24   A     Right.
25   Q     And it doesn't affect anything else he does in life,
```

Dr. Warfel – Cross

1   it's only when he's exposed to the needles?

2   A     Two things with phobia can be exposure to stimuli or

3   can also be thinking of the stimuli.

4   Q     Let's move up to May 20, 2011.  You were asked to

5   provide answers to five questions, correct?

6   A     Would you reference that, please.

7   Q     It was actually, I think it was in Exhibit 9 and it's

8   also in your records, if I'm correct.  It's on P 726.

9   A     The same document?

10  Q     Yes.  The same document.  All right.  And that is --

11  that's contained in your records as well, correct?

12  A     Yes, it is.

13  Q     Now, Doctor, I want to focus on question number five

14  for a moment.  Just refresh the jury's recollection on that.

15  Just read the question again.

16  A     Are there any accommodations that would enable

17  Christopher to perform the essential pharmacy function of

18  administering immunization by injection?  Please be specific

19  so we can consider any reasonable suggestion you may propose.

20  Q     Okay.  Now, when you answered that question, you

21  already had a note in your chart from March 8 of 2011

22  indicating that you weren't -- that the patient, himself,

23  wasn't sure whether he'd be able to administer immunizations

24  or shots, correct?  You already had that note in your chart

25  that's March 8?

Dr. Warfel – Cross

1   A     Documentation by the nurse, yes.

2   Q     That's something you would generally rely upon, notes

3   from yours nurse?

4   A     Well from that and from my taking care of Mr. Stevens

5   for over 20 years.

6   Q     Now, when you answered that question you were under the

7   understanding, were you not, that what his employer was

8   asking, is there something that you would recommend for your

9   patient so that he would be able to perform the immunizations

10  which was part of his job.  Was that your understanding?

11  A     Yes, that was.

12  Q     All right.  And you were of the opinion as of May 24,

13  2011 that there's nothing his employer could do so that he

14  could perform immunizations, is that correct?

15  A     So he cannot perform them safely.

16  Q     So he couldn't do them?

17  A     Correct.

18  Q     If he can't do them safe, he can't do them?

19  A     Not just his safety but the safety of the person being

20  immunized.

21  Q     This would have been, in your opinion, dangerous for

22  the patient and dangerous for Mr. Stevens?

23  A     Yes.

24  Q     So when you answered that question and the employer was

25  asking you to provide recommendations, there's nothing that

Dr. Warfel - Cross

1    you can recommend at that point that would enable him to do

2    those immunizations or at least to advise his employer as to

3    what they can do for him, correct?

4    A    That's correct.

5    Q    All right.  And I believe you said that

6    desensitization, that's not something that you do, correct?

7    A    That's correct.

8    Q    And it's not something that you had ever recommended a

9    patient for?

10   A    Concerning needle phobia?

11   Q    In terms of any phobia.

12   A    I had sent people for treatment for phobias in the

13   past.

14   Q    Did that involve desensitization?

15   A    It has.

16   Q    But you'd never sent anybody for needle phobia before?

17   A    I did not.

18   Q    Are you aware that during the course of this litigation

19   in approximately March of 2014 Mr. Stevens' attorneys sent

20   him to the somebody, Dr. Dattilio, to render an opinion as to

21   his needle phobia?

22   A    I'm not aware of that, no.

23   Q    Well, you met -- Dr. Dattilio's going to testify next.

24   You met him this morning?

25   A    I did.

Dr. Warfel - Cross

```
 1    Q      You continue to treat and see Mr. Stevens after March

 2    of 2000 and May of 2011, correct?

 3    A      Yes.

 4    Q      And you see him up until today?

 5    A      I sure hope so.

 6    Q      All right.  At any time that you saw Mr. Stevens from

 7    the time that you answered those questions in May of 2011 up

 8    until today, did Mr. Stevens, your patient, ever tell you I

 9    saw a Dr. Dattilio who recommended some treatment for me?

10    A      Not that I recall.

11    Q      Okay.  Do you recall Mr. Stevens telling you that

12    anyone recommended desensitization behavioral modification to

13    treat his needle phobia?

14    A      No.

15    Q      As far as you know, you're Mr. Stevens' internist --

16    you're the only doctor that he sees?

17    A      I'm a family physician.  As far as I know I'm his

18    family care doctor, not an internist.

19    Q      When you wrote the answers to the questions in May of

20    2011, did you consult with Mr. Stevens?

21    A      No, I did not.

22    Q      You didn't call him?

23    A      I did not.

24    Q      Okay.  Did you talk to his wife Elinor?

25    A      No.  I had seen him in May of that year.
```

Dr. Warfel - Cross

1    Q      Okay.  So when you wrote those notes you just did it

2    based upon whatever conversation you had had in the past with

3    him and your records, correct?

4    A      Yes.  I believe records show he had a physical in May

5    of 2011 I believe.  May 13.

6    Q      All right.  Now, when Mr. Stevens asked you to write

7    the note in March of 2011, did he tell you that he was simply

8    being asked to go to classes?

9    A      I did not have a conversation with Mr. Stevens about

10   that.

11   Q      Was there any notation in your records from your nurse

12   or anyone else indicating that he was being asked to go to a

13   class sponsored by his employer?

14   A      There was a notation on that phone message that we

15   talked about.

16   Q      All right.  Now, I want to move up to your note of

17   August 19 of 2011.  If you can turn to that and that,

18   unfortunately, its Bate stamp wasn't on it, it's actually

19   P 630.  It doesn't have the Bate stamp in your notes but it's

20   right after P 629.  Do you have that?

21   A      Yes, I do.

22   Q      Now on August 19, 2011, does that note indicate that

23   someone called your office regarding Mr. Stevens?

24   A      It does.

25   Q      Does it say who the caller was?

Dr. Warfel - Cross

```
 1   A       It would be Mr. Stevens in this case.

 2   Q       All right.  So he, himself, called?

 3   A       Yes.

 4   Q       All right.  And there's a message section there.  Could

 5   you read that to the jury?

 6   A       The message from Mr. Stevens, has questions about

 7   disability.  May need statement.  Would like to speak to

 8   nurse about this.

 9   Q       All right.  And then there's a response.  Who wrote the

10   response?

11   A       One of the nurses in my office.

12   Q       Okay.  And do you know what that -- where that response

13   came from?  In other words, was there a further conversation

14   with Mr. Stevens?

15   A       Yes.  The nurse -- the way the messaging again occurs

16   in the office, the patient would call, it would initially go

17   to one of our nonclinical people and referred to the nurse to

18   get more information from the patient and return the call.

19   Q       I'm going to ask you to bear with me for a moment.

20   Read that response.

21   A       The company wants to him at least attend a seminar on

22   immunization, wants a note stating Dr. Warfel feels going to

23   a seminar on immunizations would have an adverse effect on

24   his health.

25   Q       And then up the side again, if you could read to the
```

Dr. Warfel - Cross

1    jury what your response was to that?

2    A    I cannot do that.  Attending the seminar should not

3    have a negative effect, giving shots might.

4    Q    All right.  So, Doctor, as of August 19, 2011, would

5    the be fair to say that this note reflects that Mr. Stevens

6    was asking for a note excusing him from the seminars?

7    A    Yes.

8    Q    Saying that he can't go?

9    A    Yes.

10   Q    Okay.  It doesn't indicate in the this note that he

11   asked for some type of release saying that he could go to the

12   class, correct?

13   A    Well, no, this didn't ask if he could go.  Didn't need

14   my permission to go.

15   Q    Mr. Stevens has testified before this jury that he

16   called your office on August 19, 2011 asking for a release

17   saying that he could go to the classes.  Your note does not

18   reflect that?

19   A    What was the date, please?

20   Q    On August 19, 2011.  Same date of your note.

21   A    No, that's not what's recorded there.

22   Q    All right.  As a matter of fact it says just the

23   opposite.  He was asking for a note saying he couldn't go to

24   the seminar?

25   A    Correct.

Dr. Warfel - Redirect

1   Q     And you were of the opinion with a reasonable degree of

2   medical certainty that this would not be harmful for him to

3   at least go to the classes on the immunization, correct?

4   That was your opinion?

5   A     Correct.

6   Q     Did you communicate that to Mr. Stevens?

7   A     I didn't personally communicate.  The nurse would have

8   communicated.

9   Q     And that was your practice to have the nurse

10  communicate that to the patient, Mr. Stevens?

11  A     Correct.

12        MR. RAVEN:  Thank you, sir.  I have no further

13  questions.

14        THE COURT:  Redirect?

15        MR. BERMAN:  Just a few, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. BERMAN:

18  Q     Sticking with the August 19 message, your response does

19  still opine that he can't give the shots, does it not?

20  A     Yes.

21  Q     He can't give the immunizations whether he can attend

22  the class or not?

23  A     That's correct.

24  Q     You were asked if your March 10 note was somehow

25  contradictory to the message that lead you to write it and

Dr. Warfel – Redirect

```
 1   you said it was not.  Was your March 10 note your opinion?

 2   A     Yes.  Yes, it was.

 3   Q     The responses that you gave to the questions, those

 4   were your opinions?  The May 24 response.

 5   A     Yes.

 6   Q     Within exhibit?

 7   A     Nine.

 8   Q     Nine.  If you can take a look at that.  Would you check

 9   the date you signed that?

10   A     May 24, 2011.

11   Q     Now, the questions were not your words, were they?

12   A     They were not.

13   Q     Were you responding to the questions?

14   A     That's correct.

15   Q     So that the phrase essential function in question five

16   was not your phrase, was it?

17   A     It was not.

18   Q     Would it be fair to say that with your response to

19   Exhibit 5 you were just answering if there was anyway he

20   could give immunizations?

21   A     That's correct.

22   Q     In terms of the effect that Chris' needle phobia had

23   upon him, did it cause him to avoid things?

24   A     Yes.

25   Q     What types of things did it cause him to avoid?
```

Dr. Warfel – Redirect

```
 1    A      He did not get a flu vaccination on a regular basis.

 2    He did not want to have the blood work done on a regular

 3    basis, so we were usually able to prevail to get lab work

 4    done.

 5    Q      And did it cause him to avoid other situations where

 6    shots or needles, where he might be exposed to shots or

 7    needles?

 8    A      There weren't any other ones in my practice other than

 9    related to his immunizations.

10    Q      And your answers are limited to just your experience

11    with Chris, not how it affected him outside of your practice,

12    is that correct?

13    A      That's correct.

14            MR. BERMAN:  Thank you, Doctor?

15            THE COURT:  Mr. Raven, anything further?

16            MR. RAVEN:  I have nothing further, your Honor.

17            THE COURT:  Thank you, Dr. Warfel.  You may step

18    down, sir.

19            THE WITNESS:  Thank you.

20                (Witness excused)

21            THE COURT:  Mr. Berman?

22            MR. BERMAN:  Thank you, your Honor.  Call Dr. Frank

23    Dattilio.

24            THE COURT:  Didn't we have a conference in chambers

25    regarding Dr. Dattilio?
```

Dr. Warfel – Redirect

1           MR. BERMAN:  Yes, we have to do an offer of proof.

2           THE COURT:  Ladies and gentlemen, I have to ask you

3    to step aside.  I have some questions of the attorneys as to

4    what's to come next and we'll take care of that.

5               (Jury excused)

6           MR. BERMAN:  We have Dr. Dattilio, your Honor.

7           THE COURT:  You call him as a witness and we'll

8    have him sworn.

9           THE CLERK:  Doctor, please come forward to be

10   sworn.  Would you state your name for the record, please.

11          THE WITNESS:  It's Dr. Frank M. Dattilio,

12   D-A-T-T-I-L-I-O.

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Dattilio – by the Court

1    F R A N K   D A T T I L I O, having been called as a witness,

2    being duly sworn, testified as follows:

3              THE COURT:  This procedure is not an unusual one.

4    Sometimes when experts render opinions on various topics,

5    there's a disagreement between plaintiff's side and

6    defendant's side as to what essentially is going to be your

7    testimony and in order for me to allow certain questions to

8    be asked and answered, I have to understand basically what

9    you're going to say in general.  I mean, I'm not going to do

10   any in depth.

11             THE WITNESS:  I understand.

12             THE COURT:  Here there was mention in your report

13   of not only the trypanophobia which is the fear of injections

14   or needles, depending on who you talk to, but also there was

15   mention of obsessive compulsive behavior.  You use language

16   that would lead me to believe that there was some connection

17   between the two or perhaps the plaintiff had both problems

18   but they weren't in any way connected or one didn't grow out

19   of the other or was exacerbated by the other.  I'd like to

20   hear what your explanation of that would be.

21             THE WITNESS:  Sure.  Do you want an open response

22   or the response to his question?

23             MR. BERMAN:  No, respond to the Judge's question,

24   please.

25             THE WITNESS:  Okay.  All right.  In this particular

Dr. Dattilio – by the Court

1   case, Mr. Stevens has obsessive compulsive disorder which is

2   part of his personality disorder and was there prior to the

3   development of any specific phobias that he experienced,

4   namely fear of heights, fear of needles, blood, et cetera.

5   So in this particular case, and I emphasize that, the OCD,

6   Obsessive Compulsive Disorder, existed first and the others

7   came second to that based on his experiences in his life and

8   what manifests it or maintains it is the obsessive compulsive

9   characteristics of his personality that contributes to him

10  being resistant in certain areas.

11          THE COURT:  Okay.  Well that helps.  As I

12  understand it, you also opined that the obsessive compulsive

13  behavior is a neurological problem, is that right?

14          THE WITNESS:  Well, it can have -- it substrates in

15  neurological functioning.  We find that individuals are sort

16  of hot wired, if I may use that term, to be obsessive

17  compulsive.

18          THE COURT:  So that's genetic rather?

19          THE WITNESS:  Well, correct.

20          THE COURT:  All right.  In this case it's your

21  opinion that was the plaintiff's situation?

22          THE WITNESS:  Yes.  I believe that's the way he's

23  wired.  That's the type of individual he is.

24          THE COURT:  All right.  Well thank you, Doctor.  I

25  don't want to probe any further.  I don't want to get into

1    what the direct or the cross would be.  That's up to you guys

2    but I think I needed to establish those things to allow him

3    to testify before this jury and I would listen to argument

4    from either side as to whether or not he should be allowed to

5    express the opinion.

6           MR. RAVEN:  Can we do that outside the presence of

7    the witness?

8           THE COURT:  Sure.

9           MR. BERMAN:  Can I ask him a couple questions

10   though before we do that?

11          THE COURT:  You can.

12   DIRECT EXAMINATION

13   BY MR. BERMAN:

14   Q     Doctor, is it your opinion that the trypanophobia

15   arises out of the OCD?

16   A     In this case, yes.

17   Q     Can you explain that?

18   A     Yes.  Because he is a very conscience individual and he

19   is very control oriented, so he doesn't like situations in

20   which he's often out of control and when he sees a needle or

21   an injection or blood is drawn, there's a sense of

22   surrendering or helplessness.  That's a good part of his

23   makeup.

24   Q     Does it also affect -- the trypanophobia, does it

25   affect his ability to give an injection?

Dr. Dattilio - Cross

1    A    Yes.  More so particularly he has to look at what he's

2    doing.  When one has to receive an injection or blood drawn

3    they can look away, they can wait for the stick.  When you're

4    actually administering an injection you have to look at what

5    you're doing and be conscious and that's where he's got a lot

6    of problems.

7              MR. BERMAN:  Thank you.

8              THE COURT:  Mr. Raven.

9    CROSS-EXAMINATION

10   BY MR. RAVEN:

11   Q    Dr. Dattilio, can a person have OCD without having

12   trypanophobia?

13   A    Absolutely and vice versa.  An individual can have

14   trypanophobia without OCD.

15   Q    And prior to your seeing Mr. Stevens, had you ever seen

16   any medical records reflecting that Mr. Stevens had OCD?

17   A    Never.

18             MR. RAVEN:  Thank you.

19             THE COURT:  All right.  Do you want to have

20   argument outside the presence of the doctor now?

21             MR. RAVEN:  Yes, please.

22             THE COURT:  I think it's easier, if you don't mind,

23   we'd ask you to step down and exit the room.  We can go in

24   the back room but there's another judge there who might take

25   umbrage.  Thank you very much, sir.

```
 1                (Witness exits courtroom)

 2          THE COURT:  We will hear Mr. Raven first because

 3   he's objecting to testimony.  I think I understand what the

 4   doctor's going to stay.

 5          MR. RAVEN:  Your Honor, I think it is so

 6   prejudicial at this point to allow a jury to hear a diagnosis

 7   of a condition that can exist in and of itself without

 8   trypanophobia, something that was not presented to Rite Aid

 9   as a disability.  They would have no way of knowing about it,

10   being able to consider it in terms of a reasonable

11   accommodation.  More importantly, even if their analysis were

12   it qualifies as an ADA disability, there's going to be

13   testimony in this case from Jim Wickens, he was questioned on

14   this at his deposition as to how he came to the conclusion,

15   at least from Rite Aid's perspective, whether this patient

16   had or Mr. Stevens had an ADA disability as defined under the

17   statute.  They never got to consider whatsoever that this

18   gentleman may or may not have the OCD and to now allow the

19   jury to take that into consideration, something that Rite Aid

20   could never consider, is so different from just evaluating

21   the trypanophobia and a phobia, whether it qualifies under

22   the ADA.  I believe that Dr. Dattilio's testimony is

23   something that if it gets before the jury, Rite Aid just has

24   no way of responding to that whatsoever and at this point to

25   allow it to come in and then say Rite Aid's testimony is
```

Stevens vs Rite Aid

```
 1   going to be -- we only evaluated the trypanophobia.  We never
 2   knew about it.  He never advised us.  He had never certainly
 3   been diagnosed with it.  It's so prejudicial and I believe it
 4   really should not be permitted to come before this jury under
 5   403.  It was never even diagnosed until after the litigation
 6   got started and more, importantly, diagnosed by an expert,
 7   not even a treating physician.
 8           THE COURT:  Mr. Berman.
 9           MR. BERMAN:  The trypanophobia, the fear of
10   needles, which Rite Aid was aware of, Dr. Dattilio testified
11   is an offshoot, came from an underlying condition but they're
12   related.  Rite Aid had, Rite Aid did not ask for any
13   diagnosis.  They didn't ask for any medical records.  They
14   asked five questions.  I don't believe under the ADA you're
15   required to provide a complete medical diagnosis.  They
16   didn't ask to examine.  They didn't ask what the details
17   were.  Dr. Dattilio's report was provided many months ago.
18   They had, Rite Aid had every opportunity to have him examined
19   and to look into this and they haven't done so.  But
20   underlying this most importantly is Dr. Dattilio's testimony,
21   Mr. Stevens suffers from trypanophobia.  His trypanophobia
22   comes from his OCD.  And how his trypanophobia works is
23   related to the fact that this is from OCD as opposed to maybe
24   some other cause.  But it's one condition, the disability is
25   the trypanophobia but the details of Mr. Stevens'
```

Stevens vs Rite Aid

1   trypanophobia include the fact that it's based on OCD.

2           THE COURT:  Well, I think there's -- when the

3   defendant argues about Rite Aid not being able to properly

4   classify Mr. Stevens before they fired him because they

5   didn't know about the OCD, they only knew about the

6   trypanophobia, I think that is problematic but it misses the

7   mark because I don't even think Mr. Stevens knew he had OCD

8   until Dr. Dattilio diagnosed him with that, so he couldn't

9   have disclosed that nor could Dr. Warfel have disclosed that

10  to Rite Aid because they didn't know about it.  And the

11  problem -- the thing I see basically, I don't think the OCD

12  really makes any difference.  I think the whole thing is

13  about the fear of needles even though it arises out of an

14  underlying neurological -- he didn't really -- he skirted

15  that one but arising out of a neurological problem that he

16  calls Obsessive Compulsive Disorder and so I just think

17  that's a background thing.  I don't think that is any more

18  telling on what the jury's decision is going to have to be in

19  this case.  So under 403 I'm going to rule that the probative

20  value is not exceeded by the prejudicial effect and I'm going

21  to allow him to testify to that.

22          MR. RAVEN:  Can I respond to that?

23          THE COURT:  Certainly you can respond.

24          MR. RAVEN:  Mr. Berman raises something very

25  interesting.  He says that Rite Aid could have examined him.

Stevens vs Rite Aid

```
 1   They could have asked for Dr. Warfel's records.  Under the
 2   ADA and under the interactive process, they asked the
 3   treating physician, Dr. Warfel, what his condition was.  They
 4   don't have -- they, the employer, doesn't have the obligation
 5   to look through all of his medical records and even if they
 6   did, it still wouldn't have been there.  But more
 7   importantly, if there are many conditions, psychological
 8   conditions and neurological conditions that qualify under the
 9   ADA, depression, anxiety, OCD could be one of those.
10             THE COURT:  Right.
11             MR. RAVEN:  And what I'm afraid is that this jury
12   could just take that fact alone, something that Rite Aid
13   never got to consider when they did their research to
14   determine whether they believe they had -- Mr. Stevens had an
15   ADA disability.  The jury could, in fact, take the OCD alone,
16   without the trypanophobia, and determine that he has an ADA
17   disability.  How prejudicial, how more prejudicial can you
18   get?  They could hang their hats on that alone.  Judge, if
19   this case does go up to the Second Circuit --
20             THE COURT:  Is that a threat?
21             MR. RAVEN:  Well, no, no.  That's not what I meant,
22   but if somebody else does consider this, now you've
23   interjected another factor into this case that Rite Aid never
24   had an opportunity to evaluate.
25             THE COURT:  I understand your argument.  You have
```

Stevens vs Rite Aid

```
 1   some good points but Rite Aid did have an opportunity.  Once
 2   Rite Aid came into possession of Dr. Dattilio's report, they
 3   had all the opportunity in the world to order, to ask for a
 4   deposition and go through all this stuff with him but you
 5   didn't do that.
 6           MR. RAVEN:  That wasn't my point.  That's
 7   completely different from what I'm arguing.
 8           THE COURT:  Maybe it is but it's important to me.
 9           MR. RAVEN:  The issue is what was presented to Rite
10   Aid at the time Mr. Stevens presented his ADA claim.
11   Anything that happened during the course of the litigation,
12   the jury doesn't consider.  If there's another diagnosis
13   that's made tomorrow, the jury doesn't consider that.
14   It's -- the issue is what was the employer faced with at the
15   time and at the time that they terminated him.  They were not
16   facing under any circumstances a diagnosis of OCD.  They had
17   no way of knowing it.  Even if they had asked Dr. Warfel, he
18   wouldn't have known and now the diagnosis is made after the
19   fact, after the termination, after the litigation is started.
20   How can we ask a jury to consider what Rite Aid was facing
21   when they didn't know about it and even if they had sent him
22   for 14 exams, which they're not obligated to do, who says
23   they're going to diagnosis him with OCD.  They didn't have an
24   obligation to examine him at the time.  They had an
25   obligation to ask questions of his doctor.  So now to allow a
```

Stevens vs Rite Aid

```
 1   diagnosis to come in after the fact is, I think, the most
 2   prejudicial thing that could ever happen in this case.
 3             THE COURT:  Well, that's okay.  You can argue that.
 4   You can argue that to the jury but my ruling is that it's not
 5   and I'm going to allow the Doctor to put it before the jury.
 6   There's no way anybody could have told Rite Aid he had OCD
 7   until Dr. Dattilio diagnosed it recently.  That doesn't mean
 8   this can't go before a jury and to say the jury's going to
 9   decide this case based on OCD, as opposed to trypanophobia,
10   is pure speculation.  I don't know that.  You don't know
11   that.  You hope that's not the case.  I don't know what's
12   going to happen.  What's the jury's going to do.  Every time
13   I try to divine that I'm wrong.
14             So my ruling is that this underlying
15   diagnostic fact was discovered when Dr. Dattilio examined him
16   way after he was fired by Rite Aid, but that doesn't mean it
17   can't come before the jury as the doctor's opinion as to how
18   the trypanophobia was anchored in the obsessive compulsive
19   disorder.  I don't know how else to say it.  I'm not going to
20   say it again.  That's my ruling.
21             MR. RAVEN:  Thank you.
22             THE COURT:  You have an exception.
23             MR. RAVEN:  Thank you, your Honor.
24             THE COURT:  Although you don't need one.
25             MR. RAVEN:  That's why I didn't do it.
```

Dr. Dattilio - Direct

1          THE COURT:  Bring the jury in.

2              (Jury present)

3          THE COURT:  All right, Mr. Berman, do you have a

4    witness to call for us.

5          MR. BERMAN:  I do.  May I leave the courtroom for

6    one moment to grab Dr. Dattilio?

7          THE COURT:  Sure.  No kibitzing.

8          MR. BERMAN:  No kibitzing, your Honor.

9          THE COURT:  The doctor has been sworn, ladies and

10   gentlemen, so we don't need to swear him again.  He's under

11   oath.

12   DIRECT EXAMINATION

13   BY MR. BERMAN:

14   Q     Good morning, Doctor.

15   A     Good morning.

16   Q     Would you state your name and business address for the

17   record, please?

18   A     Yes.  It's Dr. Frank M. Dattilio, D-A-T-T-I-L-I-O.  All

19   one word, no apostrophe.  My address is Suite 3904D, as in

20   David, 1251 South Cedar Crest, two words, Boulevard,

21   Allentown, Pennsylvania 18103.

22   Q     And can you tell us your professional credentials, sir?

23   A     I am a clinical and forensic psychologist.

24   Q     What degrees do you have?

25   A     I have a PhD in clinical psychology.  I also have a

Dr. Dattilio – Direct

1    certificate of post doctoral training fellowship through

2    Department of Psychiatry at University of Pennsylvania School

3    of Medicine.

4    Q      Where did you receive your PhD and when?

5    A      I received my PhD from Temple University in

6    Philadelphia in 1986 and subsequently my post doctoral

7    training in fellowship through the Department of Psychiatry

8    at the University of Pennsylvania School of Medicine.

9    Q      And your post doctoral, tell us about your two post

10   doctoral fellowships?

11   A      One is in the field of cognitive therapy through the

12   department of psychiatry in which I underwent training for

13   the treatment of anxiety disorders, depression and

14   personality problems.  I later returned though for another

15   fellowship in the department of psychiatry in forensic

16   psychiatry/psychology where I was trained in the assessment

17   of forensic matters, both civil and criminal.

18   Q      What licenses and certifications do you hold?

19   A      I'm licensed as a psychologist in the State of New

20   York, New Jersey, Pennsylvania and Delaware.  I'm also Board

21   certified by the American Board of Professional Psychology.

22   Q      And what present positions do you hold?

23   A      Well, aside from being a clinical and forensic

24   psychologist in private practice, I'm on the faculty of

25   psychiatry at Harvard Medical School in Boston.  I'm also

Dr. Dattilio – Direct

1   with the Department of Psychiatry at the University of

2   Pennsylvania School of Medicine in Philadelphia.

3   Q     Can you tell us about your clinical experience?

4   A     Well, I have -- I've been in the field about 35 years.

5   Close to it.  I always conducted psychotherapy practice of

6   treatment, anxiety and depression, couples and family

7   problems.  During the course of that time I was also actively

8   involved in clinical assessment and later became involved in

9   conducting assessments for courts, both on the federal and

10  state level.

11  Q     Going back to your faculty positions at University of

12  Pennsylvania and Harvard, what is it that you teach at those

13  institutions?

14  A     Okay.  My appointment is Department of Psychiatry at

15  Harvard.  I have taught in the residency training program, so

16  when psychiatrists go through medical school, they go through

17  four years of residency training and I taught the last two

18  years of that PGY, post graduate year, three and four.  And I

19  will teach them particular techniques and assessment and

20  treatment of anxiety, depression, family and couples

21  problems.

22        In addition to that, I've also been part of the

23  program of psychiatry and just this past year I started as a

24  consultant to the Harvard Law School, they have what's called

25  a trial advocacy program, so they take young lawyers like

Dr. Dattilio – Direct

1    this man when they're in their third year of law school.

2    Q      Did you say young?

3           THE COURT:  He said like.

4    A      I said like.  In their third year of law school and we

5    train them on how to conduct effective direct and

6    cross-examination so that when they go out into the field

7    they know, particularly with medical and

8    psychiatric/psychological experts.  The University of

9    Pennsylvania, I supervise psychiatrists for many years who

10   were part of the program of cognitive therapy so they're

11   learning techniques for treating depression and anxiety and

12   other disorders and more recently in the past 10, 12 years,

13   I've been teaching in the forensic psychiatry fellowship

14   program.  So after a psychiatrist goes through medical school

15   for four years and they complete their psychiatric residency

16   for four years, they can opt to go through a fifth pathway or

17   fellowship in a specific area.  It could be sleep medicine,

18   it could be different types and one is forensic psychiatry.

19   So I teach that program.  I also supervise and research in

20   both areas.

21   Q      How about professional publications of books or

22   articles, can you tell us about those?

23   A      Yeah.  I have about 300 publications that include

24   books, articles, chapters, many of which are on anxiety

25   disorders, treatment of such.  Some are in the forensic

Dr. Dattilio – Direct

1    field.  My works have been translated to about 30 languages

2    used in aiding countries and training programs.

3    Q      Do you have any specific education, training assessment

4    and treatment of anxiety disorders?

5    A      Yes.  I've been fortunate to have some of the best

6    training in the world.  I worked under a Joseph Wolpe,

7    W-O-L-P-E, MD.  He was a psychiatrist at Temple University.

8    He was known as the father of behavior therapy.  He was one

9    of the leaders that developed the specific treatments for

10   phobias and anxiety disorders.  And then I later went to work

11   with the father of cognitive therapy, Aaron Beck, B-E-C-K.

12   He's also a psychiatrist.  He was at the University of

13   Pennsylvania and that focused on the combination of cognitive

14   and behavioral treatment for anxiety behavior disorders,

15   depression and couples and family relationships.

16   Q      And by the way, is Mr. Stevens' trypanophobia, is

17   trypanophobia such a disorder?

18   A      Yes.  That's T-R-Y-P-A-N-O-P-H-O-B-I-A for the record.

19   Q      What does that mean in layman's terms?

20   A      Fancy term from the Greeks, everything's borrowed from

21   the Greeks, that makes it difficult for us.  Basically a

22   needle or piercing phobia.  Trypanohpobia comes from the

23   Greek which is the sharp object or stick.  So they refer to

24   that as fear of needles, fear of sharp objects.

25   Q      In what states have you -- have you been admitted as an

Dr. Dattilio – Direct

1   expert in clinical and forensic psychology?

2   A     State of New York, New Jersey, Pennsylvania, Delaware,

3   Maryland.  I've also been in the federal district, Eastern

4   and Middle, of all those states.

5   Q     Have you testified on behalf of either prosecution,

6   plaintiff, defense and/or served as an expert for the Court

7   on anxiety disorders?

8   A     Yes.

9   Q     Tell us about that, please.

10  A     Well, many times I'm called to assess someone for the

11  plaintiff or the defense in civil matters or it may be a

12  criminal matter and if that's the case, then it might be

13  either the prosecution or the defense.  Many of the times

14  have been for defense in criminal matters and also sometimes

15  the Judge.  When they have conflicting opinions, the Court

16  has assigned me as their expert.  It's not often but rarely.

17  Once in a while the courts will say I'd like our own opinion

18  to compare.

19  Q     And you've been retained for that position?

20  A     Yes.

21  Q     How many times have you testified?

22  A     Oh, hundreds.  A lot of times.

23  Q     All right.  Let's turn to Mr. Stevens now.  Did there

24  come a time when you were asked to evaluate Mr. Stevens?

25  A     Yes.

Dr. Dattilio - Direct

1   Q      And for what purpose?

2   A      I was asked to assess whether or not his anxiety

3   interfered with his ability to administer injections as part

4   of his job.

5   Q      And who asked you to do that?

6   A      I was asked by Attorney Robert Thorpe.

7   Q      That's Mr. Thorpe sitting right there, is it not, from

8   my office?

9   A      Yes, sir.

10  Q      Did you evaluate him and when?

11  A      I did.

12  Q      Tell us about that.

13  A      I conducted an extensive evaluation over two visits.  I

14  saw him on 3/5/14 and 3/7/14 and I did a very thorough

15  history of his life from the moment of his birth, what he

16  could tell me about his early years, all the way up until the

17  present time which was 3/7/14.

18          Now in addition to that, I also administered a

19  battery of psychodiagnostic tests and measurements.  These

20  are instruments that are designed to provide us with

21  additional information over and above what we're getting

22  verbally from the individual.  It's an added measure of

23  assessment, if you will, other than eyeballing them to use a

24  crude term.  So if you go to an emergency room with a

25  complaint and they look at you, they examine you and they

Dr. Dattilio - Direct

1    say, well, we think you may have this type of disorder.

2    They'll also order an X-ray or a CAT scan or MRI to look at

3    the surface.  These measurements help us look below the

4    surface.  They're empirically based meaning they've been

5    tested and weighted on norms against people that have certain

6    disorders and who do not.  So it helps us determine whether

7    or not the individual has the criteria that they're

8    complaining about and whether that's genuine, because some

9    people can fake it and most of the time you can sense when

10   they're not being honest, but also the tests are an added

11   measure to tell us there's no inconsistencies to what they're

12   saying.  In addition I spoke with a family member.  I

13   interviewed his wife.  I also reviewed a host of materials

14   which I've listed on the first and second page of the report.

15   Q     What were those materials?

16   A     Read them into the record?

17   Q     Yes, sir.  The report is not in the record.

18   A     Okay.  I reviewed the original complaint which was

19   filed in United States District Court, Northern District of

20   New York.  I also looked at the agreement concerning material

21   covered by confidentiality, stipulated and protected

22   agreement in the District Court.  The defendant's answer to

23   civil action that was filed.  I also reviewed cover letter

24   from Attorney Thorpe, relevant EEOC documents, including Rite

25   Aid's position, statement.  Mr. Stevens' response to Rite

Dr. Dattilio - Direct

1    Aid's position, statement and the EEOC determination.  I

2    reviewed relevant pleadings to EEOC, including the amended

3    complaint, the answer to the amended complaint and employment

4    records and medical records for Mr. Stevens.  There was

5    correspondence from a Daniel Berman, Esquire, dated

6    2/5/14.  Determination from the United States Equal

7    Employment Opportunity Commission in Buffalo, local office

8    record, that was dated 2/20/2013.  Correspondence to United

9    States Equal Employment Opportunity Commission from a Cheryl

10   Fyffe-Gauntlett, F-Y-F-E dash Gauntlett, G-A-U-N-T-L-E-T-T of

11   Raven and Kolbe, LLP dated 8/31/12.  I reviewed

12   correspondence to a Mary Anne, two separate words, Drabczyk,

13   D-R-A-B-C-Z-Y-K of the United States Equal Employment

14   Opportunity Commission from Robert J. Thorpe, Esquire of

15   Hancock and Estabrook, E-S-T-A-B-R-O-O-K, LLP, dated

16   12/13/12.  I've reviewed correspondence from the Mark Warfel,

17   W-A-R-F-E-L, DO.  From Michael J Sciotti, S-C-I-O-T-T-I,

18   Esquire, dated 12/20/13.

19   Q     Was that a letter attaching Dr. Warfel's records?

20   A     Correct.  Medical records of Mr. Stevens from the Saint

21   Elizabeth's Medical Group, Faxton, F-A-X-T-O-N Street, Health

22   Care, Steven J. Colver, C-O-L-V-E-R, MD, urologist and Norman

23   Meslin, MD, colon/rectal specialist.  I also reviewed the

24   work, the work search history for Christopher Stevens dated

25   8/23/12 to 10/11/13.  Various correspondences that emanated

Dr. Dattilio – Direct

 1   from Rite Aid Pharmacy.  Photocopies of Mr. Stevens' Bachelor

 2   of Science Degree in Pharmacy from Union University of Albany

 3   College of Pharmacy dated 6/4/77.  Also a copy of Mr.

 4   Stevens' pharmacy license in the State of New York dated

 5   9/13/77.  Current license, registration certificate for

 6   Mr. Stevens dated 9/30/13.  Various materials from Rite Aid

 7   Pharmacy regarding clinical services and training.  An

 8   Associate at Rite Aid Pharmacy, quote, an associate atlas,

 9   quote.  Performance appraisals for salaried associates,

10   Mr. Stevens, dated 8/20/08.  A congratulatory letter to

11   Mr. Stevens from Mr. Michael C. Feina, F-E-I-N-A for

12   celebrating 40th year anniversary and a service award pin

13   from Rite Aid to Mr. Christopher Stevens for 25 years of

14   service.

15   Q     Would it be fair to say that in performing your

16   evaluation assessment you relied upon the medical records and

17   the examination and interviews with Mr. Stevens and his wife?

18   A     Yes.

19   Q     The other materials were just background?

20   A     That's correct.

21   Q     All right.  Tell the jury what you learned about

22   Mr. Stevens' background?

23   A     Well, in conducting a complete history I learned that

24   he was the fourth of five children born in Utica, New York.

25   He was raised in Utica.  He was raised to an intact family,

Dr. Dattilio – Direct

1   both mom and dad were in.  Had a pretty good life growing up.

2   There was no serious history of illicit drug or alcohol

3   abuse.  Father consumed alcohol but was never abusive or

4   created any turmoil in the home.  He also went to school,

5   public school system and did fairly well.  He was an A

6   student.  He had no real problems during his early school

7   years.  No adjustment issues.  He was also a conscience

8   student.  He was an Eagle Scout at one point and he actually

9   was somewhat shy.  He didn't date very much during his later

10  years.  Always hard worker.  He worked part time at 16 at a

11  drugstore as a local cashier and then in the stockroom of the

12  pharmacy and enjoyed himself.  He was a good worker and had

13  no problems on the job.  First trauma came when he was a

14  teenager.  His father became ill with cancer and

15  unfortunately he didn't live very long.  He passed when

16  Mr. Stevens was 18 years of age and this was tough because

17  the family no longer had income from his father so his mother

18  had to work and so did Mr. Stevens in order to help with the

19  family.  And mother was depressed for a while because she

20  lost her spouse and so he was very supportive.  She had her

21  own bouts of depression that were related to bereavement

22  according to him.  He continued to work and go to school.  He

23  became interested in his work at the pharmacy and admired the

24  pharmacy work.  So the man who was head pharmacist who

25  supervised him sort of started to encourage pharmacy as a

Dr. Dattilio - Direct

```
 1    field and I think that's where his interest developed and he
 2    encouraged him.  He actually was instrumental in helping
 3    Mr. Stevens get a scholarship to go.  So he graduated from
 4    high school and went, attended the Albany School of Pharmacy
 5    and, once again, was a good student.  As and Bs.  He really
 6    was never involved with any illicit drug or alcohol during
 7    his years.  He tried a little bit of alcohol but he was not
 8    prone towards that and he didn't really date at all.  He was
 9    rather shy.  He got through pharmacy school and unfortunately
10    within the five-year period of losing his father, his mother
11    become ill with pancreatic cancer which was another blow
12    because I think he was still reeling in the death of his dad.
13    So he lost two parents within five years.  Mom managed to
14    hang on until he graduated but it was only four months after
15    he graduated that she lost her struggle with cancer.  So this
16    was a tough lost for him and he and his brother had to take
17    care of the estate.  They really didn't have much but they
18    lived in the house and they eventually sold it.  During this
19    time Mr. Stevens had come back.  He passed his boards and
20    became a pharmacist, ironically at the same pharmacy he had
21    worked as a kid so it was sort of -- important for him and
22    he.  It was there that he met the love of his life who was a
23    cashier.  He started dating her and after four-and-a-half
24    years they married.  From that point Mr. Stevens went on to
25    work as a pharmacist for decades.  He worked in various
```

Dr. Dattilio - Direct

1    locations and then eventually the store that he worked for

2    was purchased by Rite Aid and he became employed at Rite Aid.

3    The longest I think -- the period of time that he worked at

4    any one store was in New Hartford.  He remained there from

5    1985 to 2000 and this was formally, I think, Carl's Drugs.

6    C-A-R-L apostrophe S, and then eventually became Rite Aid.

7    Guy that loved his work.  He gave 110 percent.  His patients

8    loved him.  Wherever he went he was very conscience.  When

9    there were other employees out he'd sometimes put in 80

10   hours.  That's a lot of hours to put in and he achieved it,

11   status of head pharmacist and was always very conscience.

12   Little obsessive compulsive with regard to files and having

13   everything in order but that's a good thing, I think, in my

14   opinion.  We want people that monitor our medication or our

15   health to be a little obsessive and he was.  He was always

16   diligent in his job and would go with the flow and he's the

17   type of individual who is a pleaser in many ways.  He follows

18   the rules and does what he's told and this constituted him

19   being a fairly good employee.  He had gotten a couple of

20   awards I think.  I believe he got award for employee, for

21   being a good employee and also he got a pin for being there

22   for 25 years.  And he worked until the problem arose with

23   regard to the injections.

24   Q    Did he develop any psychological disorders during the

25   course of his life time?

Dr. Dattilio - Direct

1    A      Yes.

2    Q      What were they or tell us about it?

3    A      What is it?

4    Q      What is it.

5    A      What is it.  Still here.  Well, first of all, he has

6    always been a very kind of obsessive compulsive type of

7    individual.  They put hundred percent into what they do.

8    They're very fastidious and very conscience about work.  You

9    know, this dovetails with how he's been completely out of

10   control with his life when he lost his folks.  You're out of

11   control, something you want to control but you can't.  He

12   loses his dad and then his mom.  So this obsessive compulsive

13   sort of nature became fortified because we sometimes deal

14   with faith issues like death and loss but becoming overly

15   controlling with what we can manipulate and so he threw

16   himself into his work and very diligent about that.  But he

17   practiced his craft in an obsessive compulsive type manner.

18   Very conscience about overchecking doses and scripts.  If

19   there wasn't something that was clear, he would call.  I

20   remember he told me one store he went to, files were messy,

21   spent a lot of time organizing, making sure everything was in

22   order and he could find it and his stores ran well.  So, it's

23   a disorder that he sort of made work for himself but the

24   negative aspect of that was that he was sort of unyielding at

25   times and a little bit rigid and he also developed some

Dr. Dattilio - Direct

```
 1   simple phobias.  One to height and the other to needles and
 2   blood draw sticks.  Again, things where it would promote not
 3   having a lot of control over the environment of the
 4   circumstance.  Part of his nature.  And certainly with that a
 5   little self focus because of his consciousness and these are
 6   disorders but, you know, in some ways, in many ways people
 7   allow them to work for them until there's a problem when they
 8   can't, they don't have a lot of elasticity or flexibility and
 9   then it becomes a more pronounced issue.
10   Q     You mentioned he developed specific phobias.  One of
11   them was trypanophobia?
12   A     Trypanophobia or let's transfer that to needle phobia.
13   Q     Would you explain in detail to us Chris' trypanophobia?
14   First of all, how did you confirm the diagnosis of
15   trypanophobia with Chris?
16   A     Several ways.
17   Q     What did you do?
18   A     Several ways.  The psychodiagnostic testing helps us do
19   that.  Also the assessment and the history.  And I also used
20   a technique called exposure which I gave him no forewarning,
21   I produced a 27-and-a-half gauge syringe or what's called an
22   insulin syringe, same size syringe that we use or are used to
23   give flu slots.  I pulled it out of the drawer --
24   Q     Let me stop you for those who might not look at the
25   needle that they use for the flu shots.  Is it a small one,
```

Dr. Dattilio – Direct

1    large one?

2    A     It's about this big (indicating).  It's got a thin

3    barrel where the fluid is lodged and then the needle actually

4    is about the size of a large sewing thread needle.

5    Q     So when you say this large, you're talking about the

6    whole syringe?

7    A     Syringe.  Plunger, barrel and needle about this big

8    (indicating).

9    Q     Needle itself, can you give us --

10   A     About that long (indicating).  It's not injecting a

11   whole lot of fluid.  Usually insulin or flu vaccine.  So I

12   produced it, laid it on a desk and I watched the reaction.

13   Okay.  Unprepared.  Unprepared.  Spontaneous.  And typically

14   it's spontaneous reactions that people can't rehearse.  So he

15   got white and looked and I took the cap off the syringe and I

16   said I want to show this to you and he looked at it and he

17   didn't like looking at it and then I took it and I drew the

18   edge of the needle to my skin and I punctured the skin on top

19   of my hand until it bled and I thought he was going to faint.

20   He got white and did not do well at all, turned his head and

21   was a little annoyed with me and rightly so because when we

22   treat people we don't do that.  We don't surprise them but

23   this was an assessment.  So I was looking for that

24   spontaneity and after treating people for 30 years I can tell

25   when they're pretty much, when they're putting on a show and

Dr. Dattilio - Direct

 1   they're not.  They just have that spontaneous sick look to
 2   them and they turn white, very uncomfortable and so I asked
 3   him about how he felt.  He said I don't like looking at that
 4   at all, why didn't you tell me that?  Well, I want to see
 5   your reaction.  I pulled it out and I wiped off the blood.  I
 6   literally let him look at the blood.  We discussed it, we
 7   talked about how he felt seeing the blood, how he felt about
 8   the needle without puncture, how he felt when he saw the
 9   puncture, so forth.  That's one measure that I used to
10   assess.  In addition to the history that I took with regard
11   to his experiences with needles.
12   Q     Can you tell us about that.
13   A     Sure.  When he was very young, about eight years old,
14   he developed an illness and the family physician suspected it
15   might have been meningitis.  So he went to the hospital and
16   one of the tests for meningitis is a spinal tap in which they
17   inject a needle in the spine and, in fact, I had the
18   wonderful pleasure of having that experience one time which
19   is horrible and they draw out cerebral spinal fluid to
20   measure the level of proteins.  That tells them whether or
21   not the person has meningitis or not.  So he was threatened
22   with the possibility of having this done.  Apparently they
23   told him that they were going to do this but then they didn't
24   because they ruled out he had meningitis.  That was very
25   nerve racking for him.  He didn't care for that at all.  It

Dr. Dattilio – Direct

```
 1    was a bad experience and he recalls that he had a lot of

 2    heightened anxiety about getting any kind of injection.

 3            It was subsequent to that period that he had to

 4    undergo a few inoculative injections.  He doesn't remember

 5    receiving any Novocaine at the dentist but he does remember

 6    not liking the experience at all with needles and having a

 7    great deal of difficulty with them.  Then at age 18 he

 8    dropped a large item on his foot in the pharmacy.  He injured

 9    his toe.  So when he went to the emergency room, they looked

10    at it, without warning pulled out a needle and stuck him in

11    the foot which really sent him through the roof because it

12    was really painful and a large needle and he –– I think that

13    worsened his anxiety at that point.  And he yelled loudly and

14    then he had to receive his tetanus shot at one point.  This

15    was also a very negative experience and he had a great deal

16    of difficulty with it to the point where he can't even use a

17    needle to get a splinter out.  He just does not like any

18    puncturing of the skin at all.  So, of course, when he got

19    married he had to give blood and that was a nightmare.  He

20    had a hard time giving blood but it seems that the stick of a

21    draw of blood was a little easier than the jab of an

22    injection and certainly watching it and looking at it is very

23    difficult for him, which is most people that can have any

24    fear of needles turn their head, wait for the stick and then

25    not look at it.  Seems to be more painful when you watch
```

Dr. Dattilio – Direct

1   piercing their skin and draw.  So that contributed to his

2   absolute disdain for any kind of needles and punctures and he

3   avoided it as much as he could.

4   Q    Can you tell us, first, how this affects Chris with

5   respect to receiving injections and then how it would

6   affect -- do you have an opinion with respect to how it would

7   affect him giving injections?

8   A    All right.  Well, anyone who receives an injection and

9   most of us have, you're on the receiving end, so there's no

10  performance involved other than just lying there.

11  Q    Let me interrupt because I want to make sure it's

12  clear.  When I'm asking for your opinion, I'm asking within a

13  reasonable degree of professional certainty.

14  A    Yes.  That's correct.  It's not -- there's no

15  performance involved.  There's submitting and bearing it,

16  hurrying it, getting it over as quick as possible.  So he has

17  been able to tolerate that when absolutely necessary.

18  Doesn't like it, tries to avoid it but when he has to he gets

19  it.  Creates a lot of anxiety for him so he's better off,

20  like most people that are needle phobics, when they don't

21  know it's coming, it hits them, then it's over.  But when

22  you're performing it's different because you can't look

23  away.  You can't cognitively avoid and when I say cognitive,

24  think about being somewhere else or something pleasant.  You

25  have to focus on what you're doing and you have to watch the

Dr. Dattilio - Direct

```
 1   stick.  So you have to watch the skin being pierced and
 2   inevitably you have to watch some blood, wipe it usually with
 3   an alcohol pad or, you know, sterile solution, put a BandAid
 4   over it.  So there's a lot to do with Mr. Stevens' issues.  A
 5   big problem is lightheadedness and fainting.  Becoming faint,
 6   even when he's seated, there's trouble with that.  His
 7   concern was how am I going to perform this function
 8   repeatedly when I have to watch it, look at it and I'm not --
 9   I can't guarantee I'm not going to drop over.  You know,
10   there's lots of concerns with somebody potentially fainting
11   when they give an injection.  I don't want anybody fainting
12   when they give me an injection.  I don't want the needle to
13   break off in my arm or to drag and cause a laceration or --
14   you want it done competently.  So this was his concern and he
15   really just did not believe that he could do this at all.  He
16   knew his anxiety was too high and so --
17   Q    Let me ask you a question:  Within a reasonable degree
18   of professional certainty, was he right?
19   A    Absolutely.  Absolutely.  I mean in his condition?
20   Q    Yes.
21   A    In my professional opinion he should not be performing
22   a function when his anxiety is so high it will interfere with
23   that ability and to do it correctly because we're talking
24   about a human being.  We're not talking about picking a stick
25   of -- piece of meat or wood.  We are talking about a human
```

Dr. Dattilio - Direct

1   being.  He has to remain vigilant in the event that there's a

2   negative reaction.  Anaphylaxis, which is what sometimes

3   individual can experience after they get an injection.  If

4   he's not in a position to be able to function, then you know

5   that's a major concern.  So I don't think antically he felt

6   as well as physically able to do that.

7   Q     Doctor, would the effect of giving an injection given

8   his current condition affect his ability to concentrate for

9   any period of time after?

10  A     Sure.

11  Q     Tell us about that.

12  A     Well, when anxiety raises to that level -- everybody's

13  experienced some anxiety at one time or another.  You're

14  hypervigilant.  Your blood pressure goes up.  You're not

15  always focused on what you should be doing because you're a

16  little bit beside yourself.  So to go back and then

17  concentrate on other duties such as filling a script or

18  checking synergistic effects of medication --

19  Q     When you say synergistic?

20  A     S-Y-N.

21  Q     Are you taking about interactions?

22  A     My understanding, pharmacists have to be concerned

23  about whether people are not getting medications, two at a

24  time that are going to cause problems and sometimes

25  physicians are prescribing, experts miss that so they need to

Dr. Dattilio – Direct

1    be vigilant about that.  And I treated a number of

2    pharmacists who have explained that to me.  So, he has

3    certain concerns about being able to function after that and

4    that was his -- that was his worry.

5    Q      How does this type of condition develop?

6    A      Usually individuals will have a bad experience early in

7    their life.  You know, you typically are not afraid of dogs

8    other than their bark or growl but if you've been bitten or

9    you've been mauled or close to, your anxiety goes very high

10   and you have more of a trauma so you may develop more of a

11   phobia or you may have had experience with heights, so on so

12   forth.  So most develop because it was a negative experience.

13   It hurt.  It stung.  Over and above.  I haven't met anybody

14   in my 35 years who was ecstatic about getting needles.  Even

15   drug addicts don't like puncturing themselves but they do

16   because they have to.  So usually there's a trauma but

17   sometimes avoiding it because of the anticipated fear creates

18   sort of a vacuum because then, when they eventually have to,

19   it's become such an avoided issue that anxiety goes up even

20   higher.

21          So if you've been like phobic of water or heights

22   and you've managed to avoid that pretty much and then you

23   have to do it, it becomes worse.  So it compounds over time

24   and he's had a number of experiences where it was just

25   painful.  There was a loss of control meaning he had to

Dr. Dattilio – Direct

1   subject to it.  It sort of works in harmony with his

2   obsessive compulsive nature.  I don't like being out of

3   control.  They like controlling their environment.  So this

4   raised the level for him and in two particular areas are

5   heights and needles.  There maybe other areas that he was

6   never exposed to that he could be phobic of but these are the

7   ones we know of.

8   Q     In Chris' case with the symptoms, can you describe what

9   symptoms are produced by the trypanophobia?

10  A     Lightheadedness, syncope, S-Y-N-C-O-P-E, fainting

11  aspect of light headedness.  I'm going to tell you a minute

12  ago I said your anxiety goes up but sometimes there's a

13  vasovagal effect where the blood pressure drops rapidly and

14  you get lightheadedness and dizzy and that often happens with

15  blood and injections.

16  Q     So it happens with Chris?

17  A     Yes.  I watched him almost keel over when he was

18  sitting when I produced the needle.  Very uncomfortable.

19  They may have increased breathing, respiration and sometimes

20  sweating.

21  Q     Does it have an effect on his neurological functions?

22  A     Yes, because it's --

23  Q     Explain to us why and how.

24  A     Without getting too technical, it's the sympathetic

25  nervous system, sympathetic branch of the nervous system

Dr. Dattilio – Direct

```
 1  which increases our heart rate, respiration, involuntary
 2  functions.  When that is triggered, it's a neurological
 3  reaction, okay, because we have that overdrive.  And then
 4  what shuts down those symptoms is called the parasympathetic
 5  branch but the problem is that works much, much slower than
 6  the sympathetic branch, so sometimes it takes a lot longer
 7  for the symptoms to subside.  You don't want to have them.
 8  That's why most people avoid the thing they're phobic about.
 9  They don't want to have anxiety reaction because it doesn't
10  go away right away.  Lingers for a while.
11  Q     Does it affect brain function?
12  A     Well, the neurochemical disposition in the brain which
13  has to affect those areas in the nervous system are also off
14  so you may have some, you know, negative reactions.  A lot of
15  the jitteriness, a lot of uncomfortable feelings.  Edgy.
16  Q     Do you have any doubt that Chris suffers from
17  trypanophobia?
18  A     No.  Let me tell you, if I did, I would have never -- I
19  wouldn't be here.  Okay.  I have had people who said they had
20  certain anxieties and they were making it up.  Okay.  This is
21  not one of those cases.  This guy has it.
22  Q     Does -- strike that.  What affect does it have on his
23  ability to work?
24  A     Well, in this particular situation, I don't believe
25  that he would have been able to effectively function in
```

Dr. Dattilio – Direct

1    providing injections for patients and I also have grave

2    concern about the state he would be if forced to do so

3    afterwards in filling scripts and taking care of his duties

4    as a pharmacist.

5    Q      Are there other types of jobs he'd be unable to do?

6    A      I couldn't imagine him being a phlebotomist, drawing

7    blood all the time or, you know -- in fact, he didn't even

8    like looking at the needles in the pharmacy.  He didn't have

9    to touch them, they were packaged, but he didn't like looking

10   at them.  Anything that would have to do with any puncture,

11   infusion, stick.  I'd never ask him to take a splinter out of

12   my finger either because he probably wouldn't do a very good

13   job and wouldn't do it.  There's some things that in the

14   medical field would be a problem for him.

15   Q      Is the condition treatable?

16   A      Absolutely.

17   Q      Tell us about the treatment.

18   A      About 20 to 23 percent of the world's population or the

19   United States population has needle phobias.  People don't

20   advertise it, but probably not many who do.

21   Q      Let me ask you a question:  There's a scale, is there

22   not; in other words, some people have worse than others?

23   A      Yes.  Some people have severe, some people have it -- I

24   mean I get them.  I don't love them but I get them.

25   Q      Where does Chris fall on the spectrum?

Dr. Dattilio - Direct

1  A      He's at the high end.  He's, you know, 80 percent

2  range, 89 percent range.  The only step worse is the people

3  who literally die because they refuse to be stuck.  That's,

4  that's blatant but so, you know, getting -- some people have

5  problems, they'll take it in the arm but they don't like it

6  in the mouth.  The dentist has to do that.  I had somebody

7  that had to have an injection in his eye and had real

8  problems after that.  Understandably so.  So there's

9  different ranges.  About 20 to 23 percent of the population

10 have it.  Unfortunately, the majority of those people never

11 get treated because they don't have.  They can successfully

12 avoid it.  They don't go near needles when they're phobic,

13 they stay away from them.  If you can do it successfully,

14 they do.  But in this particular case, yeah, we have a range

15 of severity.  So there's mild, moderate, severe.  And it's

16 very treatable.  If people are willing to submit and get

17 treatment, it can go anywhere from three to five sessions to

18 be done in a couple of months.  Depends on the experience.

19 Q      Now, not all treatment is successful, would that be

20 fair to say?

21 A      No.  No.

22 Q      After examining Chris do you have an opinion with

23 respect to whether or not Chris would tend to be resistant

24 to, first, to the idea of treatment?

25 A      Well, I think he would be appropriately anxious about

Dr. Dattilio - Direct

1    it, as most people are, and I think because there's

2    performance involved, it would be more difficult for him.

3    Remember, we're not just talking about treating him to be

4    able to go to the dentist or to have blood drawn or have

5    something done.  I mean, we're talking about an obsessive

6    compulsive type of person who's very conscience about

7    everything he does.  So if he's going to give injections, he

8    wants to do them right, do them stably, in a stable fashion

9    and he wants to be able to enjoy what he's doing and feel

10   like he's helping people.  So I think that would create --

11   but I think if someone sits with him, works with him and

12   says, look, it's not as bad as you think, we can desensitize,

13   reduce.  I think he's willing to do that.  He's a pleaser.

14   He likes making people happy.  He's been doing that in his

15   job for decades.

16   Q    Would the treatment be more complicated for someone to

17   get to the point where they could administer injections than

18   it would be to get them to the point where they could receive

19   injections?

20   A    Absolutely.  Yes.

21   Q    Most of your experience with treatment is with respect

22   to the people who are being treated so that they can receive

23   injections, is that correct?

24   A    Yes.

25   Q    That's the majority of the statistics?

Dr. Dattilio - Direct

```
 1   A      Although I have had people that went into the medical
 2   field, believe it or not, and had anxiety about needles.
 3   Didn't think it would be that bad when they came to their
 4   level of work as a nurse or as a physician where they had to
 5   start giving them, and the physicians can always dump it on
 6   the nurses so they can get away with it.  Particularly it's
 7   more so with nurses who are physician assistants, then they
 8   say I'm having more anxiety about this than I thought.  Now
 9   I'm worried I'm going to break a needle or have to do this
10   again or it's a bad stick.  So there's a performance anxiety
11   component to doing it as opposed to just, let's face it, if
12   you have to stick, you got to grit your teeth, not look,
13   hurry, shoot, get it over with and it's done.
14   Q      That's in the case where people don't have a fear
15   themselves of getting needles?
16   A      Correct.
17   Q      So they're starting in a different place than Chris
18   would be starting?
19   A      Absolutely.
20   Q      Let me ask you this:  Do you recognize this book?  I'm
21   holding it up.
22   A      I see it in my sleep.  It's called Diagnostic
23   Statistical Manual of Mental Disorders.
24   Q      What is that?
25   A      It's our Bible.  It's like a physician's desk reference
```

Dr. Dattilio - Direct

```
 1   as to the physician or the Merrick, M-E-R-R-I-C-K manual for
 2   physicians.  It gives you all of the diagnostic nomenclature.
 3   All diagnoses that are constituted by the spectrum of mental
 4   illness.
 5   Q    Is that a copy you're holding up in your hand?
 6   A    It's a pocket copy.  It's that thing condensed here so
 7   we can stick it in our pockets when we go to the hospital.
 8   Q    Given the amount of gray hair, are you actually able to
 9   read that?
10   A    I have --
11           THE COURT:  I think it's time to take a break.
12           MR. BERMAN:  Thank you, your Honor.
13               (Short break taken)
14               (Jury present)
15           THE COURT:  Okay, Mr. Berman, you may continue.
16           MR. BERMAN:  Thank you, your Honor.
17   BY MR. BERMAN:
18   Q    Are the conditions you diagnosed of Mr. Stevens found
19   in the DMS-5?
20   A    Yes, they are.
21   Q    Both trypanophobia and OCD?
22   A    Yes.
23   Q    Can you explain to us how the OCD and the trypanophobia
24   are related?
25   A    Okay.  Well they're both anxiety disorders.
```

Dr. Dattilio – Direct

1    Q     And I'm talking about in Mr. Stevens' case, not in

2    general.

3    A     But because they're both governed off of anxiety, the

4    OCD is sort of the fulcrum or the housing that sets the tone

5    for phobias developing and so particular experiences that one

6    may have during their life time, particularly issues that

7    involve being out of control or a loss of autonomy, that

8    becomes the foreground for the anxiety to develop in terms of

9    a simple phobia.  Could be a specific phobia.  Could be

10   social phobia.

11   Q     And in Mr. Stevens' case?

12   A     In this particular case the OCD, the obsessive

13   compulsive was there and what it generated as a result is

14   specific phobias, namely heights and the needle phobia, some

15   blood and there's also a little social phobia with him too I

16   noticed but I didn't make that diagnosis but some of it's a

17   fear, a little bit of the generalized fear of making a fool

18   of himself in public.  I think it's probably related to, you

19   know, what happens if I don't do well with his performance

20   and then I feel bad for the patient because his patients are

21   very important to him.

22             MR. BERMAN:  I have nothing else.  Thank you.

23             THE COURT:  Thank you Mr. Berman.

24             MR. RAVEN:  Thank you, your Honor.

25

Vicky Ann Theleman, RPR, CRR
USDC Court Reporter

1   CROSS-EXAMINATION

2   BY MR. RAVEN:

3   Q     Good morning, Doctor.

4   A     Good morning.

5   Q     Doctor, I just want to pick up on something.  You said

6   you made a diagnosis of OCD, correct?

7   A     Yes.

8   Q     You're aware that there's no claim in this case that he

9   ever told his employer or was diagnosed with OCD before he

10  was terminated?  You understand that, correct?

11  A     That's correct.

12  Q     So there's no claim in this case for that whatsoever?

13  A     That's correct.

14  Q     Doctor, you can have OCD without having trypanophobia,

15  correct?

16  A     Absolutely.

17  Q     The only claim in this case is that Mr. Stevens says he

18  has trypanophobia?

19  A     Yes.

20  Q     And that prevented him from giving injections or

21  immunizations through his employment, correct?

22  A     That's correct.

23  Q     All right.  Now, Doctor, you exposed Mr. Stevens to a

24  syringe and needle, correct?

25  A     Yes.

Dr. Dattilio - Cross

1   Q    And you said that you did it without telling him that

2   you were going to do it?

3   A    Right.

4   Q    Before you injected yourself, did you tell him you were

5   going to do it?

6   A    Yes.

7   Q    All right.  And did you, at the time that you performed

8   those tests, have Mr. Stevens hooked up on any type of

9   monitors to measure his blood pressure?

10  A    No.

11  Q    Did you have any type of instruments or measurements of

12  his pulse?

13  A    No.

14  Q    Would it be fair to say that when you performed the

15  tests, you were just observing Mr. Stevens, correct?

16  A    Eyeball, right.

17  Q    And you were basing your opinion on complaints or

18  anything he said to you, correct?

19  A    Based, based on complaints.  I based on my observations

20  of his nonverbal behavior and what I observed commensurate

21  with the people that I've treated of phobias over the years.

22  So I relied on my credible judgment.

23  Q    Would it be fair to say you were basing it upon the

24  subjective complaints of Mr. Stevens as opposed to objective

25  tests such as, I think what you talked about before, somebody

Dr. Dattilio - Cross

```
1   comes into an emergency room and says, oh, I fell and my leg
2   hurts.  They have to take an X-ray or an MRI or CAT scan,
3   those would be objective tests?
4   A     Right.  The only objective test were the techniques
5   that were used.  I employed a personality inventory anxiety
6   measure and there was another one for that I used to
7   determine his blood injection symptom scale.
8   Q     That was for the OCD, correct?
9   A     That was for that and the trypanophobia.
10  Q     When you did the test for taking the syringe out and so
11  forth, you did not have him hooked up to any equipment that
12  would give you an objective finding, correct?
13  A     Bio feedback, monitor for pulsation or heart rate, no.
14  Q     Now, Doctor, I want to skip ahead, going to be pretty
15  brief here.
16  A     Sure.
17  Q     You are of the opinion with a degree of certainty in
18  your field --
19  A     Psychological.
20  Q     -- in psychology, that Mr. Stevens' condition is
21  treatable, correct?
22  A     Yes.
23  Q     All right.  As a matter of fact you issued a report in
24  March of 2014, correct?
25  A     Yes.
```

Dr. Dattilio - Cross

1  Q      And, Doctor, you are of the opinion in March of 2014

2  that Mr. Stevens could undergo desensitization behavioral

3  modification training?

4  A      Systematic desensitization, correct.

5  Q      And that there was a 90 percent chance that he could be

6  cured of his trypanophobia, is that correct?

7  A      Yes.

8  Q      All right.  And, Doctor, in your report, in fact on the

9  last page, on page 16 you indicated that Mr. Stevens could

10  even be treat -- would be cured or treated with as little as

11  one therapy session, correct?

12  A      Well, what I indicated was that there are treatments,

13  exposure sessions that are as little as one.  Whether or not

14  he would respond to one would have to remain to be seen but

15  he could possibly.

16  Q      And, Doctor, you also indicated that the treatment is

17  affordable and would not require long-term therapy, is that

18  correct?

19  A      That's correct.  It's typically the type of treatment

20  that does not require long-term therapy or it can be done

21  without medication, as well.

22  Q      Mr. Stevens has testified that he's made an appointment

23  with someone as of now for an initial visit and it would take

24  14 to 15 visits to help him and each one of those visits

25  would be $340.  You don't indicate that in your report,

Dr. Dattilio - Cross

1    correct?

2    A      No.

3    Q      Okay.  As a matter of fact, even as you just told this

4    jury, he could possibly be treated in just one visit?

5    A      Right.  It's the type of treatment that you get.

6    Q      By the way, in your report you did not differentiate

7    between Mr. Stevens receiving injections and Mr. Stevens

8    giving injections, correct?  You didn't make that

9    distinction, did you?

10   A      With regard to the level of anxiety?

11   Q      Well, in terms of level of anxiety and more importantly

12   in terms of his treatment.

13   A      Yes.  That's correct.

14   Q      Okay.  So there's nothing in your report that would

15   tell us, you know, give us a different percentage chance of

16   him being able to give immunizations as opposed to just

17   getting an injection?

18   A      Correct.

19   Q      And, again, it would be the treatment you said is

20   affordable, correct?

21   A      Yes.  Often times it's covered by medical insurance.

22   Q      But assuming it's not.  It's still affordable; it's not

23   something that's outrageous?

24   A      I guess that's a relative term.

25   Q      I agree.

Dr. Dattilio - Cross

1  A     The cost runs anywhere from 150 to 200, maybe to 250

2  and that's a cognitive behavioral therapist.  If it's an

3  analytic-style therapist who typically take longer, the type

4  of treatment they use, maybe 150 to 300 depending on where

5  you're at.

6  Q     Dr. Dattilio, did you, after you examined Mr. Stevens,

7  did you ever offer to treat him?

8  A     I can't.  No, I didn't.  I can't.  Ethically I'm not

9  allowed to treat if I'm assessing someone in a separate

10 matter.

11 Q     Did you recommend him to perhaps one of your

12 colleagues?

13 A     No, because my involvement was just to assess.  Not to

14 make any treatment recommendations forward.

15 Q     So your involvement in this case was because it was

16 litigation, correct?

17 A     That's correct.

18 Q     And you were retained by these attorneys to evaluate

19 Mr. Stevens in the context of his lawsuit, correct?

20 A     That's correct.

21 Q     Now, prior to your seeing Mr. Stevens, are you aware of

22 anyone who -- let me ask you this:  Prior to your treatment

23 or your evaluation of Mr. Stevens, was there available

24 treatment for trypanophobia?

25 A     You mean his immediate vicinity or environment or

Dr. Dattilio - Cross

```
 1   anywhere?
 2   Q      Was there treatment for it, period.
 3   A      Absolutely.
 4   Q      How long has that treatment existed?
 5   A      Forty, fifty years.
 6   Q      Okay.  And if one were to do research, perhaps even
 7   just Google it or go on the internet for treatment for needle
 8   phobia, is that something that's pretty accessible in terms
 9   of finding?
10           MR. BERMAN:  I'm going to object, your Honor.
11           THE COURT:  Why?
12           MR. BERMAN:  Speculative as to what one Googling
13   would be.
14           THE COURT:  You don't know what the Google would
15   turn up until you Google but people who use computers go into
16   Google, have a certain level of anticipation what they can do
17   when they're using that device.  I think this doctor can tell
18   us based on any experience he's had in using a computer what
19   he would expect to find.
20   A      Well, I can tell you that I have Googled to look for
21   people in different areas because I'm well-known.  I get
22   e-mails, I'm looking for a therapist to treat my anxiety in
23   Milwaukee, Wisconsin.  I can go on ListServ or Google and
24   find, I recognize people's names, I'll refer them, so they're
25   all over.
```

Dr. Dattilio – Cross

```
 1   Q     Okay.  All right.  So would it be fair to say that the
 2   treatment was available and that it could fairly easily be
 3   found if one wanted to do that?
 4   A     Absolutely.  I mean this is Albany.  David Barlow who
 5   is one of the gurus in anxiety disorder treatment was at the
 6   University of Albany.  They're all over the place in this
 7   area.
 8   Q     That's not too far from where Mr. Stevens lives,
 9   correct?
10   A     Correct.  Not at all.
11   Q     Do you know whether when Mr. Stevens made an
12   appointment to go for the initial evaluation?
13   A     With?
14   Q     With whoever he's going to go to now.
15   A     Not at all.
16   Q     Do you know if he's gone for the evaluation?
17   A     I haven't spoken to him since the last time I assessed
18   him.  I said good morning to him this morning.
19   Q     You haven't seen him since you evaluated him?
20   A     Not at all.
21   Q     When you took the needle out and you said you didn't
22   tell him, okay, you did tell him that you were going to
23   inject yourself, correct?
24   A     Yes.
25   Q     Did Mr. Stevens ask to leave the room?
```

Dr. Dattilio - Cross

```
 1   A     He said I don't know if I can watch it and I said I
 2   want you to be present when I do it and he was very
 3   uncomfortable and I did it quickly and drew blood.
 4   Q     But he didn't ask to leave the room, correct?
 5   A     No.
 6   Q     All right.  Now, and he didn't faint?
 7   A     Almost.
 8   Q     Okay.  But he didn't faint?
 9   A     He didn't faint.  He was sitting.
10   Q     Now, do you have any information or have you been given
11   any information as to whether Mr. Stevens was offered some
12   classes and offered training through his Rite Aid employer in
13   administering immunizations?
14   A     I believe I read something somewhere in the literature
15   that said that.  I don't remember correctly but I think I saw
16   something somewhere that or he said it about, that he would
17   be trained to do that.
18   Q     Do you have any information as you sit here now after
19   you've evaluated this case as to what that training was and
20   what the classes encompassed?
21   A     No.
22   Q     Do you know whether those classes included pharmacists
23   who were resistant or did not want to use needles?
24   A     No.
25   Q     Okay.  And, Doctor, that would be something important
```

Dr. Dattilio - Cross

```
 1   to know when evaluating this case in terms of whether

 2   Mr. Stevens, had he gone through the classes, would have been

 3   able to immunize and go through the program --

 4           MR. BERMAN:  That's beyond the scope.

 5   Q    -- correct?

 6           MR. BERMAN:  That's beyond the scope of the

 7   witness' testimony of what would have happened had he gone to

 8   classes to which he knows nothing.

 9           MR. RAVEN:  Just testing his knowledge.

10           THE COURT:  Well, I think that's right.  There's

11   been no testimony that I heard any way about what those

12   classes would consist of as to how they were conducted, would

13   be conducted, who would conduct them, what would be the

14   material of those classes and for the doctor to have to make

15   a guess as to whether or not going to classes he knows

16   nothing, nothing about would help the plaintiff is probably

17   not an appropriate question.  So your objection is sustained.

18   BY MR. RAVEN:

19   Q    Did you ask for any information as to what the classes

20   encompassed?

21   A    No.

22   Q    Did you observe at any time Mr. Stevens receiving an

23   injection?

24   A    No.

25   Q    Did you ask him if he could inject in front of you?
```

Dr. Dattilio - Redirect

```
 1   A      I'm sorry?

 2   Q      Sure.  Did you ask him whether he would be willing to

 3   inject in front of you?

 4   A      No, I didn't ask him that.

 5   Q      Did you ask him to hold the needle and syringe?

 6   A      Yes.

 7   Q      Did he?

 8   A      No.

 9   Q      In August of 2011 when Mr. Stevens was terminated from

10   his employment I think the answer would be the same, there

11   was treatment available for him to become an immunizer, is

12   that correct?

13   A      Yes.

14          MR. RAVEN:  Thank you.  I have nothing further.

15          THE COURT:  Redirect?

16          MR. BERMAN:  Just a couple, your Honor.

17   REDIRECT EXAMINATION

18   BY MR. BERMAN:

19   Q      Just to be -- just to be clear, Mr. Raven asked you

20   when you made your observations of Mr. Stevens' reaction to

21   the needle you didn't have him hooked up to any machines but

22   you did make observations of him physically, did you not?

23   A      Correct.

24   Q      And were those objective observations?  Did you find

25   objective signs that you saw?
```

Dr. Dattilio – Redirect

1   A      Yes.  And they're based off of my years of experience

2   working with individuals in treatment anticipating or trying

3   to forecast whether they were going to lose consciousness or

4   they're going to get shockey.  I know what the prelude is.

5   He certainly had that response.  So, no, I'm sure if I had

6   hooked him up, that may have given us vital data but I felt

7   that what I saw was sufficient based on my experience.

8   Q      When you mentioned to Mr. Raven the cost of 150 to

9   $300, that was per hour per session, was it not?

10  A      Per hour per session depends on where you live.  Go to

11  Manhattan, you're talking about $300 an hour.  If you go, you

12  know, you go down south somewhere, it's a different story.

13  Upstate New York it may be less but generally the reasonable

14  and customary charge, if you will, is between 150 to $200 per

15  session for that.

16  Q      Per session but not for the whole treatment?

17  A      No.  That's right.

18  Q      In terms of the Google searches, when you were asked

19  about the Google searches you referred to a search you might

20  make?

21  A      Well, I have access to ListServs, so American Disorder,

22  American Associate of Anxiety Disorders.  The Association for

23  Cognitive Behavior Therapy.  We have ListServs so we can go

24  on there and say, hey, look, I have a patient who has needle

25  phobia, he lives in Utica, New York, any referrals of, you

Dr. Dattilio - Redirect

1  know, seasoned therapists for completing simple phobia

2  injections.  That's when you get names, I'm in that area,

3  I'll be happy to take them.

4  Q     When you do a computer search you use ListServ because

5  its provides you with reliable sources, is that right?

6  A     Some of whom I may even know.

7  Q     Have you ever Googled anything?  Have you ever used

8  Google, not a search for that, have you ever used Google?

9  A     Yes.  Restaurants and stuff like that, sure.

10  Q     Was it your experience that Google always gives you

11  reliable information?

12  A     No.  Sometimes it's like a wild goose chase.  Sometimes

13  it's good but sometimes it's not so good.

14  Q     When you met with Chris, was that the first time that

15  he learned that treatment was available?

16  A     Yes.

17  Q     Do you know if Rite Aid offered him treatment?

18  A     No.  I think I answered that specific question.

19  Q     And what was the answer?

20  A     No treatment was offered.  He was just told you have to

21  do it.

22        MR. BERMAN:  I have nothing further.

23        THE COURT:  Mr. Raven?

24

25

Dr. Dattilio - Recross

1    RECROSS-EXAMINATION

2    BY MR. RAVEN:

3    Q     Dr. Dattilio, but again you don't know anything about

4    the classes that were being offered?

5    A     No.

6    Q     Okay.  So you don't know what the trainers would have

7    done?

8    A     No, not at all.

9    Q     Okay.  And do you know if in your conversations with

10   Mr. Stevens whether he had ever inquired as to what the

11   classes entailed and what they could have done?

12   A     No.

13   Q     Are you aware that Dr. Warfel, his treating physician

14   for over two decades, has said that it would not be harmful

15   for him to attend the classes at Rite Aid.  Are you aware of

16   that?

17   A     I don't remember seeing anything like that, no.

18   Q     You reviewed Dr. Warfel's records --

19   A     Yes.

20   Q     -- correct?

21         MR. RAVEN:  Could we have Defendant's Exhibit 12,

22   please?

23         MR. BERMAN:  Your Honor, I've got to object to

24   this.  This is beyond scope of the recross.  The recross was

25   on treatment, not on training and not on whether it would be

Dr. Dattilio - Recross

1   harmful for him to attend training.

2            THE COURT:  That's right.  I'll sustain that.

3   Q    Did you ever meet Dr. Warfel other than here?

4   A    Just this morning, no.

5   Q    When you evaluated the patient, did you ever call

6   Dr. Warfel?

7   A    No.  I had records so....

8   Q    But you did review his records, correct?

9   A    Yes.

10  Q    You're aware -- are you aware that Dr. Warfel said he

11  could go to the classes?

12  A    You know, I've read the records.  I don't remember

13  seeing that but I'll take your word for it it exists.  I can

14  go back in the record and see it.

15  Q    Is there a difference between going to the classes and

16  actually doing an injection?

17  A    Sure.

18            MR. RAVEN:  Thank you very much.  Nothing further.

19            MR. BERMAN:  Nothing, your Honor.  Thank you.

20            THE COURT:  Thank you, Dr. Dattilio.  You may step

21  down, sir.

22                 (Witness excused)

23            THE COURT:  Okay, Mr. Berman, what do you got?

24            MR. BERMAN:  I'm going to switch seats with

25  Mr. Whitaker at this point, your Honor, and give everybody a

Dr. Dattilio - Recross

1    break from hearing my tones.

2            MR. WHITAKER:  Judge, our next witness is Karen

3    Simone.

4            THE CLERK:  Would you state your name for the

5    record, please.

6            THE WITNESS:  Karen Simone.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Karen Simone – Direct

```
 1   K A R E N   S I M O N E, having been called as a witness,

 2   being duly sworn, testified as follows:

 3          THE COURT:  Okay.  Proceed.

 4   BY MR. WHITAKER:

 5   Q     Good afternoon, Miss Simone.

 6   A     Good afternoon.

 7   Q     First I want to thank you for coming out.  I know it's

 8   a day early.  Would you please introduce yourself to the

 9   jury, giving your full name and tell them where you live and

10   work?

11   A     Sure.  Karen Simone and I live and work in Syracuse,

12   New York.

13   Q     And what is your profession?

14   A     My profession is vocational rehabilitation counseling

15   and also lifecare planning which is part of rehabilitation.

16   Q     And where are you currently employed?

17   A     I'm currently self-employed, K. Simone and Associates.

18   Q     Just backup for a moment.  Can you briefly explain for

19   the jury, you mentioned the two areas of your profession,

20   vocational rehabilitation and lifecare planning.  Can you

21   just explain for the jury what those two things are and the

22   difference between them?

23   A     Sure.  So, vocational rehabilitation counseling is

24   working with people with disabilities to help them overcome

25   limitations and barriers to hopefully be able to return to
```

Karen Simone – Direct

1    work or get a job in the labor market and if that's not

2    possible, then to help them be as independent as possible.

3    And lifecare planning is sort of a subset of vocational

4    rehabilitation or rehabilitation, in general, in that it's

5    understanding the medical and diagnoses and treatments

6    associated with certain conditions and how frequently they

7    need to occur to prevent decompensation and how much those

8    things cost.

9    Q     Can you just give the jury a background of your

10   education, give them your educational background, please?

11   A     Sure.  I have a bachelor's degree from SUNY Oswego in

12   public justice and then I attended graduate school at

13   Syracuse University and rehabilitation counseling and then I

14   also have a post graduate certification in lifecare planning

15   from the University of Florida.

16   Q     And, Miss Simone, can you please explain for the jury

17   what your work experience has been since you completed

18   graduate school?

19   A     Sure.  I started working while I was in graduate school

20   and I started working in private rehabilitation, helping

21   injured workers return to work or working with their

22   employers to make job accommodations and modifications so

23   they could stay at work or go back to work.  I did

24   employability assessments to determine what their skills were

25   and also labor market research to understand what the

Karen Simone – Direct

1    viability of their options were in the labor market.  I then

2    went to work inpatient for something different at Upstate

3    University Hospital in Syracuse and I worked on the rehab

4    floor with some pretty severe injuries.  I also worked on the

5    psychiatric inpatient unit helping them understand what their

6    vocational options were when they recovered from disability.

7    I then went to work for Met Life Disability Insurance Company

8    where I worked with a very large employer.  I partnered with

9    them to help their employees return to work that were on

10   disability claim.  So I would work with the supervisors to

11   suggest job accommodations, modifications, work with the

12   doctors to make sure it was safe, then I was promoted into

13   management.  Managed the clinical staff and then I got the

14   job of managing their appeals department and then I left and

15   went to work with Dr. Ken Reagles in Syracuse who does expert

16   witness testimony, as well as he sort of mentored me and took

17   me under his wing and now I'm self-employed and do the same

18   type of work.

19   Q    So, just to summarize all told, how many years of

20   experience do you have in vocational rehabilitation?

21   A    Started in 1992.  So several decades.

22   Q    Miss Simone, you mentioned earlier, I believe a

23   certification you have.  Make sure I don't miss it, can you

24   explain to the jury any professional certifications that you

25   hold?

Karen Simone – Direct

1   A     Sure.  I'm a certified rehabilitation counselor and

2   that requires a person to, these days, have a Master's degree

3   in rehabilitation.  And I'm also a certified lifecare planner

4   and that requires the post-graduate work where you get

5   specifically trained, 120 hours minimum, for lifecare

6   planning.

7   Q     And are you a member of any professional organizations

8   related to your field of practice?

9   A     Yes.  I'm a member of the International Association of

10  Rehabilitation Professionals and it's -- they also have state

11  chapters.  I also belong to the New York State chapter.

12  Q     Do you have any leadership roles within your field of

13  specialty?

14  A     Yes.  I'm currently president of the New York Chapter

15  of Higher Ups.

16  Q     Have you ever conducted any seminars or lectures in the

17  field of vocational rehabilitation?

18  A     Yes.  Together with Dr. Reagles, every year we

19  co-present an advanced law class at Syracuse University.  He

20  sort of takes the economic loss and I take the lifecare

21  planning piece to introduce law students to the consent of

22  lifecare planning.

23  Q     Can you just provide a little bit more detail.  You

24  mentioned the term economic loss, can you explain briefly for

25  the jury a little more specifically about what you were

Karen Simone – Direct

1   speaking on at the Syracuse School of Law?

2   A     Well, we present the prongs of proving damages in civil

3   litigation.  So one prong is the loss of earnings capacity

4   piece of it.  So it's employability assessments, it's

5   understanding a person's employability following an event or

6   a disability.  It's understanding loss of household services

7   and then the other piece of the economic damages is what

8   their future health related goods and services are going to

9   cost for the rest of their life as a result of the incident

10  that took place.

11  Q     Have you ever provided these services to attorneys or

12  in actual civil litigation proceedings like this one?

13  A     Yes, I have.

14  Q     Okay.  And just, generally speaking, what's the nature

15  of the services that you're typically providing in civil

16  litigation like this?

17  A     It's typically employability analysis assessments,

18  losses of earning capacity assessments and lifecare planning.

19  Q     Are you compensated for those services?

20  A     Yes.

21  Q     Are you being compensated for your services here today?

22  A     Yes.

23  Q     Does that compensation affect your professional

24  judgment in any way?

25  A     No.

Karen Simone – Direct

1   Q     Did there come a time when were you asked to evaluate

2   this specific case --

3   A     Yes.

4   Q     -- with Mr. Stevens, Christopher Stevens?

5   A     Yes.

6   Q     Specifically who asked you to do that?

7   A     Mr. Rob Thorpe.

8   Q     He's one of the attorneys here today?

9   A     That's correct.

10  Q     What were you asked to do; what information were you

11  asked to consider?

12  A     I was asked to assess whether there were any reasonable

13  accommodations that could have been made that would have

14  allowed Mr. Stevens to remain employed with Rite Aid and also

15  his employability following job termination in 2011.

16  Q     The assessment of whether there's potential reasonable

17  accommodations, is this something you have experience?

18  A     Yes.  I've been working with employers for decades to

19  help them understand how to accommodate for people.

20  Q     Are you ever asked to advise or consult with employers

21  on these issues?

22  A     I'm sorry.  Can you say again.

23  Q     Have you ever been asked to advise or consult with

24  employers on these issues whether and what type of reasonable

25  accommodations can be provided?

Karen Simone - Direct

1   A     Yes, absolutely.  Especially my work experience with

2   Crawford and my work experience with Met Life.

3   Q     In terms of the documents -- let me ask you this:  Did

4   you review any documents in preparation or as part of your

5   analysis of this case?

6   A     Yes.  I reviewed medical records provided to me,

7   certain legal documents, employer records, employment

8   records.  Obviously my interview of Mr. Stevens.

9   Q     And in terms of the employer records, do you recall

10  whether you had the opportunity to view Rite Aid's job

11  description for pharmacist?

12  A     Yes, I did.

13  Q     Did you also have the opportunity to view any of

14  Mr. Stevens' records or documents relative to his efforts to

15  get a new job after being fired?

16  A     Yes, I did.

17  Q     I believe you mentioned a moment ago that you did

18  personally interview Mr. Stevens?

19  A     Yes, I did.

20  Q     Can you just tell us a little bit about that interview

21  and some of your, what your impressions were of that

22  interview of Mr. Stevens?

23  A     Sure.  When I met Mr. Stevens he struck me as a quiet

24  and somewhat reserved person.  As the interview progressed he

25  did cooperate and give me answers but he was quiet and didn't

Karen Simone - Direct

1   elaborate a lot initially, but as he became more comfortable

2   and he started talking more about what occurred, it became

3   very apparent how embarrassed he was that he wasn't working

4   and that he had been fired from a job and he was very

5   concerned about caring for his children and what his future

6   economic status is going to be.  He had worked for 40 years

7   for one company and so that was a severe source of concern

8   for his future.

9           MR. RAVEN:  Objection.  Move to strike.

10           THE COURT:  Well, I think part of the answer can

11   stand but I think I'll strike the part that has to do with

12   her assessment of his embarrassment, whether or not he was

13   bothered by not being able to support his family and all the

14   other things we've heard from other witnesses, but I'll

15   strike that because this witness is not qualified to testify

16   in that area.

17           MR. WHITAKER:  Okay.

18   Q    What did you learn -- what, if anything, did you learn

19   about Mr. Stevens' educational background?

20   A    I learned that he graduated from Whitesboro High School

21   in 1972.  By his report he was a straight A student.  That he

22   had gone on to Utica College, the first in his family, and

23   after a couple of years transferred to the Albany School of

24   Pharmacy where he graduated in 1977 with a bachelors in

25   pharmacy.

Karen Simone – Direct

1   Q      As part of your analysis did you examine the licensing

2   requirements for a pharmacist in New York State?

3   A      I did.

4   Q      And what were your conclusions based on that analysis?

5   A      That he's qualified -- he holds a current valid

6   license.

7   Q      Did you discover anything, as part of your analysis of

8   the licensing requirements, that requires a pharmacist to be

9   certified to immunize?

10  A      Can you say that again.

11  Q      Is the ability -- is certification to immunize part of

12  the licensing requirements for a pharmacist in New York?

13  A      No, it is not.  It's a separate thing.

14  Q      What is the importance or, I guess, what is the

15  relevance of Mr. Stevens' educational background and his work

16  experience in terms of his prospects for employability?

17  A      Well, Mr. Stevens has a bachelor's degree in pharmacy

18  and he's only ever worked in retail so he doesn't have a

19  particularly diverse background in pharmacy.  Those two

20  factors put him at a competitive disadvantage to what is out

21  there in the labor market in terms of competing with people

22  that have a doctorate in pharmacy and have some diversity to

23  their background.

24  Q      Can you just explain a little bit more to the jury

25  about that.  You mentioned doctorate in pharmacy.  How common

Karen Simone – Direct

1  is it for young pharmacists to have that now?

2  A     That's standard of education now is doctorate in

3  pharmacy or they call it a PharmD.

4  Q     As part of your analysis here, did you have the

5  opportunity to learn about Mr. Stevens' medical history?

6  A     Yes.

7  Q     What did you learn?

8  A     I learned that he was diagnosed with trypanophobia,

9  which is the fear of needles, and also he was diagnosed with

10 the fear of heights, both of which are anxiety disorders and

11 he was also diagnosed with obsessive compulsive personality

12 disorder.

13 Q     Were you also asked to familiarize yourself or I should

14 say did you look at documentation regarding the circumstances

15 of Mr. Stevens' termination from Rite Aid?

16 A     Yes, I did.

17 Q     And what did you learn?

18 A     I learned that Rite Aid started requiring their

19 pharmacists to become immunizing pharmacists and that

20 Mr. Stevens had informed them that he was unable to become an

21 immunizing pharmacist and that he had the fear of needles and

22 requested an accommodation and Rite Aid turned around and

23 asked him some additional questions and did not feel that it

24 qualified under the ADA and terminated his employment.

25 Q     Miss Simone, I want to take one step backwards very

Karen Simone – Direct

```
 1   briefly because we talked about the licensing requirements

 2   for a pharmacist.  Can you just explain to the jury what the

 3   Dictionary of Occupational Titles is?

 4   A     Sure.  It's a catalog of about 12,700 jobs that are --

 5   exist in our economy or supposed to exist in our economy.

 6   Q     Do you know who authors and publishes that?

 7   A     Right.  The Department of Labor.

 8   Q     The United States Department of Labor or New York State

 9   Department of Labor?

10   A     United States Department of Labor.

11   Q     Can you consider this dictionary as part of your

12   analysis of Mr. Stevens' case?

13   A     Well, it's one of the sources of information I always

14   look at.

15   Q     How is it relevant to your analysis?

16   A     Well it gives a description of the job.

17   Q     Of the job of?

18   A     Of a pharmacist or any other job that you want to look

19   up; that some of the jobs we have today are not included in a

20   Dictionary of Occupational Titles.

21   Q     I know you don't know the actual definition off the top

22   of your head.  Is it a relatively short or long definition

23   from your memory?

24   A     It's about this long (indicating).

25              THE COURT:  Well, the record can't reflect that.
```

Karen Simone – Direct

1    Why don't you translate that into English.

2           THE WITNESS:  Three inches.  Let me measure

3    specifically.

4    Q    Miss Simone, was that definition a part of the report

5    that you produced in this case?

6    A    Yes.

7    Q    Would it help if I showed it to you?

8    A    I have it right here.

9    Q    You do have it with you?

10   A    Okay.

11   Q    Could you just read that definition to the jury,

12   please?

13   A    Sure.  Compounds and dispenses prescribed medication,

14   drugs and other pharmaceuticals for patient care according to

15   professional standards and state and federal legal

16   requirements.  Reviews prescriptions issued by physician or

17   other authorized prescriber to ensure accuracy and determine

18   formulas and ingredients needed.  Compounds medications using

19   standard formulas and processes such as weighing, measuring

20   and mixing ingredients.  Directs pharmacy workers engaged in

21   mixing, packaging and labeling pharmaceuticals.  Answers

22   questions and provides information to pharmacy customers on

23   drug interactions, side effects, dosage and storage of

24   pharmaceuticals.  Maintains established procedures concerning

25   quality assurance, security of controlled substances and

Karen Simone - Direct

1    disposal of hazardous waste drugs.  Enters data such as

2    patient name, prescribed medications and cost to maintain

3    pharmacy files, charge system and inventory.  Make the same

4    medications to determine identity, purity and strength.  May

5    instruct interns and other medical personnel on matters

6    pertaining to pharmacy or teaching college of pharmacy.  May

7    work in hospital pharmacy and be designated pharmacist

8    hospital.

9    Q     In the field of vocational rehabilitation, how

10   authoritative is this dictionary that the department of labor

11   publishes?

12   A     Well, it's the standard for job descriptions.

13   Q     Okay.  I know that was a long definition but am I

14   correct in stating that it does not mention the ability to

15   give immunizations?

16   A     Correct.  It does not mention it.

17   Q     I'd like to shift gears to the reasonable -- the issue

18   of reasonable accommodations.  Miss Simone, what is your

19   understanding as to what the term reasonable accommodation

20   means?

21   A     Reasonable accommodation is changing or modifying a job

22   or a work environment so that somebody can perform the job or

23   compete for the job and enjoy the same benefits as other

24   people that are employed.

25   Q     Did you have an opportunity to examine whether there

Karen Simone – Direct

```
 1   were any reasonable accommodations available for Mr. Stevens
 2   in this case?
 3   A      Yes.
 4   Q      And what were your conclusions and opinions regarding
 5   that?
 6   A      Well, my conclusions and opinions were that there were
 7   several accommodations that could have been considered for
 8   Mr. Stevens.
 9   Q      Can you please just explain to the jury what those
10   accommodations are?
11   A      Sure.  Well, first and foremost, it could have been
12   considered that he could have been reassigned to a bigger
13   store that had more than one pharmacist on at any given time
14   so that the other pharmacists could have given the
15   immunizations.  It may be in that scenario that he would have
16   been required to reduce his hours to less than full time but
17   nevertheless that would have been an option to consider.
18   They could have changed the immunization schedule or made an
19   immunization schedule at his store so that he was only
20   assigned to work during hours or times when immunizations
21   were not offered.  They could have considered diverting
22   immunizations to a nearby store and they could have
23   considered offering him a different job all together that he
24   may have been qualified to perform such as a pharmacy
25   technician and they could have informed him or offered him to
```

Karen Simone – Direct

1   attend desensitization therapy in an effort to possibly

2   eliminate his phobia or at least reduce it to the point where

3   he would no longer have that limitation and he could fully

4   function as an immunizing pharmacist.

5   Q    Now, just following up on some of those accommodations.

6   You mentioned reassignment to a larger store.  Did you have

7   the opportunity to consider any information relative to the

8   size and resources of Rite Aid?

9   A    Yes.

10  Q    Based on the information you reviewed can you just

11  explain for the jury approximately how many stores Rite Aid,

12  stores and locations that Rite Aid has?

13  A    I don't know the exact number of stores.  I know there

14  are several stores in the vicinity.  Mohawk Valley I also

15  consider Central New York because many people commute to

16  Syracuse to work, as well.  I considered the deposition

17  testimony of Mr. Spink's in which there were several stores

18  that had more than one pharmacist on on particular days that

19  were consistently high traffic.

20  Q    And do you know approximately how many stores in 2011

21  were within the City of Utica, how many Rite Aid stores?

22  A    Not off the top of my head.

23       THE COURT:  Okay.  We're going to break for lunch

24  now, it's 12:30.  We'll see you back at 1:30.

25       Court stands adjourned.

Karen Simone – Direct

```
 1              (Lunch break taken)

 2              (Jury present)

 3              THE COURT:  All right.  Mr. Whitaker, you may

 4    continue.

 5              MR. WHITAKER:  Thank you, your Honor.

 6    BY MR. WHITAKER:

 7    Q     Miss Simone, I believe where we left off I had asked

 8    you a question regarding approximately how many stores that

 9    Rite Aid has.

10    A     Right.

11    Q     Please expand upon that.

12    A     Sure.  When I did my research, I found that Rite Aid

13    has approximately 4600 stores in 31 states within the United

14    States.  And that in the Utica/Rome area there were

15    approximately ten Rite Aid Pharmacy stores within 11 miles.

16    Q     And within the Utica Rome area, were there any stores

17    that were very closely located to each other?

18    A     It appeared that way.  Few blocks.

19    Q     I'm sorry?

20    A     A few blocks.

21    Q     By a few blocks, some of them are separated by a few

22    blocks.  I'd like to move onto the earnings capacity part of

23    your analysis.

24              Miss Simone, were you asked to study the earning

25    history of Mr. Stevens as a pharmacist?
```

Karen Simone – Direct

```
 1    A      Yes, I was.

 2    Q      And what were your conclusions; what did you find out

 3    about his earning capacity?

 4    A      That he earned anywhere from 131,000 a year to 135,000

 5    a year as a pharmacist.

 6    Q      Can you explain for the jury what the term, what the

 7    term earning capacity -- earning capacity means?

 8    A      Earnings capacity is a person's ability to work and

 9    earn a certain wage.

10    Q      And do you have an opinion regarding Mr. Stevens'

11    earning capacity had he not been fired by Rite Aid?

12    A      Well, considering -- yes, I do.  I have an opinion and

13    my opinion is that his earnings capacity would have been

14    consistent with what he had earned in the past.  There's no

15    reason to believe that there would have been any career

16    changes or anything other than remaining to work as a

17    pharmacist considering he had done it for 35 years for the

18    same employer.

19    Q      And just to clarify, when I'm asking you throughout

20    what your opinion is, I'm asking you what's your professional

21    opinion as a vocational rehabilitationist.  Is that what you

22    understand what I'm asking you?

23    A      Yes.  I understand that.

24    Q      Miss Simone, you referred to the term residual

25    employability analysis?
```

Karen Simone - Direct

1    A      Yes.

2    Q      Can you explain to the jury what that term means?

3    A      Residual employability is a person's employability

4    following an event or a disablement.  Residual meaning what's

5    left after something has occurred.

6    Q      And is in within your field of expertise, is there a

7    particular method that's used to make this determination?

8    A      Yes, there is.

9    Q      Can you explain that for the jury, please?

10   A      Sure.  To determine a person's residual employability,

11   we look at their age, we look at their education, training,

12   work experience, any limitations they may have and then what

13   is available in the labor market as the last piece to that.

14   Q      And did you conduct this type of analysis relative to

15   Mr. Stevens?

16   A      Yes, I did.

17   Q      What were your conclusions?

18   A      My conclusions were that, initially, that he was

19   qualified at least on paper to work as a pharmacist in other

20   venues, if you will, in the labor market and certainly as an

21   assistant to a pharmacist or what they call a pharmacy

22   technician.

23   Q      I'm going to ask you if you're familiar with another

24   term.  Are you familiar with the term mitigation?

25   A      Yes.

Karen Simone – Direct

1    Q      What is meant by that term?

2    A      Mitigation is an attempt to lessen the severity of

3    something for the consequences of something.

4    Q      And how is mitigation important to your employability,

5    employability analysis?

6    A      Because it helps me understand what a person has done

7    to impact their circumstances.

8    Q      And in evaluating this case, did you analyze whether

9    Mr. Stevens, in your opinion, appropriately attempted to

10   mitigate his damages?

11   A      Yes.  I did look at that and based on my interview of

12   Mr. Stevens and the records that were provided to me, he had

13   attempted to look for work and submitted several inquiries

14   and applications in an tempt to secure another job as a

15   pharmacist.

16   Q      Now, we've heard some testimony in this trial already

17   about the fact that Mr. Stevens remains unemployed even

18   through today.  But based on your interview of Mr. Stevens

19   and your review of the records in this case do you believe,

20   is it your opinion, your professional opinion that

21   Mr. Stevens has made a good-faith effort to mitigate his

22   damages?

23   A      Yes.  He made a good-faith effort in terms of looking

24   at the context of this situation.  This is a gentleman who

25   had worked for the same employer for 40 years.  He never had

Karen Simone – Direct

1   to look for a job in his entire life.  He never had to

2   develop a resume.  He never had to sell himself.  He had

3   always worked there.  So to go out and to submit all his

4   applications, it's my understanding he visited a few

5   employers in person.  He had called a few people.  He made a

6   good-faith effort, the best that he knew how to make.

7   Q     Miss Simone, can you briefly explain some of -- both

8   the assets and the barriers that exist relative to

9   Mr. Stevens' ability to get a job?

10  A     Sure.  Well, certainly his assets are that he does have

11  a degree in pharmacy.  He has a lot of work experience so

12  he's got great skills.  He is licensed.  There are no

13  infractions on his license or history of suspensions or

14  anything like that, so those are assets.  And he has worked

15  for the same employer for several years which would appear to

16  some people as being very loyal, which it is, but to a hiring

17  manager that sort of turns into a barrier because then the

18  red flags come up as to why somebody who is in their 50s who

19  has worked for the same employer for 40 years is now out of a

20  job and looking for employment.  So some barriers are his

21  age, the fact that he's competing for jobs with recent

22  graduates who have doctorate degrees because that's now the

23  requirement; that he has been terminated from employment and

24  that he does only have experience in one sector of pharmacy.

25  So he doesn't have the diverse background in pharmacy.

Karen Simone - Direct

```
 1   Q      And would any of these barriers that you just
 2   discussed, when Mr. Stevens is applying for a job, would any
 3   of those barriers have an impact on his ability to get an
 4   interview to go to the next step if you will?
 5   A      Well, sure.  As I said, the same factor that may seem
 6   like an asset because he was loyal, as a hiring manager
 7   you're wondering what happened and so when you're looking at
 8   that resume, and you have 20 or 30 other job applicants from
 9   people who have doctorate degrees, you're asking yourself
10   something doesn't seem right and what is the situation.
11   Q      I'm going to present another term to you:  Transferable
12   skills analysis.  Are you familiar with that term?
13   A      Yes.
14   Q      Can you please explain to the jury what that means?
15   A      So that's the skills and abilities that you acquire
16   through your work history, through your work experience, that
17   you can rely upon or consider when looking at maybe is there
18   another job out there that I could do with those skills and
19   is there a market for it in a labor market.
20   Q      Just so the jury understands.  This transferable
21   skills, is this part of what you're looking at in evaluating
22   Mr. Stevens' ability to mitigate his own damages?
23   A      Absolutely.
24   Q      So did you conduct a transferable skills analysis
25   relative to Mr. Stevens?
```

Karen Simone – Direct

1   A      I did.

2   Q      What were your conclusions?

3   A      Well, my conclusions were that he certainly is

4   qualified on paper, as I said, to be a pharmacist.  And so

5   the real test to that is are his skills marketable out there

6   in today's labor market?  So I investigated a variety of

7   settings within the pharmacy industry.

8   Q      And what I'd like to do now is if you could just walk

9   the jury through what, what some of these other opportunities

10  are that exist that you found?

11  A      Sure.  I looked at, of course, retail pharmacy and the

12  employers that were contacted said they do offer immunization

13  and most of them are large chain retail pharmacies and that

14  their pharmacists do administer the immunizations but they

15  would not comment on whether they knew it was mandatory or

16  not.  They would refer us to the district office and then we

17  didn't get a call back on one of them.  And then I

18  investigated, okay, could he then go work in a clinical

19  setting?  When I say clinical, I mean in a hospital or some

20  health care facility where immunizations are not commonplace

21  for the pharmacist.  And then through labor market research

22  and talking to professors and people within those health care

23  industry, organizations, I discovered that he wasn't really

24  qualified.  He can't compete with the, what they're looking

25  for in the clinical pharmacies so then I turned my attention

Karen Simone – Direct

```
 1    to look at what I call not direct patient contact jobs.  So

 2    consultant or mail order pharmacies which has emerged in the

 3    recent years and unfortunately there's just no labor market

 4    for those jobs in Central New York.

 5    Q    What about the work as a consultant, did you consider

 6    that?

 7    A    Yes.  I'm sorry.  I thought I said that.

 8    Q    Oh, okay.

 9    A    Consultant and there was not really a viable market for

10    that either.

11    Q    What is meant by the term labor market analysis?

12    A    Labor market analysis is using data sources, contacting

13    people in the labor market to understand what employers are

14    looking for, what's the climate out there for people with

15    certain skills to, to get jobs.  The likelihood of them

16    getting selected for jobs.

17    Q    And did you conduct a labor market analysis in this

18    case relative to Mr. Stevens?

19    A    I did.

20    Q    What were your conclusions?

21    A    Well, my conclusions were that for the positions of

22    consultant, they're not viable.  That the clinical pharmacist

23    positions were not a feasible option for Mr. Stevens to

24    consider but there were the several pharmacy tech positions

25    that were available.
```

Karen Simone – Direct

1   Q     And Mr. Stevens would be qualified, in your opinion?

2   Would Mr. Stevens be qualified for that position?

3   A     He would be over qualified.  He's certainly qualified

4   but he's over qualified, but yes.

5   Q     And because he's over qualified what would that mean in

6   terms of his prospects as employability as a pharmacy tech?

7   A     An employer might be suspicious, again, as to why a

8   pharmacist is applying for a pharmacy tech position.  Again,

9   a red flag.

10  Q     Miss Simone, you mentioned in your report that you had

11  considered some statistics by New York State and United

12  States Department of Labor, is that correct?

13  A     That's correct.

14  Q     Are you familiar with the term, let me ask you this:

15  What source of data does the New York State Department of

16  Labor issue on employment opportunities for occupations?

17  A     Well, they provide data on short-term employment

18  projections, long-term employment projections, current

19  existing numbers and wages.

20  Q     And that data that they release, is that specific to

21  occupations or is that sort of more general?

22  A     They have both.

23  Q     So it is specific to occupations?

24  A     Yes.

25  Q     Did you review -- we'll start with the long-term

Karen Simone – Direct

1    projections.  Have you reviewed the long-term projections by

2    the New York State Department of Labor relative to work as a

3    pharmacist?

4    A      I did.

5    Q      And if you could just explain for the jury what years

6    does that long-term projection cover?

7    A      I believe 2012 through 2022.

8    Q      If I told you it's 2010 to 2020.

9    A      I'm ahead of myself.

10   Q      Do you have a copy of the report with you by any

11   chance, the New York State Department of Labor?

12   A      I have it in my --

13   Q      Projection.

14   A      I have it in my briefcase.

15   Q      All right.  I'll just move on.  If you remember, what

16   was the long-term projection for pharmacists in that report

17   in the Mohawk Valley region?

18   A      Fourteen percent growth.

19   Q      Did any of the additional information or other

20   projections by the department of labor conflict with that in

21   any way?

22   A      Yes.  The short-term projections, which are for the

23   years 2013 through 2015, sorry, projected a negative 2.2 with

24   a loss of ten jobs in the Mohawk Valley region and for the

25   Central New York region it projected a flat zero percent.  No

Karen Simone - Direct

1    growth.

2    Q      So the jury understands, probably most of them do

3    anyways, when you say Central New York area, what geographic

4    area does that cover?

5    A      I apologize.  Onondaga County, Syracuse, New York.

6    Q      So that would reach out to Syracuse?

7    A      Correct.

8    Q      And these short-term projections, are these issued more

9    frequently than the long-term projections by the state

10   department of labor?

11   A      Yes.

12   Q      Based on your analysis that you conducted relative to

13   Mr. Stevens, are you surprised with the difficulties he's had

14   in gaining employment since he was fired?

15              MR. RAVEN:  Objection.

16              THE COURT:  Sustained.

17   Q      Miss Simone, based on your analysis, in your

18   professional opinion what is the likelihood of Mr. Stevens

19   gaining employment in the field of pharmacy?

20   A      It's my professional opinion that his employability is

21   severely diminished because of all the barriers that I

22   previously mentioned.

23   Q      And I believe you may have testified to this earlier

24   but in terms of your review of the efforts that Mr. Stevens

25   has made to gain employment, what is your professional

1    opinion as to whether he has made a good-faith effort?

2    A    Well, it's my opinion that he did make a good-faith

3    effort.  He made the best effort that he knew how.

4    Q    And those barriers that you discussed for the jury that

5    exist within the marketplace, in your opinion do they -- is

6    it your opinion that they have impeded his ability to get a

7    job over the last three years?

8    A    Yes.

9         MR. WHITAKER:  That's all I have, your Honor.

10        THE COURT:  All right.  Mr. Raven, you may

11   cross-examine.

12        MR. RAVEN:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. RAVEN:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    Miss Simone, you were called here to testify today

18   obviously in connection with Mr. Stevens' litigation,

19   correct?

20   A    Correct.

21   Q    And the majority of your business is evaluating in the

22   scope of litigation?

23   A    Well, no, I do a fair amount of testimony for Social

24   Security too.

25   Q    So besides Social Security and litigation, that's

Karen Simone – Cross

```
 1   essentially what you do in your business?

 2   A     I do do some case management too.

 3   Q     Do you own the business?  I'm sorry.  I couldn't hear

 4   you.

 5   A     Yes, I own the business.

 6   Q     All right.  Now, you came to certain conclusions after

 7   evaluating Mr. Stevens and looking at his records and

 8   employment records and so forth and one of the first things

 9   that you talked about on direct examination was the licensing

10   and registration requirements of pharmacists in New York?

11   A     Correct.

12   Q     And, Miss Simone, you would agree with me that

13   licensing requirements and certifications set a minimum

14   standard for industries and professions, such as pharmacists,

15   correct?  It's the minimum standards?

16   A     You have to meet certain criteria in order to become a

17   licensed pharmacist.

18   Q     All right.

19   A     Yes.

20   Q     Miss Simone, you would agree with me, would you not,

21   that the industry itself has a right to set higher standards?

22   A     The industry has a right to set certain standards for

23   job descriptions.  I guess I don't understand exactly what

24   you're saying.

25   Q     Well, in other words -- let's take the pharmacy
```

Karen Simone – Cross

```
 1   situation.  You have to meet certain criteria to become a

 2   pharmacist, correct?

 3   A      Correct.

 4   Q      And then when one gets out into the field and starts

 5   applying for jobs and they go to different employers,

 6   different employers may have different criteria for your

 7   being employed, correct?

 8   A      Sure.

 9   Q      Okay.  And it's no different from other industrials

10   such as teaching perhaps, correct?

11   A      Correct.

12   Q      Or working in a hospital?

13   A      Correct.

14   Q      Or perhaps working as a contractor, correct?

15   A      Correct.

16   Q      And the standards that the employer sets can sometimes

17   be higher and require more of an individual than what is set

18   by the minimum standards in order to get the license, is that

19   correct?

20   A      Yes.  They can ask more of an employee.

21   Q      And in your experience in evaluating these cases and

22   determining employability of individuals, you would agree

23   with me that no industry stays stagnant, correct?

24   A      Correct.

25   Q      And the standards that existed perhaps in the 1960s for
```

Karen Simone – Cross

```
 1    an industry or for a profession are certainly not the same
 2    that exist now?
 3    A     True.  Not for all but for some.
 4    Q     Okay.  And for many professions those skills that are
 5    required, in order to keep up with technology, to keep up
 6    with new methods of treatment and so forth, the industry has
 7    to change, correct?
 8    A     Correct.
 9    Q     All right.  And you wouldn't argue with an employer who
10    wants to set a higher standard for treating patients than
11    just going by the basics, you wouldn't argue with that
12    concept, would you?
13    A     No.
14    Q     Of course not.  Now, the pharmacy industry, by the way,
15    how many pharmacy cases have you testified in?
16    A     This is the only pharmacy, pharmacist.
17    Q     Pharmacist.  This is the first case?
18    A     Yes.
19    Q     Okay.  So up until now you haven't had to do any
20    research regarding the pharmacy industry in terms of
21    employability, correct?
22    A     Well, if you're talking about specific to
23    pharmaceuticals or just pharmacists?
24    Q     I'm talking about just pharmacists.
25    A     Just pharmacists, right.
```

Karen Simone - Cross

```
1    Q     So you have never done any investigation on that before
2    and you've never testified in that area before, correct?
3    A     Correct.
4    Q     All right.  Now, you talked about on direct a little
5    bit about reasonable accommodations for Mr. Stevens and if I
6    understood you correctly you were talking about accommodating
7    him in the context of putting him in a position, a different
8    position than he had before and excusing him from
9    immunization, correct, where he didn't have to do that?
10   A     Well, I wouldn't call it a different position.  It's
11   still pharmacist, it's just at a different location.  A
12   different way of --
13   Q     Let me rephrase that.  You aren't suggesting that his
14   employer should have put him in a position where he was
15   excused completely, one hundred percent, from performing the
16   function of immunization?
17   A     No.  What I said was his employer had an obligation to
18   consider various options, including reassigning him to a
19   different location but also desensitization therapy or that
20   recommendation would have maybe, if successful, allowed him
21   to remain there.
22   Q     Outside of the desensitization cognitive therapy?
23   A     Okay.
24   Q     All of the other suggestions that you made in terms of
25   putting him in a store with dual pharmacists, sending a
```

Karen Simone - Cross

 1   patient who came in and said I want a flu shot to a different

 2   store that's perhaps two or three blocks away?

 3   A     Right.

 4   Q     Those are suggestions where Mr. Stevens would not have

 5   to immunize, correct?

 6   A     Correct.

 7   Q     Now, let me ask you about the desensitization.  I'm

 8   going to switch and I'm going to come back to my original

 9   subject.

10         You are not suggesting to this jury that an

11   employer has an obligation to treat a condition?

12   A     No, I'm not suggesting that they treat it.

13   Q     I didn't mean to cut you off.

14   A     No.  That's okay.

15   Q     So if a different type of impairment, such as somebody

16   has diabetes and presented to their employer saying I need an

17   accommodation because I have diabetes.  I have to leave early

18   on Thursdays because I have a doctor's appointment or during

19   the course of the day sometimes I get a little dizzy, I may

20   have to sit down or I may need a break.  Those are

21   accommodations where the employee can still do their job, is

22   that correct?

23   A     That's correct.

24   Q     And --

25   A     Maybe.

Karen Simone – Cross

```
 1    Q     They're asking for an accommodation so they can still

 2    do their essential job functions but with an accommodation,

 3    correct?

 4    A     Correct.

 5    Q     But you wouldn't expect and you would never suggest to

 6    this jury that the employer had an obligation to either

 7    diagnosis or treat that condition, that would never happen,

 8    correct?

 9    A     Correct.

10    Q     And there's no requirement for that, correct?

11    A     Correct.

12    Q     So, to suggest that Mr. Stevens' employer should have

13    sent him for desensitization training, that's a treatment,

14    correct?

15    A     Well, suggesting that this is something that a person

16    could pursue to help them is different than providing the

17    actual treatment.

18    Q     Well, you're not suggesting that the employer has an

19    obligation to suggest a course of treatment for an illness,

20    are you, any different from a diabetic?

21    A     No.  I'm suggesting an employer has an obligation to

22    protect a 40-year asset.

23    Q     If the person, again, getting back to somebody who has

24    diabetes.  Do you expect the employer to say, hey, you've got

25    to go to this doctor or you've got to go for this treatment
```

Karen Simone – Cross

```
 1   or you need this particular test.  It's not the employer's

 2   obligation, you're not suggesting that, are you?

 3   A     No, but a lot of employers now have wellness programs

 4   to help employees understand how to treat their conditions

 5   and to be well so that they can perform better on the job.

 6   Q     That's optional, correct.  That's not something they're

 7   required to do; that's something that's optional?

 8   A     Yes, but it's pretty standard with the larger

 9   employers.

10   Q     But employers don't have to do it; they don't have to

11   do it?

12   A     No, they don't have to do it.

13   Q     And certainly when you're talking about illnesses, it's

14   one thing for preventive medicine.  They don't suggest

15   treatment for a particular illness and they're not required

16   to do that, are they?

17   A     Can you say that again.

18   Q     Let me rephrase it.  I didn't phrase that correctly.

19   You're not suggesting that an employer would be required to

20   suggest treatment for a particular illness, correct?

21   A     They're not required to suggest it.

22   Q     Thank you.

23   A     No.

24   Q     Now, when you use the term reasonable accommodation,

25   okay, you were using that term in a general sense, correct?
```

Karen Simone – Cross

```
 1   A      Correct.
 2   Q      Okay.  You were not using that term with reference to
 3   what the definition of reasonable accommodation is under the
 4   Americans with Disability Act?
 5   A      Correct.  I was not, right.
 6   Q      So you don't know that definition?
 7   A      Well, I know in general the definition.
 8   Q      If you know in general, would you agree with me that
 9   under the Americans with Disability Act, an employer's
10   required to provide, to provide a reasonable accommodation so
11   that the person can perform the essential functions of the
12   job?
13              MR. WHITAKER:  Objection, your Honor.
14              THE COURT:  Basis?
15              MR. WHITAKER:  Well, he's asking about definitions
16   under ADA of essential functions.  He's asking for a legal
17   opinion.  This is a vocational rehabilitation expert.
18              THE COURT:  I don't think he's asking her to give
19   an opinion.  I think he's asking her if she knows about the
20   definition.
21              MR. RAVEN:  Correct.
22              THE COURT:  She can tell us what her general
23   knowledge of that condition is because it dovetails with her
24   employment practice.
25
```

Karen Simone - Cross

```
 1   BY MR. RAVEN:

 2   Q     Are you familiar with that terminology under the

 3   Americans with Disability Act, a reasonable accommodation so

 4   that the person can perform the essential functions of the

 5   job?

 6   A     Yes.  I'm familiar with those terms.

 7   Q     And that doesn't mean that you have to give them a

 8   different job that doesn't require those functions.  It means

 9   so that they can perform their job with those essential job

10   functions, correct?

11             MR. WHITAKER:  Same objection, your Honor.

12             THE COURT:  This time I'll sustain it because he is

13   asking for a legal --

14   Q     Now, I believe you told the jury before that you were

15   trying to determine whether Mr. Stevens could, in fact, get

16   another job in the area as a pharmacist, correct?

17   A     Correct.

18   Q     Okay.  And you did some analysis as to where the other

19   Rite Aid stores were, correct?

20   A     Yes.

21   Q     But you did something else, you tried to contact other

22   pharmacies, correct?

23   A     Correct.

24   Q     And you contacted CVS?

25   A     Correct.
```

Karen Simone - Cross

1    Q    And Wegman's?

2    A    Correct.

3    Q    And Walgreens?

4    A    Yes.

5    Q    And Target?

6    A    Correct.

7    Q    And Wal-Mart?

8    A    And Wal-Mart.

9    Q    All right.  And your inquiry from those particular

10   stores was, is the pharmacist required to give immunizations,

11   correct?

12   A    Correct.  Is it mandatory.

13   Q    Is it mandatory.  I think we're on the same page there.

14   A    Yeah.

15   Q    And you didn't get any response or you were referred to

16   corporate and you didn't get an answer?

17   A    When I got to that particular question, they -- I don't

18   know why.  They stopped and they said that they can't answer

19   that question.

20   Q    So, Miss Simone, as you sit here today you're not able

21   to tell this jury whether those pharmacies, those retail

22   pharmacies mandate that their pharmacists be immunizers?  You

23   can't tell the jury that, correct?

24   A    I can't tell the jury that.

25   Q    You can't tell them that it's not mandated, correct?

Karen Simone – Cross

```
 1   A      Right.  I only know that the pharmacists there do the

 2   immunizing and they do offer the immunizing, with the

 3   exception of Wal-Mart, didn't have them that year but they

 4   would in the future.

 5   Q      Now, you've been by all those stores in the past,

 6   correct?

 7   A      Most of them but not to the pharmacies.

 8   Q      What's the big sign you see in the windows or outside

 9   the stores, especially around this time of the year,

10   especially around September, what's the sign you see?

11          MR. WHITAKER:  Objection, your Honor.  This is both

12   irrelevant and beyond the scope.

13          THE COURT:  Well that maybe some indication of what

14   the store is offering to its clientele by way of immunization

15   services so that's what he's asking about.

16          MR. RAVEN:  That's what I'm asking.

17          THE COURT:   I'll overrule that.

18          MR. WHITAKER:  Can we get clarification as to what

19   time frame the question is in 2011?

20          THE COURT:  Timeframe is --

21   BY MR. RAVEN:

22   Q      Fine.  How about from 2011 to the present?

23   A      I don't recall 2011.

24          MR. WHITAKER:  Judge, again, just an objection.  If

25   we're talking about beyond 2011, it's irrelevant.  If he
```

Karen Simone - Cross

```
 1   wants to limit the question to 2011 or earlier, that's

 2   different.

 3              THE COURT:  How is it irrelevant?  We're talking

 4   about time of discharge and today and in the future.

 5              MR. WHITAKER:  This line of questioning pertains to

 6   whether pharmacies were offering this immunization.  What's

 7   happening now is not the issue.  What matters is the market

 8   in 2011.

 9              THE COURT:  I disagree with you.  I think it's

10   what's happening now.  That directly impacts upon his ability

11   to get a job today and yesterday and tomorrow and those are

12   the things we are here to learn about.  Overruled.

13   BY MR. RAVEN:

14   Q     Do you need the question read back?

15   A     Could you, please.

16              MR. RAVEN:  Could we have the reporter read back if

17   we could.  I just want to make sure we get the exact

18   terminology.

19                   (Record read back)

20   A     So today?

21   Q     2011 today or any time in between.

22   A     Well, there are several signs but I think the one

23   you're looking for is get your flu shot here.

24   Q     All right.  Now, Miss Simone, have you seen signs that

25   specifically say flu shots available upon request or
```

Karen Simone – Cross

```
 1   something to that?
 2   A     No, I don't recall.
 3   Q     Have you seen the signs that say no appointment
 4   necessary?
 5   A     I don't recall any.
 6   Q     You haven't seen any of those signs?
 7   A     I don't remember exactly.  I get my shots at the doctor
 8   so I don't pay real attention.  I've seen the get your flu
 9   shots here.  I don't remember the specific terminology on
10   them.
11   Q     Now, I'm going to switch gears again.  I'm going back
12   to something we touched on before.  You testified that one of
13   the things that Rite Aid could have done is that they could
14   have, in Mr. Stevens' store, had a patient come in and
15   Mr. Stevens says, I'm sorry, but I'm not an immunizer,
16   despite the fact that there's a sign outside and said, you
17   know, but by the way there's a Rite Aid two blocks, three
18   blocks away, could have sent him to another Rite Aid,
19   correct?  Is that what you said?
20   A     I don't think that exactly characterizes what I said.
21   Q     What did you say?
22   A     I didn't say despite the fact that there's a sign out
23   front.
24   Q     Okay.  Forgetting the sign.  You said you could have
25   sent him to another Rite Aid?
```

Karen Simone – Cross

```
 1   A      The sign might say no immunizations or he could have

 2   said we don't give the immunizations here, we give them at

 3   the store two blocks down the road.

 4   Q      Have you ever researched Rite Aid's marketing of their

 5   immunization program to their patients, have you done any

 6   reach on that whatsoever?

 7   A      No.

 8   Q      Would it surprise you to know that they advertise that

 9   flu shots are available upon request in every single store

10   any time there is a pharmacist on duty?  Are you aware of

11   that?

12            MR. WHITAKER:  She's not here as a marketing

13   expert.  She gave a market --

14            MR. RAVEN:  I'm sorry, she is.  She gave a

15   marketing analysis.

16            THE COURT:  Overruled.

17   A      I'm trying to remember what you said now.  Repeat.

18   Q      Are you aware that Rite Aid markets their immunization

19   program that any time a pharmacist is on duty that flu shots

20   and immunizations such as shingles and a number of other

21   things, pneumococcal, are available to their patients?

22   A      I was not aware of that but it doesn't mean that

23   accommodations can't be made for people.

24   Q      Well --

25   A      And I only suggested that they consider these options.
```

Karen Simone - Cross

```
 1   Not that it has to be written in stone.
 2   Q    So what you're asking Rite Aid or an employer similar
 3   to them to do is to change their marketing and change their
 4   immunization plan to accommodate one pharmacist?
 5   A    One pharmacist who worked for them for 40 years.
 6   Q    Would it make any difference whether he worked for Rite
 7   Aid for two years?
 8   A    Well, I think that they had a loyal employee that --
 9   and really, yes, with any employee there should be an
10   obligation to protect people that you have invested in.
11   Q    Okay.  You're not suggesting that you should treat a
12   two-year employee any different from somebody who worked for
13   the company for 35 years, are you?
14   A    No.
15   Q    You treat them equally and the same?
16   A    No, but for somebody that has shown you loyalty --
17   Q    And your opinion is they change the program simply
18   because, the entire program simply because of longevity?
19   A    I'm just suggesting that they consider these options.
20   I'm not suggesting that they change their entire marketing
21   strategy.
22   Q    Now, let's talk about Mr. Stevens' attempts to gain
23   employment.  You said he gave it a good try, correct?
24   A    Yeah.  Yes.
25   Q    And there's been testimony that for the most part, with
```

Karen Simone - Cross

```
 1   a couple of exceptions, Mr. Stevens has gone online and
 2   filled out online applications.  Do you understand that?
 3   A     Yes, I do.
 4   Q     And his testimony was approximately 40 to 50 times he's
 5   done that and he's done that for the past three-and-a-half
 6   years?
 7   A     M-m h-m-m.
 8   Q     Do you understand that?
 9   A     I do.
10   Q     And other than that, Mr. Stevens has never sought,
11   other than the Department of Labor which is required when he
12   got his unemployment, he's never sought any assistance
13   through any type of professionals to help him market himself
14   and to get a job, do you understand that?
15   A     Yes.
16   Q     Now, Miss Simone, in your profession, you're familiar
17   with individuals who can help, and particularly in
18   professional, professionals, there are people out there that
19   can help you try to get a job, correct?
20   A     That is correct.
21   Q     There's something known as job coaches?
22   A     Yes.
23   Q     Okay.  There's employment agencies?
24   A     Correct.
25   Q     Okay.  And these are people who can help those who are
```

Karen Simone – Cross

1    not familiar with the process rather than just sitting

2    online all day and filling out applications, there are

3    professionals that can help you, correct?

4    A     Correct.

5    Q     And you, in your profession as a vocational expert and

6    rehabilitation, you even suggest those to people, don't you?

7    A     Yes.

8    Q     Okay.  Did you ask Mr. Stevens whether, in fact, he

9    consulted with a job coach?

10   A     I believe he said that he had not consulted with a

11   professional.

12   Q     Did you ask him whether he consulted with an employment

13   agency?

14   A     No.  He mentioned that he had gone to the department of

15   labor.

16   Q     Okay.

17   A     Which is where most people go.

18   Q     Is that only because of the unemployment benefits that

19   he received?

20   A     Well, I don't know that that was the only reason why.

21   Q     Did he tell you he went back to the department of labor

22   after his unemployment ran out?

23   A     I don't recall that conversation.

24   Q     So when you say he made good efforts to find a job, he

25   had those options open to him but he didn't take them, did

Karen Simone - Cross

1    he?

2    A      Well --

3    Q      Yes or no.

4    A      That would require him to know about them.

5    Q      But he did not make those efforts, correct?

6    A      Correct, but he didn't know about them.

7    Q      How do you know he didn't know about them?  You didn't

8    ask him, did you?

9    A      I asked him what he did and again he, he's never had to

10   look for a job.  He wouldn't necessarily know to access

11   certain resources.

12   Q      But you didn't ask him those questions?  You didn't ask

13   him whether he sought a job coach or any typo of --

14   A      I didn't ask him about the job coach, true.

15   Q      You didn't ask him about an employment agency?

16   A      Correct.  We talked about the department of labor.

17   Q      Miss Simone, you would agree with me, had he consulted

18   with an employment agency or a job coach, even somebody to

19   help him with his resume, that would have increased his

20   chances to find a job, correct?

21   A      One would hope so but you can't say for sure.

22   Q      I'm not asking you for sure.  I'm just saying it would

23   have increased his chances?

24   A      I would hope so.

25   Q      Okay.  Now, you said that his prospects for finding a

Karen Simone – Cross

```
 1    job in the future, I don't -- I forgot your word but you said
 2    they're not good, correct?
 3    A     Yes.
 4    Q     You would agree with me that one of the reasons why his
 5    job prospects into the future are not good is because he
 6    still can't immunize, correct?
 7    A     Well it certainly is one of the barriers.
 8    Q     Okay.
 9    A     Sure.
10    Q     Let's talk about those barriers for a moment.
11    Mr. Stevens is now 60 years of age, correct?
12    A     Correct.
13    Q     He's had a lot of experience over the years?
14    A     Correct.
15    Q     Correct?  And that's a good thing, that's not a
16    barrier, that gives him a better chance of getting a job,
17    correct?
18    A     No, not necessarily.
19    Q     Well, he's got good experience you'd agree with me?
20    A     No, he's got great experience.  I don't disagree with
21    that at all.
22    Q     Somebody whose got good experience certainly has a
23    better chance of getting a job than somebody who has no
24    experience or little experience you'd agree with that,
25    wouldn't you?
```

Karen Simone – Cross

1    A      Not necessarily.

2    Q      Well, you're not suggesting that people would

3    discriminate against him simply because he's 60 years old,

4    would you?

5    A      I will tell you that you would hope that people

6    wouldn't discriminate but when they screen applications, they

7    do look at these things.

8    Q      Okay.  Let me ask you this.

9    A      It's a reality.

10   Q      You mentioned the fact that he had been terminated or

11   fired from his job would be a barrier, that's one of the

12   negative parts of it, correct?

13   A      Well sure.

14   Q      Now, if Mr. Stevens were to walk in and actually get an

15   interview and he told that prospective employer that, hey,

16   the only reason I was terminated was because I'm not an

17   immunizer, that would be a pretty valid excuse.  It's not

18   like he stole or that he mixed up prescriptions and killed

19   somebody or something like that.  It's because he wasn't an

20   immunizer.  That's not a negative in terms of if he was going

21   to be employable, would it?

22   A      Having been a hiring manager, anybody who has been

23   terminated, especially for a reason like that, would raise a

24   red flag for me because when you're a hiring manager and you

25   have valuable employees that have a lot of experience, you

Karen Simone - Cross

```
 1   don't want to let them walk out that door unnecessarily.  So
 2   that would be a red flag.
 3   Q    But if the prospective employer thought well, gee, that
 4   company was stupid for letting him go, we've got ourself a
 5   catch, that's a possibility, right?
 6   A    It's always a possibility.
 7   Q    Okay.  Now, you gave some testimony as to Mr. Stevens'
 8   salary.  Okay.  I think you said anywhere from 135,000,
 9   130,000, somewhere in that ballpark?
10   A    M-m h-m-m.
11   Q    Would you agree with me that if Mr. Stevens went out
12   and got a job tomorrow, he would have no future damages,
13   correct, no wage loss?
14   A    Well, depends on what job he got.
15   Q    Okay.  Well, are pharmacists, and let's pick the retail
16   generally, the retail chains, they pay about the same in the
17   area of Utica?
18   A    There's a range and in the same vicinity maybe if it
19   were full time.
20   Q    He's not going to be paid less than hundred thousand
21   dollars to be a pharmacist with his experience, correct?
22   A    I wouldn't think so.
23   Q    So, if he were to get a job tomorrow he would be able
24   to, he would not have any future economic loss unless he took
25   a job for, say, 10 or $15,000 less?
```

Karen Simone - Cross

```
1   A      If it were full time.

2   Q      Okay.  That's what I'm talking about, full time.

3   A      Yeah.  Okay.

4   Q      Now, you mentioned something about other possibilities

5   such as working in a clinical setting?

6   A      Right.

7   Q      Okay.  And that's not a possibility for Mr. Stevens,

8   correct?

9   A      It really is not feasible.

10  Q      How about in a hospital?

11  A      That is the clinical setting.

12  Q      What I meant was in a pharmacy-type place that doesn't

13  have contact with patients such as mail order?

14  A      Oh, correct.  What was the question.  I'm sorry.

15  Q      I believe you said that those were not available to

16  him?

17  A      There is not a large job for that in Central New York.

18  Q      If he moved he might have more of a chance getting a

19  job in that field?

20  A      He may but a lot of them did want hospital experience,

21  as well as just a preferred criteria.

22  Q      If he was in the mail order?

23  A      Yeah.  When I looked at the mail order it was the

24  consultant role.  I'm sorry.  It was the pharmacy consultant

25  role that had additional qualifications that they were
```

Karen Simone – Redirect

```
 1   looking for that Mr. Stevens didn't have.  Not the mail
 2   order.  I apologize.
 3   Q     Not a problem.  So if he did move and he was able to
 4   relocate, he'd have a better chance becoming employed perhaps
 5   by one of those types of places?
 6   A     Possibly the opportunities are not as great as they are
 7   as a pharmacist but they are out there.
 8   Q     But it is a possibility?
 9   A     It's a possibility.
10         MR. RAVEN:  Okay.  Thank you, Miss Simone.  Thank
11   you very much.
12         THE COURT:  Redirect?
13         MR. WHITAKER:  Yes, your Honor.
14   REDIRECT EXAMINATION
15   BY MR. WHITAKER:
16   Q     Miss Simone, you were asked an awful lot of questions
17   about your proposed reasonable accommodations.  Is it fair to
18   say that all you're suggesting is that the employer -- let me
19   back up.  Are you familiar with the phrase interactive
20   process?
21   A     Yes.
22   Q     Isn't that what you're suggesting Rite Aid should have
23   engaged in here?
24   A     Yes.
25   Q     In your opinion did they do that?
```

Karen Simone – Redirect

```
 1   A      No.
 2   Q      In your opinion did they have a responsibility to do
 3   that?
 4   A      Yes.
 5   Q      And part of engaging in that interactive process would
 6   have included discussing some of these reasonable
 7   accommodations?
 8   A      Yes.  Exploration of different options that might work
 9   for both Mr. Stevens and for Rite Aid.
10   Q      There was a lot of discussion about, you know, and
11   suggestions that you're asking Rite Aid to change their
12   marketing strategy, are you doing that?
13   A      No.
14   Q      Isn't it true, one of the accommodations you suggested
15   was double coverage, is that correct?
16   A      Correct.
17   Q      Would Rite Aid still be able to offer immunizations at
18   a store with double coverage?
19   A      Yes.  The other pharmacist could do the immunization.
20   Q      So the idea with your double coverage accommodation
21   then is that, is Mr. Stevens would do what?
22   A      He could work at the locations where the pharmacies are
23   big enough that they have to staff with more than one
24   pharmacist on certain days because that's their high traffic
25   days and maybe it means that he works two days at this
```

Karen Simone – Redirect

1   location and two days at this location, or maybe it means

2   that he just works part time at this location where he can

3   work in tandem with another pharmacist that can give the

4   immunizations.  That allows Mr. Stevens to remain employed

5   and finish out his career until he retires and Rite Aid gets

6   to keep an experienced pharmacist.

7   Q    Based on your experience, is that the type of

8   accommodation you've seen employers make?

9   A    I've seen employers make all sorts of accommodations

10  through creative thinking.

11  Q    You were asked some questions about Mr. Stevens'

12  employability if he moved out of the area.  Did you have, as

13  part of your analysis here, did you do any research on the

14  employment opportunities for pharmacists as a whole even

15  outside of Central New York/Mohawk Valley region?

16  A    Just in terms of prospects?

17  Q    Yes.

18  A    Yes, I did.  I read a few articles regarding the

19  current climate for recent pharmacy grads.

20  Q    When you say articles, from what sorts of publications?

21           MR. RAVEN:  Objection.

22           THE COURT:  Basis?

23           MR. RAVEN:  It's hearsay.

24           THE COURT:  Well, no, if he asked her if she read

25  an article, she said yes and he said what kind of publication

475

Karen Simone - Redirect

```
 1   was it.  That's not hearsay.  That's her observation of what
 2   she was reading.
 3           MR. RAVEN:  My objection might be a little
 4   premature.
 5           THE COURT:  It is premature.
 6           MR. RAVEN:  I might have to wait until the next
 7   couple of questions.
 8           THE COURT:  You will probably have to do that.
 9   BY MR. WHITAKER:
10   Q    Could you please answer the question?
11   A    I'm sorry.  Can you repeat the question?
12           MR. WHITAKER:  Would you mind reading back the
13   question, please.
14               (Record read back)
15   A    Okay.  There was an article published by a Dr. Daniel
16   Brown in the Journal of Pharmacy Education where he spoke.
17           MR. RAVEN:  Objection.
18           THE COURT:  You can't tell us what's in the article
19   yet.
20           THE WITNESS:  Oh, sorry.
21           THE COURT:  That's all right.
22   Q    And this journal that you reviewed, is this something,
23   is this of a reliable enough source, is this something you
24   would typically rely upon in your field of expertise in
25   making your analysis?
```

Karen Simone – Redirect

```
 1   A     Yes.  It's an industry publication for pharmacists.
 2   Q     Okay.  And based on your review of that information,
 3   what is your opinion in regards to the employment market for
 4   pharmacists as a whole?
 5              MR. RAVEN:  Same objection.
 6              THE COURT:  No.  If she's -- I don't think he quite
 7   asked it but I think he's asking if that was an authoritative
 8   piece of literature in that article.  She said she relied on
 9   it, it's a publication in her industry, so I guess that's
10   sort of equivalent to saying it's authoritative.  Was it
11   authoritative?
12              THE WITNESS:  Well, it is in the pharmacy industry.
13              THE COURT:  That's what we're talking about in the
14   pharmacy.
15              THE WITNESS:  Yes.  Doctor Brown is.
16              MR. WHITAKER:  Is the it okay for her to answer?
17              THE COURT:  Yes.
18   BY MR. WHITAKER:
19   A     Doctor Brown is a thought leader in pharmacy education
20   or pharmacy work force and so your question to me was what
21   was my opinion about the job market?
22   Q     Job prospects as a whole for pharmacists.
23   A     That there right now is a surplus of pharmacists and
24   recent pharmacy graduates, especially in New York State
25   because of the explosion that we had in the early 2000s of
```

Karen Simone – Redirect

```
 1   pharmacy schools.  Now they're graduating all of those

 2   pharmacists and it has saturated the market and so the job

 3   demand has remained level but the number of pharmacists has

 4   increased dramatically from 6,000 graduates in the early 2000

 5   to about 13,000 graduates a year now.

 6   Q     In your opinion does that serve as another barrier to

 7   Mr. Stevens' employability?

 8   A     Sure.  It speaks to the competitiveness of the job

 9   market for pharmacists right now.

10   Q     Miss Simone, there is a suggestion on cross that your

11   practice might be limited to testifying in court.  Can you

12   just give the jury some background in terms of your actual

13   work in the field of vocational rehabilitation?

14   A     How far back do you want me to go?

15   Q     Let's say in the last decade.

16   A     In the last decade, I worked directly with people with

17   disabilities and their supervisors to make job accommodations

18   and coordinate return to works.  I worked with Met Life

19   Disabilities, the largest customer Raytheon.  I would go and

20   visit their plants, meet with their supervisors, do job

21   analyses.  Help the employers figure out how they can make

22   changes to keep their employees at work.  I also conducted

23   employability analyses to make sure people were meeting the

24   definition of employability as per the contract and I

25   supervised the staff, that's when I moved into management.
```

Karen Simone — Redirect

1    But do you want me to go on?

2    Q    No.  That's fine.  You were also asked whether this was

3    your first time testifying relative to a pharmacist, do you

4    remember that?

5    A    Correct.

6    Q    Is it accurate to say that the methodology that you

7    employ or that you utilize for your employment analysis is

8    the same for any occupation?

9    A    It's the same for any occupation.  I do research on

10   every case I get because in the field of rehabilitation,

11   vocational rehabilitation, what we say in our industry is N

12   equals one meaning every case is individual specific.  No

13   person has the same disability.  No person has the same job

14   requirements.  It's like a fingerprint.  So you have to treat

15   that person as a brand new experience, that you have to do

16   your research and understand all the facts.

17   Q    There was some discussion with Mr. Raven about whether

18   Mr. Stevens, in fact, used a job coach.  If he had utilized a

19   job coach, could that job coach have removed the barrier

20   discussed which is his age?

21   A    No.  They can't remove barriers and they're expensive.

22   They can only help coach to try to help him mitigate those

23   barriers as much as they possibly can but they still exist.

24   Q    And one of the things a job coach will do is help

25   somebody revise their resume, is that correct?

Karen Simone – Redirect

```
1    A     Well, I want to be specific.  A job coach by definition
2    in my field is somebody who goes on site with a person and
3    helps them learn how to do a job.  Generally, job coaches
4    work with people with severe developmental disabilities that
5    need constant supervision until the job becomes so routine
6    that they can do it on their own because they have a severe
7    disability because that's really what a job coach is.
8              A vocational counselor or a vocational
9    rehabilitation counselor, somebody like myself, who has a
10   rehabilitation degree and who has worked in that field will
11   work with people like Mr. Stevens to try to the help them
12   take the best approach.
13   Q     If I'm understanding your testimony correctly, a job
14   coach wouldn't have necessarily been of value to Mr. Stevens,
15   it would have been a rehabilitation specialist?
16   A     Yes.  If we're using correct terminology.
17   Q     Okay.  I'm sorry.
18   A     That's okay.
19   Q     Just to clarify, with a vocational rehabilitation is
20   they will do things like help somebody properly draft a
21   resume?
22   A     Correct.
23   Q     The Department of Labor at the unemployment office,
24   they also provide that service as well?
25   A     That's correct.
```

Karen Simone – Redirect

1   Q     So the services they provide are very similar to a

2   vocational rehabilitationist?

3   A     Well they're not schooled on dealing with impairments

4   and limitations.

5   Q     Based on everything that you reviewed, did Rite Aid

6   offer Mr. Stevens, when they fired him, any sort of

7   rehabilitation, vocational rehabilitation services?

8          MR. RAVEN:  Objection.

9          THE COURT:  Well, I don't think this witness has

10  demonstrated that she has a knowledge of what Rite Aid knew

11  at the time.

12         Let me have that question again, Vicky, would

13  you, please.

14          (Record read back)

15         THE COURT:  Well, I think she can -- I guess I was

16  going the wrong way.  I think she can answer that if she

17  understands what Rite Aid did or didn't offer Mr. Stevens.

18         MR. WHITAKER:  Yeah, Judge, if I may, I know we're

19  going back aways.  She, at the outset, indicated part of her

20  review included deposition transcripts of Rite Aid employees,

21  as well as Rite Aid's policies.

22         THE COURT:  I remember that.  That's true but that

23  may not satisfy Mr. Raven.

24         MR. RAVEN:  It has not.

25         THE COURT:  Surprise.

Karen Simone - Redirect

```
 1            MR. RAVEN:  Yeah, unless this witness has some
 2   personal knowledge or something that she read as to what Rite
 3   Aid did or didn't do afterwards, she cannot answer that
 4   question to begin with.  And, secondly, I object on the
 5   grounds that you have to establish that Rite Aid had some
 6   obligation after he was terminated to do something and I
 7   don't believe that can be the case.
 8            THE COURT:  Well that's a separate question but
 9   your first question war more on target.  She can only tell us
10   based on what she knows from reviewing the documents that I
11   was just advised of and advised of before in her testimony
12   what she believes Rite Aid did or didn't do.  She can tell us
13   in her judgment whether or not, as far as her professional
14   understanding was, whether or not it was everything that
15   could have been, should have been done.  So you can answer
16   that part of it.
17            Do you know what we're talking about?
18            THE WITNESS:  I'm not sure I do.
19            MR. WHITAKER:  Well, Judge, if I may clarify.  I
20   believe that's the question I asked, it's based on what she's
21   reviewed.
22            THE COURT:  All right.
23            MR. WHITAKER:  Well, while Dan rewrites it, can we
24   get a formal ruling because I believe you initially indicated
25   that question was proper because it's limited to what she has
```

Karen Simone – Redirect

1   reviewed as part.

2            THE COURT:  You didn't say that initially but now

3   we've got that clarified.

4            MR. WHITAKER:  Okay.

5            THE COURT:  You said based on everything.

6            MR. WHITAKER:  Let me just ask the question again

7   in a different way.

8   BY MR. WHITAKER:

9   Q    So based on the materials that you've reviewed in this

10  case and your interview of Mr. Stevens, is it your

11  understanding or is it your opinion whether Rite Aid offered

12  job rehabilitation to Mr. Stevens after they fired him?

13           MR. RAVEN:  Objection.  Same objection.

14           THE COURT:  Same ruling.  Overruled.

15  A    I did not see anything in the file material or in my

16  conversations with Mr. Stevens that out placement services

17  were offered.

18  Q    In your professional opinion is that something that

19  Rite Aid should have done?

20           MR. RAVEN:  Objection.

21           THE COURT:  Overruled.  I think that's her area of

22  expertise.  She can give us her opinion.

23  A    I'm not sure that it should have been done.  I think it

24  could have been done.

25  Q    The last thing I want to cover with you, Miss Simone,

Karen Simone - Recross

1  you received some questions regarding whether, you know,

2  Mr. Stevens were to go get a job tomorrow he would have no

3  future economic loss.  But isn't it true that a new employer,

4  if he were hired, could also offer less benefits than what

5  Rite Aid offered?

6  A     They could.

7  Q     And what sort of employee benefits are potentially at

8  issue?

9  A     Well, salary of course being number one.  Potentially

10  could offer him less, knowing that he's out of work, they

11  could try to get him for less because they know that the job

12  market is saturated.  There's healthcare coverage.  There's

13  retirement benefits.

14  Q     Do employees --

15  A     Vacation days.

16  Q     Does the health care premium the employee might have to

17  pay vary from employer to employer?

18  A     It does.

19            MR. WHITAKER:  That's all I have, your Honor.

20            THE COURT:  Recross?

21            MR. RAVEN:  Just a couple questions, Judge.

22            THE COURT:  Okay.

23  RECROSS-EXAMINATION

24  BY MR. RAVEN:

25  Q     Miss Simone, you gave some additional testimony just

Karen Simone – Recross

```
 1   now about the market's flooded with pharmacists and new

 2   graduates and so forth, correct?

 3   A      There's a surplus right now, yes.

 4   Q      I'm not asking where you live in particular but what

 5   area do you live in?

 6   A      I live in Syracuse.

 7   Q      In Syracuse.  Okay.  And you get to travel around New

 8   York State a little bit?

 9   A      Not a lot, a little.

10   Q      You see new pharmacies opening quite a bit, don't you?

11   A      I guess I've never really taken note.

12   Q      You don't know?

13   A      No.  Same one's been in my neighborhood for years.

14   Q      You see one pharmacy open right across the street from

15   another over the last five years?

16   A      Well I know a few.

17   Q      I guess what I'm asking, have you done any analysis,

18   you personally, as to the number of stores that are opening

19   and new stores opening, whether it be CVS, Rite Aid or

20   Wegman's, have you done any personal analysis to see how many

21   stores there are now as to, say, three years ago?

22   A      No.

23   Q      Or five years ago?

24   A      No, I've done no analysis to number of stores.

25   Q      And you've done no analysis, I assume, on the
```

Karen Simone - Recross

```
 1    projection of the number of stores that will be open, new

 2    stores in, say, the next five years, you haven't done any

 3    analysis on that?

 4    A     No.

 5    Q     I just want to take you back for a moment.  I think

 6    we're almost finished here.  Mr. Whitaker was asking you

 7    questions about the other accommodations that Rite Aid could

 8    have made and one of them being putting Mr. Stevens in a

 9    store with two physicians, correct?

10    A     Correct.

11    Q     Now, pharmacists, do you have any first-hand knowledge

12    as to how a pharmacy, such as Rite Aid, operates in terms of

13    having two pharmacists in the same store?

14    A     In terms of how they divide their job functions?

15    Q     Or not the job functions but the hours in which they

16    work, do you have any personal knowledge as to that

17    whatsoever?

18    A     If there's two pharmacists on staff together?

19    Q     Correct.

20    A     The hours they work -- I don't understand.  I'm sorry.

21    Q     Let me ask it this way:  Are you assuming that any time

22    that a store's open that has two pharmacists, that the

23    pharmacists are going to be on duty for the entire time

24    together, is that an assumption you're making?

25    A     I would think if they're both scheduled to work from
```

Karen Simone – Recross

```
 1   5 to 9 or 9 to 5 or whatever it is, then they're both there
 2   ready and willing to work.
 3   Q     Would you be open to the idea that sometimes when
 4   there's dual pharmacists, in fact, most of time when there's
 5   dual pharmacists at a bigger store or higher volume store,
 6   there are many times when there's still one pharmacist on
 7   duty at a time and there's only certain times that there's
 8   two pharmacists on duty.  In other words, it's not 12 hours a
 9   day or 8 hours a day 5 days a week.  Are you open to that
10   idea?
11   A     Yes, of course.
12   Q     So there would be times then even in a dual pharmacy
13   pharmacist situation where Mr. Stevens could, in fact, be by
14   himself in that store?
15   A     No.  I think I misunderstood what you're saying.  My
16   understanding is that based on what I read from Mr. Spink's
17   deposition transcript and what I understand is that there are
18   certain stores that are large enough where they staff two
19   pharmacists on at the same time.
20   Q     You said Mr. Spink's deposition testimony?
21   A     I believe it was Mr. Spink.
22   Q     He was the pharmacy district manager in that area,
23   that's your understanding?
24   A     Right.
25   Q     Did you also read the fact that he said that there was
```

Karen Simone - Redirect

```
 1   not two pharmacists on duty all the time and there are times
 2   where, even an individual such as Mr. Stevens in a dual
 3   pharmacist store could, in fact, be there by himself, do you
 4   recall reading that?
 5   A     No.  But I believe what you say and, again, I'm just
 6   making this a suggestion for consideration that that could
 7   have been arranged without a lot of hardship.
 8   Q     Almost finished here.  That accommodation would be an
 9   accommodation that would fully excuse Mr. Stevens from
10   performing the essential job function of immunization,
11   correct, it would excuse him completely?
12   A     Correct.
13   Q     And do you understand that under the Americas with
14   Disability Act that the employer's not responsible to do
15   that, do you understand that?
16             MR. WHITAKER:  Objection, your Honor.
17             THE COURT:  Sustained.
18             MR. RAVEN:  I have no further questions.
19             THE COURT:  Redirect?
20             MR. WHITAKER:  Just a very simple question, Judge.
21   REDIRECT EXAMINATION
22   BY MR. WHITAKER:
23   Q     Miss Simone, for all of that, the discussion about
24   double coverage, isn't it true that in your professional
25   opinion Rite Aid could have simply had Mr. Stevens work
```

Karen Simone – Redirect

1    during the hours when we knew there was double coverage?

2    A      Yes.

3             MR. WHITAKER:  Thank you.

4             THE COURT:  Anything further?

5             MR. RAVEN:  No further questions.

6             THE COURT:  Thank you, Miss Simone.  You may step

7    down, ma'am.

8                  (Witness excused)

9             THE COURT:  Out of witnesses?

10            MR. BERMAN:  We are, your Honor.  We have Raven's

11   vocational rehab expert coming in out of order tomorrow

12   morning followed by our economist and then we are resting.

13   We're done.

14            THE COURT:  So then you'll have an opportunity to

15   begin with your witnesses after that.

16            MR. RAVEN:  I can't get them for tomorrow.  I will

17   have one witness tomorrow morning and then I will have

18   witnesses and hopefully go rather quickly through them on

19   Tuesday and Wednesday.

20            THE COURT:  All right.  Ladies and gentlemen, we

21   had a conference in the jury room about timing in part and I

22   indicated to you that I was surprised that the trial was

23   going to last longer than I had anticipated and maybe it's my

24   fault that I anticipated wrongly.  But the one thing that's

25   important for you to do is not blame the attorneys because

Karen Simone – Redirect

```
1    they have to put in what proof they think is necessary to
2    support their side of the case, and it may be annoying to you
3    and it may be annoying to me but that's not the point.  The
4    point is we've got parties on both sides and they're
5    depending on you guys to do a fair and impartial evaluation
6    of the proof and make a decision and I personally apologize
7    to you for keeping you one minute longer than is necessary,
8    but I think we're going to have to go through that.  I know
9    there's been cooperation from both sides.  Neither attorney
10   has been obstructive.  Both attorneys have done the best they
11   could to get the people in when they're available.  So beyond
12   that, I don't know else I can say.
13              So, right now we don't have any more
14   witnesses, right?  That means they're going home.
15         MR. BERMAN:  That is correct, your Honor.
16         THE COURT:  They don't mind that.
17         MR. BERMAN:  It is a nice spring day.
18         THE COURT:  Let me remind you, ladies and
19   gentlemen, not to discuss the case among yourselves, with
20   anybody else or permit anyone to discuss it with you.  We'll
21   see you tomorrow morning.  Have a pleasant evening.
22              (Jury excused)
23              (Court stands adjourned)
24
25
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4          I, VICKY A. THELEMAN, Federal Official

 5    Realtime Court Reporter, in and for the United

 6    States District Court for the Northern District of

 7    New York, do hereby certify that pursuant to Section

 8    753, Title 28 United States Code that the foregoing

 9    is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page

12    format is in conformance with the regulations of the

13    Judicial Conference of the United States.

14

15

16                              /s/ Vicky A. Theleman

17                        VICKY A. THELEMAN, RPR, CRR

18                        US District Court - NDNY

19

20

21    Dated:  April 10, 2015.

22

23

24

25
```