UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRISTOPHER STEVENS,

                    Plaintiff,

          vs.                                          6:13-CV-783

RITE AID CORPORATION d/b/a RITE AID
PHARMACY, a/k/a ECKERD CORPORATION d/b/a
RITE AID,

                    Defendant.
_____

THOMAS J. McAVOY
Senior United States District Judge

DECISION and ORDER

I.     INTRODUCTION

          Before the Court are Defendant's motion for judgment as a matter of law or, in the alternative, for a new

trial, dkt. # 108; and Plaintiff's motion to amend the judgment, dkt. # 111.   The motions have been fully briefed,

and both are ripe for disposition.   For the reasons that follow, both motions are granted in part and denied in

part.

II.    BACKGROUND

          Plaintiff Christopher Stevens was a pharmacist working for the Rite Aid pharmacy company until he was

discharged in August 2011.   This case arises from Rite Aid's requirement that its pharmacists administer

injections for immunizations, and Mr. Stevens' contention that he could not do this because he suffers from

trypanophobia, also called needle phobia.   Plaintiff brings claims under the Americans with Disabilities Act

("ADA"), and the New York State Human Rights Law ("NYSHRL" or "Human Rights Law").   He alleges that Rite

Aid violated the ADA and the Human Rights Law by (1) discharging him because of his disability; (2) failing to provide him a "reasonable accommodation" for his disability; and (3) retaliating against him because he exercised his rights under the ADA and the Human Rights Law.   Following an eight (8) day trial, the Jury found that Plaintiff proved that: (1) he was discharged because of a disability in violation of the ADA;  (2) Rite Aid failed to provide a reasonable accommodation in violation of the ADA; (3) he was retaliated against in violation of the ADA; (4) he was discharged because of a disability in violation of the NYSHRL; (5) Rite Aid failed to provide a reasonable accommodation in violation of the NYSHRL; and (6) he was retaliated against in violation of the NYSHRL.  The Jury awarded Plaintiff $485,633.00 in back-pay damages; $1,227,188.00 in front-pay damages (encompassing 4.75 years from the date of the verdict, *i.e.*, January 22, 2015); and $900,000.00 in non-pecuniary damages.

Defendant moves for a for judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b), or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59.  Plaintiff moves pursuant to Fed. R. Civ. P. 59(e) to amend the judgment to add pre- and post-verdict interest.

III.     LEGAL STANDARD

a.  Rule 50

In reviewing a motion brought under Rule 50(b), "[t]he court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence" bearing in mind that a jury is free to believe or disbelieve any part of a witness' testimony. *Jones v. Town of E. Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (quoting *Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir. 2007)).  Thus, the court may "disregard all evidence favorable to the moving party that the jury is not required to believe," *Zellner,* 494 F.3d at 371 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135 (2000)), and is required "to give [the non-moving] party the benefit of all reasonable

2

inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of

conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."

*Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001) (citation omitted).

> The moving party thus bears a heavy burden, especially where, as here, "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." [*Cash v. Cty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011)](internal quotation marks omitted); *Bakalor v. J.B. Hunt Transp., Inc.,* No. 11–CV–2911, 2013 WL 3185546, at *1 (S.D.N.Y. June 24, 2013). "A judgment notwithstanding the verdict may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Wiercinski v. Mangia 57, Inc.,* 787 F.3d 106, 112 (2d Cir.2015) (internal quotation marks omitted); *see also Cash,* 654 F.3d at 333 .

*Graham v. City of NY,* --- F. Supp.3d ----, 2015 WL 5258741, at * (E.D.N.Y. Sept. 10, 2015).

### b. Rule 59

#### 1. 59(a)

Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion, grant a new trial on all

or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in

federal court[.]" FED. R. CIV. P. 59(a)(1)(A).

> Grounds for granting a new trial include a verdict that is against the weight of the evidence, *Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003), substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.,* 761 F.3d 192, 203 (2d. Cir. 2014), prejudicial misconduct from counsel, *Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 540 (2d Cir.1992), and non-harmless errors in jury instructions, *United States v. Kozeny,* 667 F.3d 122, 130 (2d Cir.2011), or verdict sheets, *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.,* 425 F.3d 126, 136 (2d Cir. 2005).

*Graham,* 2015 WL 5258741, at *5 (E.D.N.Y. Sept. 10, 2015).

"A district court should grant a new trial motion if it 'is convinced that the jury has reached a seriously

erroneous result or that the verdict is a miscarriage of justice.'" *United States v. Landau*, 155 F.3d 93, 104 (2d

Cir. 1998) (quoting *Smith v. Lighting Bolt Productions, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987)); *see Raedle v.*

*Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012) ("'[A] decision is against the weight of the evidence . . . if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice.'" )(quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002)). Such a motion may be granted "even if there is substantial evidence to support the jury's verdict." *Landau*, 155 F.3d at 104 .

Though a trial judge "is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner ," *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998), a jury's verdict should "rarely be disturbed." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) (per curiam); *see also Carroll v. Cty. of Monroe,* 712 F.3d 649, 653 (2d Cir. 2013); *Raedle,* 670 F.3d at 417–18. Evaluations of the evidence should be made with a "high degree of deference ... to the jury's evaluation of witness credibility...," *ING Global v. United Parcel Serv. Oasis Supply Corp.,* 757 F.3d 92, 97–98 (2d Cir.2 014) (quoting *Raedle,* 670 F.3d at 418), and "a trial judge's disagreement with the jury's verdict is not a sufficient reason to grant a new trial.'" *Lawson*, 920 F. Supp.2d at 344 (quoting *Kittay v. Korff (In re Palermo*), No. 08cv7421, 2011 U.S. Dist. LEXIS 99537 (S.D.N.Y. Sept. 2, 2011)).

2. 59(e)

Under Rule 59(e), a district court may "alter or amend judgment to correct a clear error of law or prevent manifest injustice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014) (internal quotation marks omitted). "[A] motion for pre-judgment interest after the entry of judgment is properly construed as a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e)." *Azkour v. Little Rest Twelve*, Slip Copy, 2015 WL 1413620, at *1 (S.D.N.Y. March 23, 2015). A motion for post-judgment interest may likewise be considered under Rule 59(e). *See Lankler Siffert & Wohl, LLP v. Rossi*, 2004 WL 541842, at *2 (S.D.N.Y. March 19, 2004).

IV.    DISCUSSION

a. Defendant's Rule 50(b) Motion

The Court will discuss the issues raised in Defendant's Rule 50(b) motion *seriatim*.

1.    Arguments Considered on the JMOL Motion

Plaintiff argues that all of Defendant's arguments for a JMOL, except the argument that administering injections was an essential job function, are procedurally barred because Defendant failed to raise them in its Rule 50(a) motion. *See* Pl. Mem. L. in Opp. [dkt. # 129], pp. 1-2. Defendant counters that while it focused its oral Rule 50(a) motion on Plaintiff's alleged failure to prove that he could perform the essential functions of his job, with or without reasonable accommodation, it also referenced its arguments made at summary judgment and in pre-trial motions that Plaintiff had not—and could not have as a matter of law—prove he was disabled when he was terminated. Def. Reply Mem. L. [dkt. #134], p. 2 (citing Tr. at 585-86).

Rule 50(a) provides that a motion for judgment as a matter of law made before the case is submitted to the jury "shall specify ... the facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). A Rule 50(a) motion made before submission of the case to the jury is a necessary predicate to a post-trial Rule 50(b) motion. *Bracey v. Bd. of Ed. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).

> Because a motion pursuant to Rule 50(b) "is in reality a renewal of a motion" pursuant to Rule 50(a), *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir. 1993)(citation omitted), the grounds on which a party may rely in a Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]." [*Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)]; *see Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5, 128 S. Ct. 2605, 171 L. Ed.2d 570 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."). "[T]he movant is not permitted to add new grounds after trial" in a Rule 50(b) motion. *Galdieri–Ambrosini*, 136 F.3d at 286. Arguments not raised in a preceding Rule 50(a) application are not properly preserved for review in a subsequent Rule 50(b) motion. *See Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012); *Holmes v. United States*, 85 F.3d 956, 963 (2d Cir. 1996).

*Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, 2015 WL 3605143, at *3 (E.D.N.Y. June 05, 2015).

Rule 50(b) motions are restricted to issues raised in a 50(a) motion so the plaintiff will be on notice of deficiencies in his proof. *See Galdieri-Ambrosini*, 136 F.3d at 286. However, relief from the specificity requirement is also available "where necessary to avoid manifest injustice." *Doctor's Assoc., Inc. v. Weible*, 92 F.3d 108, 113 (2d Cir.1996) (internal quotation omitted); *see Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 246 (E.D.N.Y. 2014)(A court may consider an argument not raised in a Rule 50(a) motion if the court "finds that 'to ignore it would result in manifest injustice' or if it would constitute a 'purely legal error.'") (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)).

At the close of Plaintiff's case, the following colloquy took place:

MR. BERMAN: We rest, your Honor.

THE COURT: All right. Does defense have motions?

MR. RAVEN: Yes, your Honor. At this time I have an application for a Rule 50. I have a Rule 50 application and the basis is fairly simple: Plaintiff still has an obligation to establish that even if plaintiff has a disability, which I know your Honor has already ruled under the Americans with Disability Act is an issue of fact for the jury, they still have an obligation to come forward and show that Rite Aid had to provide a reasonable accommodation so that Mr. Stevens could, in fact, perform the essential job functions and, again, with or without an accommodation and we've had no testimony whatsoever other than suggestions that we should have put him in a different position and essentially excused him from the essential job function of immunization. So there is absolutely no basis for this jury to determine that Rite Aid violated the Americans with Disability Act.

Simply put, there's been no proof that we were required to put him in a different position. The only thing that Mr. Stevens has asked for and only thing argued before this jury, we should have excused him from the essential job function. That's the basis of my motion.

THE COURT: Would you like to respond to that?

MR. BERMAN: I sure would, your Honor. Whether or not it was an essential job function is a question of fact at this point. There is plenty of evidence from which the jury can conclude that it is, not in terms of accommodation. It has been suggested that Mr. -- there's been plenty of testimony that Mr. Stevens could have continued to present proof [*sic*] to perform the essential job function, his essential job functions had he received an accommodation. Various accommodations have been suggested. I believe it's for the jury but the first accommodation would have been to engage in the interactive process with him and suggest, I'm not – nobody is saying that Rite Aid was obligated to provide him

6

with treatment but certainly to suggest, to have an interactive discussion and suggest treatment might be available.

Second of all, he could easily, at least the evidence thus far is, he could easily have been assigned to stores where there was double coverage and there's been plenty of testimony about that from Rite Aid's own people that there were a number of stores that had two pharmacists on at once and this was done with a floating pharmacist. This is, again, a question for the jury to determine. Another possibility, and maybe it's not a great possibility, but I think it's up to the jury, is could they have had scheduled where he was on but no injections would be given at that particular store. Remember we're talking about 2011. There's been absolutely no proof in the record thus far with respect to how significant a portion of the job it was at the time he was terminated. If you look at the history of the job there are any number of factors and we addressed them in the summary judgment motion but there are any number of factors from which the jury could conclude in 2011 it wasn't an essential function. There was testimony from their own expert this morning that very often to -- to reach an accommodation under the ADA employers will hire help to help somebody with their job. Now here we've heard you can only have a pharmacist give injections. Jury could conclude and I think could conclude based on the testimony of their witness that Rite Aid could have hired an LPN at $10 an hour to give shots to accommodate Mr. Stevens.

THE COURT: Where do you get an LPN at $10 an hour?

MR. BERMAN: I don't know what the answer is. Whatever the hourly rate is. In other words, these are all jury questions and I think at this point it would be premature to dismiss the case.

THE COURT: I'll reserve decision on the Rule 50 motion.

Tr. pp. 585-88.

Although somewhat cryptic, the Rule 50(a) motion was made in the context of a case during which Defendant repeatedly challenged numerous factual and legal aspects of Plaintiff's ADA and NYSHRL claims. Reviewing Defendant's oral Rule 50(a) motion in this context, Plaintiff was clearly put on notice that Defendant challenged whether the evidence was sufficient to establish that: (1) Plaintiff was disabled; (2) performing immunizations was an essential function of Plaintiff's position; (3) Rite Aid had an obligation to provide an accommodation that would allow Plaintiff to continue his employment without performing immunizations; (4) a reasonable accommodation existed, and (5) Rite Aid violated the ADA and, by logical extension, the similarly-analyzed NYSHRL. Thus, the Court will examine these issues.

2.      Disability under the ADA

Defendant argues that Plaintiff failed to establish that he was disabled within the meaning of the ADA. Defendant's argument is twofold.  First, it argues that Plaintiff failed to prove that his trypanophobia was a condition that impaired a bodily function. Def. Mem. L. p. 12.   Second, Defendant argues that even assuming the trypanophobia is a qualifying condition, Plaintiff failed to prove that it substantially limited the major life activities of working and/or "the operation of a major bodily function[s], including but not limited to . . . neurological [and] brain functions." Id. p. 11.

A. Impairment Under the ADA

The testimony of both Drs. Warfel and Dattilio, viewed in the light most favorable to Plaintiff,  supports the Jury's conclusion that Mr. Stevens suffers from a condition that qualifies as a   psychological impairment under the ADA.  The Equal Employment Opportunities Commission ("EEOC") defines a "physical or mental impairment" as:

> Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, Immune, circulatory, hemic, lymphatic, skin, and endocrine;

29 C.F.R. § 1630.2(h)(1).

Dr. Warfel testified that Plaintiff suffered from a fear of needles during the two decades he treated Plaintiff.  Tr. p. 335.   Dr. Warfel arrived at this diagnosis "based on providing [Plaintiff's] care over those 20 years. [Plaintiff] never or was often resistant to having blood work done.  Did not want to receive immunizations himself because of fear associated with needles, which he explained to me and so I've known about it since that time." Id..   Dr. Warfel explained that he was aware that when Plaintiff was "faced with needles, ... [h]e would become lightheaded, dizzy, he'd have an increased heart rate and he'd get very anxious." Tr. p. 337.   Dr.

8

Warfel also explained these same facts to Rite Aid in response to the May 20, 2011 request for additional information about Plaintiff's fear of needles. Ex. P-9. Specifically, when asked what the effects on Plaintiff would be if he were to administer an immunization by injection, Dr. Warfel responded that Plaintiff would become diaphoretic (sweaty), hypotensive (drop in blood pressure) and probably faint. Ex. P-9; Tr. p. 339. However, Dr. Warfel testified on cross-examination that he had never given Plaintiff an injection, nor observed Plaintiff having his blood drawn. Thus, his testimony regarding the effects of needles in Plaintiff's presence is speculative at best and based solely on Plaintiff's self-report.

However, the Jury also heard the testimony of Dr. Frank Dattilio, a Board Certified Clinical and Forensic Psychologist and a Clinical Instructor in Psychiatry at Harvard Medical School as well as at the University of Pennsylvania Perelman School of Medicine, with extensive experience diagnosing and treating individuals who suffer from a wide range of anxiety disorders, including phobias. Tr. pp. 377 - 381, 408, 417-418. Dr. Dattilio explained that he performed an extensive evaluation of Plaintiff over the course of two visits in March 2014, which included a thorough history of Plaintiff's entire life, a review of Plaintiff's medical records, a battery of pyschodiagnostic tests and measurements, as well as an interview with Plaintiff's wife. Tr. p. 383 - 386. Dr. Dattilio told the Jury that he was able to confirm his diagnosis that Plaintiff suffers from trypanophobia (or needle phobia) by a technique known as "exposure." This was where, without warning, Dr. Dattilio produced an insulin syringe, laid it on a desk, then drew the edge of the needle to his skin and punctured the top of his hand until it bled, all the while watching Plaintiff's reaction. Tr. p. 391- 393. Dr. Dattilio explained that this triggered an unprepared, spontaneous reaction from Plaintiff that could not be rehearsed. Plaintiff turned white, looked visibly annoyed, and almost fainted. Tr. pp. 392, 415. Dr. Dattilio further testified that Plaintiff' condition, trypanophobia, is a formal diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association. Tr. pp. 404, 405. He also testified that it is a specific phobia

that affects approximately 20 to 23 percent of the general population. Tr. p. 391, 402.

Based on the testimony from Dr. Dattilio about Plaintiff's demonstrated phobia, combined with Dr. Warfel's testimony of Plaintiff's twenty-year reluctance to receive injections or have his blood drawn, the Jury had a legally sufficient evidentiary basis to find that Plaintiff suffers from an impairment within the meaning of the ADA.

## B. Substantial Limitation of Major Life Activity

Next, Defendant argues that even if Plaintiff had adduced sufficient evidence to show that his bodily functions were impaired, he failed to show that the purported impairment substantially limited his ability to engage in a major life activity. Plaintiff counters that the evidence amply supported a conclusion that Plaintiff's trypanophobia substantially limits his ability to work and the operation of his neurological and brain functions.

### i. Ability to Work

As the Court stated when ruling on the motions *in limine*, it is clear that the ADA Amendments Act ("ADAAA") expanded the EEOC regulations pertaining to the standard defining "a substantial limitation" under the ADA. These regulations now indicate that the standard "is not meant to be ... demanding," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," § 1630.2(j)(1)(iii). Currently, an impairment will be considered a disability under the ADA "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C .F.R. § 1630.2(j)(1)(ii). An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630 .2(j)(1)(ii); *see also Brandon v. O'Mara*, 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011).

However, at least one court has found that the post-ADAAA standard for determining whether a person is substantially limited in the major life activity of working still requires proof that the plaintiff was impaired in his

ability to perform either a class of jobs or a broad range of jobs in various classes. In *Krachenfels v. North Shore Long Island Jewish Health System*, 2014 WL 3867560 (E.D.N.Y. July 29, 2014), Judge Bianco examined the post-ADAAA Code of Federal Regulations and the EEOC's *Interpretive Guidance on Title I of the Americans with Disabilities Act.* He noted that the EEOC has removed from the text of the regulations a discussion of the major life activity of working because "no other major life activity receives special attention in the regulation," and "in light of the expanded definition of disability established by the [ADAAA], this major life activity will be used in only very targeted situations." *Krachenfels* at *14, fn. 11 (quoting the *EEOC Interpretive Guidance* at § 1630.2(j)). Moreover, he noted that the *EEOC Interpretive Guidance,* which the Second Circuit treats as authoritative, indicates that "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." Judge Bianco concluded that the test for determining whether a person's ability to work was substantially impaired has not changed from the pre-ADAAA standard. *Krachenfels* at * 14, fn. 11.

The Court concurs with Judge Bianco's analysis. While a plaintiff need not prove that he is prevented, or significantly or severely restricted from performing a class of jobs or a broad range of jobs in various classes, he must nevertheless prove that he is substantially limited in his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. *See Widomski v. SUNY at Orange*, 748 F.3d 471, 475 (2d Cir. 2014); *O'Connor v. Huntington U.F.S.D.,,* 2014 WL 1233038, at *1 (E.D.N.Y. Mar. 25, 2014)(Bianco, J.); 29 C.F.R. § 1630.2(j)(3)(i); *see also Gorbea v. Verizon New York, Inc.,* 2014 WL 917198, at * 7, n. 10 (E.D.N.Y. March 10, 2014)(Matsumotot, J.).[1]

---

[1]("Although the current version of the relevant EEOC regulations no longer defines a substantial limitation in the major life activity of working, the Second Circuit has continued to use the definition from the previous version of the regulations.")(citing *Cardo v. Arlington Cent. Sch. Dist.*, 473 Fed. Appx. 21, 24 (2d Cir. 2012) (it should be noted that the discrimination in *Cardo* occurred before the ADAAA, so the pre-ADAAA standard applied anyway).

Based on this determination, the Jury was charged:

Substantially Limits a Major Life Activity

If you find that Plaintiff has an impairment, then you must determine whether that impairment substantially limits a major life activity.

-Substantially Limits

Substantially limits means "considerably"' or "to a large degree" as opposed to interfering in only a minor way. However, an impairment need not prevent, or significantly or severely restrict, the performance of a major life activity to be considered substantially limiting.

-Major Life Activity

"Major life activities" are the normal activities of living. For purposes of this case, the pertinent major life activities are working and neurological functioning.

-Working

To prove that he suffers from an impairment that substantially limits the major life activity of working, Plaintiff must prove that his impairment substantially limits him in performing a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

A "class of jobs" is defined as those jobs requiring similar training, knowledge, skills, or abilities within the geographical area where the Plaintiff lives and works. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

In determining whether Plaintiff's ability to work is substantially limited, the criteria you must consider are:

A.      The geographical area to which Plaintiff has reasonable access;

B.      The job from which Plaintiff has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which Plaintiff is also disqualified because of impairment (class of jobs); and/or

C.      The job from which Plaintiff has been disqualified because of an impairment, and the number of types of other jobs not utilizing similar training, knowledge, skills, or abilities within the geographical area from which the individual is also disqualified because of impairment (broad range of jobs in various classes).

12

In arguing that there was sufficient evidence for the Jury to conclude that Plaintiff's impairment substantially limits his ability to work, Plaintiff points to Dr. Dattilio's testimony. Dr. Dattilio testified that Plaintiff' impairment significantly restricts, if not all together precludes, him from performing any job that requires giving injections or drawing blood, *see* Tr. pp. 400 - 401 ("I don't believe that he would have been able to effectively function in providing injections for patients and I also have grave concern about the state he would be [in] if forced to do so afterwards in filing scripts and taking care of his duties as a pharmacist"), and any position in the medical field "that would have to do with any puncture, infusion, [or] stick" would be "a problem for him." Tr. p. 401.

As Defendant argues, Plaintiff is not disqualified from a broad class of jobs simply because he cannot use a needle. While he may be disqualified from jobs that require him to give injections or draw blood, this does not include all pharmacy jobs or even all medical jobs. Plaintiff is a pharmacist who could work at any pharmacy where pharmacists only dispense medication. *See Krachenfels*, 2014 WL 3867560, at *14 (plaintiff's condition did not prevent her from performing other positions "within her qualifications"); *Allen v. Southcrest Hosp.*, 455 F. App'x 827, 835 (10th Cir. 2011) (even after ADAAA, a plaintiff's ability to work must be compared to those " with comparable training, skills, and abilities"). However, the jury was instructed that a "class of jobs" is defined as those jobs requiring similar training, knowledge, skills, or abilities within the geographical area where Plaintiff lives and works. Although not specifically argued by Plaintiff, it is possible that the Jury could have taken Plaintiff's testimony about his inability to find another pharmacist's position in the area as evidence that no comparable jobs existed within the geographical area where Plaintiff lives. Thus, viewing the evidence in the light most favorable to Plaintiff, there is sufficient evidence for the jury to reasonably conclude that Plaintiff's trypanophobia substantially limited him in performing a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

13

ii.  Brain/Neurological Functioning

Next, Defendant argues that Plaintiff failed to present any evidence that his brain/neurological functioning was "substantially limited" by his trypanophobia.  The Court disagrees.

When asked whether Plaintiff' impairment had an impact on the operation of his neurological function, Dr. Dattilio testified:

> Yes, ... [I]t's the ... sympathetic branch of the nervous system which increases our heart rate, respiration, involuntary functions.  When it is triggered, it's a neurological reaction, okay, because we have that overdrive.  And then what shuts down those symptoms is called the parasympathetic branch but the problem is that works much, much slower than the sympathetic branch, so sometimes it takes a lot longer for the symptoms to subside. You don't want to have them.  That's why most people avoid the thing they're phobic about. They don't want to have anxiety reaction because it doesn't go away right away. Lingers for a while.

Tr. pp. 399 - 400.

As to the impact on Plaintiff' brain function, Dr. Dattilio testified that "the neurochemical disposition in the brain which . . .  affect those areas in the nervous system are also off, so you may have some . . . negative reactions.  A lot of jitteriness, a lot of uncomfortable feelings. Edgy."  Tr. p. 400.   Dr. Dattilio also testified that giving an injection could affect Plaintiff's ability to concentrate. Tr. p. 397 ("[W]hen anxiety rises to that level .... You're hypervigilant. Your blood pressure goes up. You're not always focused on what you should be doing because you're a little bit beside yourself.").

The Jury was charged that "[t]o establish that his impairment substantially limited him in the major life activity of neurological functioning, Plaintiff must prove that, as a result of the impairment, his ability to perform neurological functions/brain functions was substantially limited as compared to most people in the general population."   Viewing Dr. Dattilio's testimony in the light most favorable to Plaintiff, there was sufficient evidence for the Jury to conclude that Plaintiff's trypanophobia substantially limited him in the major life activity of neurological functioning because the impairment substantially affected his sympathetic/parasympathetic branch

reactions - a state of neurological dysfunctioning unlike most people in the general population who do not suffer from such phobias.  The motion on this ground is denied.

### 3.    Perform Essential Functions

Next, Defendant argues that Plaintiff failed to present sufficient evidence for the Jury to reasonably conclude that performing immunizations was not an essential function of a pharmacist's position with Rite Aid. Viewing the evidence in the light most favorable to Plaintiff, the Court must disagree.

"[T]he plaintiff must demonstrate that he . . . could have performed [the essential] functions [of his position], with our without a reasonable accommodation"  *McMillan v. City of N.Y.*, 711 F.3d 120, 127 (2d Cir. 2013).  "[U]nder no circumstances can a reasonable accommodation involve the elimination of an essential job function."  *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 133 (E.D.N.Y.  2014)(citing *Shannon v. New York City Transit Authority*,  332 F.3d 95, 100 (2d Cir. 2003) and *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991)).  To the extent Plaintiff sought to be excused from performing immunizations, it was his burden to show that this was not an essential function of a pharmacist's position at Rite Aid.  On this issue, the Jury was instructed:

> If you find that the Plaintiff was otherwise qualified,[2] then you must determine whether he has proven that he was able to perform the essential functions of the position with or without a reasonable accommodation.

> The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

> A job function may be considered essential for any of several reasons, including:

> 1. the reason the position exists is to perform that function;

---

[2]The Jury was also instructed: "Otherwise qualified means that the Plaintiff has the requisite skill, experience, education, and other job-related requirements of the position."  There is no meritorious argument that Plaintiff was not "otherwise qualified" to hold a pharmacist's position.

2. there are a limited number of employees available among whom the performance of that job function can be distributed; and

3. the job function is highly specialized and the person in that position is hired or maintained for his expertise or ability to perform that particular job function.

Evidence of whether a particular function is essential includes, but is not limited to:

a. the employer's judgment as to which functions of the job are essential;

b. written job descriptions prepared by the employer for advertising or posting the position;

c. written job descriptions prepared by the employer for use in interviewing applicants for the position;

d. the amount of time spent performing the function;

e. the consequences of not requiring the person holding the position to perform the function; and

f. the work experience of past and/or current employees who have held or hold similar positions.

In opposition to Defendant's motion, Plaintiff points to the testimony of his Pharmacy District Manager, William Spinks. Spinks did not include giving immunizations in his description of Plaintiff' duties and responsibilities as a Pharmacy Manager for Rite Aid. Tr. pp. 292 - 293. Plaintiff also points to the written job description Rite Aid issued in April of 2011 (after the immunization program was initiated) which listed sixteen (16) "essential duties and responsibilities," none of which included administering injections or immunizations. Ex. P-14. In addition, Plaintiff points to Rite Aid's written Immunization Program description which indicates that not all pharmacists will be immunizers, and specifically provides that "[a]ppointments can be used in one immunizer stores so that patient needs can be addressed on the non-immunizer day." Ex. P- 3, p. 31, Bate Stamp D-00081.

Despite that there existed evidence that contradicted each of the facts identified by Plaintiff in support of

the contention that providing immunizations was not an essential function of the job, [3] on the instant motion the Court must view the evidence in the light most favorable to the Plaintiff. When doing so, the Court finds that there was sufficient evidence for the Jury to reasonably conclude that giving immunizations was not an essential function of a pharmacist's job with Rite Aid. The motion on this ground is denied.

### 4. Existence of a Reasonable Accommodation

Defendant next argues that Plaintiff failed to prove that a reasonable accommodation existed at the time he was terminated, or that he would have accepted an identified accommodation if offered. The Court agrees.

A plaintiff in an ADA failure to accommodate case "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment . . . ." *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). A reasonable accommodation may include, *inter alia*, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . training materials or policies, or other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). While a plaintiff's burden of production as to the reasonableness of the accommodation is "not a heavy one," *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 366 (E.D.N.Y. 2012) (quoting *Borkowski v. Valley Cent. Sch. Dist*, 63 F.3d 131, 138 (2d Cir. 1995), "[the plaintiff] bears both the burdens of production and persuasion" as to the existence of an accommodation. *Picinich v. United Parcel Services*, 321 F. Supp. 2d 485, 504 (N.D.N.Y. 2004). Once the plaintiff meets his burden of demonstrating that a reasonable accommodation exists, the burden shifts to the defendant to demonstrate that the plaintiff's proposed accommodation would result in an undue hardship. *Tillman v. Verizon New York, Inc.*, 2015 WL 4603372, at *21 (E.D.N.Y. July 30, 2015)(citations omitted).

---

[3]For example, Rite Aid's Senior Director of Clinical Service, Richard Mohall, explained that the appointment procedure upon which Plaintiff relies was only a temporary measure used during the initial phase of the immunization program as pharmacists were becoming certified to give the immunizations. Tr. at 626-27.

At trial, Plaintiff claimed Rite Aid could have provided a reasonable accommodation by: (1) providing desensitization therapy; (2) transferring him to a Pharmacy Technician position; (3) hiring a nurse to give immunizations during his pharmacy shifts; or (4) relocating him to a dual-pharmacist store where another pharmacist could perform immunizing duties.[4]

## A. Desensitization Therapy

As to desensitization therapy, Plaintiff does not rebut Defendant's contention that employers are not obligated by the ADA to provide medical treatment to a disabled employee, *see Emerllahu v. Pactiv, LLC,* 2013 WL 5876998, at *4 n.2 (W.D.N.Y. Oct. 30, 2013) ("the provision of medical treatment is not a reasonable accommodation under the ADA"); *Desmond v. Yale-New Haven Hosp., Inc.,* 738 F. Supp. 2d 331, 350 (D. Conn. 2010) ("[n]othing in the text of the ADA or in the regulations promulgated thereunder contemplate that an employer should be required to provide a disabled employee with medical treatment in order to restore [his] ability to perform essential job functions."), or that Plaintiff failed to prove that had the desensitization therapy been offered, he would have undertaken it. *See* Def. Mem. L., p. 21.[5]   Rather, Plaintiff argues that *if* Rite Aid had engaged in the interactive process, it might have learned of the availability of this treatment.  From this

---

[4]As indicated above, a reasonable accommodation cannot involve the elimination of an essential job function.  Thus, Plaintiff's proposed accommodations 2-4 are appropriate accommodations only if providing immunizations are a function, but not an "essential function," of a pharmacist's position at Rite Aid.

[5] Defendant argues:

Even if Rite Aid were obligated to offer therapeutic treatment for Plaintiff's trypanophobia, Plaintiff failed to prove (or even attempt to prove) that—had it been offered—he would have taken it. From the start, Plaintiff told Rite Aid he "would *never even consider* trying to become an immunizing pharmacist." Tr. at 92. (emphasis added). At trial, Plaintiff testified that he only began to "look into" desensitization training after realizing that his aversion to needles may have been a contributing factor to his chronic unemployment. Even at the time of trial, Plaintiff admitted that he was "still on the fence" about whether he would pursue treatment. Indeed, he testified that he believed that trypanophobia "is a life-long problem" that he "honestly [did] not believe [he] can be treated for it." Tr. at 120-121; 148. Given this testimony, Plaintiff failed to prove that Rite Aid discriminated against him by not offering to treat his trypanophobia.

Def. Mem. L. p. 21.

Plaintiff argues:

> "[A] reasonable and fair minded" jury could easily conclude that, through the interactive process, Rite Aid might have learned of the availability of desensitization treatment. While Rite Aid was not required to provide Plaintiff with treatment, the evidence supports a finding by the Jury that informing Plaintiff of the availability of treatment and allowing him time for same might have been a very simple and reasonable accommodation. In fact, if treatment was successful, this accommodation would have worked even if giving immunizations was an essential job function, which it is not.

Pl. Mem. L. pp. 24-25.

The Court finds that the potential that Rite Aid might have learned of desensitization therapy from Plaintiff or his treatment providers fails to satisfy Plaintiff's burden of demonstrating that a reasonable accommodation existed. *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 567 (2d Cir. 2000) (a failure to accommodate necessarily fails if plaintiff does not prove the existence of an accommodation, beyond "mere speculation"). Furthermore, Plaintiff's current position that he would have undergone therapy if afforded time to do so by Rite Aid runs contrary to the undisputed evidence at trial. Plaintiff testified that he had no intention of seeking this treatment, Tr. at 92; 148; that to this day he has not sought the treatment, Tr. at 120-21; 173-74, and that, rather than discussing the potential efficacy of the treatment with his doctor at the time Rite Aid instituted the immunization requirement, Plaintiff asked specifically for a note excusing him from the immunization training. Tr. at 361-63. Given these undisputed facts, a reasonable jury could not have concluded that Rite Aid failed to accommodate Plaintiff by giving him "time" to pursue desensitization treatment.

### B. Transferring Plaintiff him to a Pharmacy Technician Position

Plaintiff also failed to show that he could have been reasonably accommodated by transferring to a Pharmacy Technician position. At trial, Ms. Burch testified that Rite Aid did offer this alternate position to

19

Plaintiff, but Plaintiff refused.[6]  Tr. at 217-18; 687.  While Plaintiff testified that he "did not recall" this option

being offered to him, Tr. at 102, Plaintiff did not to testify that he would have taken this alternate position if it had

been offered.  To the contrary, Plaintiff testified that although he had been out of work for more than three years

at the time of trial, he never mentioned having applied for a non-pharmacist position with any company, let alone

with Rite Aid.  Plaintiff cannot complain about Rite Aid for not offering an accommodation he never asked for,

and one which he not have accepted.  *Barber*, 562 F.3d at 1231-32 (rejecting reasonable accommodation claim

where plaintiff "would have refused" an alternate position); *Grimes*, 2004 WL 2378841, at *19 ("Mr. Grimes has

failed to put forth any evidence of a vacant position for which he would have been qualified and would have

accepted."); *see also Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005) ("[T]he employer fails to

participate in the interactive process only if, among other things, the employee can demonstrate that the

employee could have been reasonably accommodated but for the employer's lack of good faith.").

## C.  Hired a Nurse to Give Immunizations

Defendant argues that "Rite Aid cannot be liable for failing to hire additional  employees—like a nurse,

to perform immunizations for Plaintiff—because that is not a reasonable accommodation as a matter of law."

Def. Mem. L. p. 23.   Plaintiff does not oppose this contention, *see* Pl. Mem. L. pp. 24-25, and therefore it is

deemed abandoned or conceded. *See. e.g., Mitchell v. City of Albany*, 2010 WL 1235389, at *7 (N.D.N.Y.

Mar.31, 2010)( "[T]he failure to oppose a portion of a motion for summary judgment is deemed abandonment of

the claim to which the motion applies, and, in the Northern District of New York, is deemed consent to granting

that portion of the motion.").  Furthermore, the Court agrees with Defendant that the request that Rite Aid hire a

nurse to perform immunizations for Plaintiff does not constitute a reasonable accommodation within the

---

[6]Defendant argues that this was presumably because Pharmacy Technicians make "substantially" less than
Pharmacy Managers.

meaning of the ADA. *See Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011) ("It would not be a reasonable accommodation to require the employer to . . . hire new employees."); *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001) ("[A]n employer is not required to hire additional employees or assign those tasks that the employee could not perform to other employees."); *Patton v. Dobson Ass'n*, 113 F.3d 1242, 1997 WL 218587, at *1 (9th Cir.1997) (unpublished) ("Restructuring an existing job can be a reasonable accommodation under the ADA, but an employer is not required to hire additional employees or make fundamental modifications in its operations." (internal citation omitted)); *Hunt-Watts*, 43 F. Supp.3d at 134 ("Plaintiff's proposed accommodation is also not reasonable because it amounts to having other employees do her job for her, and would result in Defendant having to employ two professionals to perform the job of one podiatrist. . . . Plaintiff has submitted no evidence that the accommodation she seeks is a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. To the contrary, it is clear that the costs of hiring two employees to perform the job of one clearly outweigh the benefits of doing so.")(internal quotation marks and citation omitted); *Martin v. St. Luke's Episcopal Hosp.*, 2014 WL 4810303, at *12 (S.D. Tex. Sept. 23, 2014) ("as a matter of law, a request to hire more staff . . . is not a reasonable accommodation"); *Floyd v. Lee,* 2015 WL 1501664, at *19 (D.D.C. Mar. 31, 2015) ("hiring an additional Legislative Assistant to help Ms. Floyd complete her work would not constitute a 'reasonable' accommodation," and holding that—as a matter of law—reducing workload is not a reasonable accommodation)); *see also* 29 C.F.R. § 1630.2(o), App. (explaining that an employer is not required to hire an "assistant ... [to] perfor[m] the job for the individual with a disability"); *Borkowski*, 63 F.3d at 138 (An accommodation is deemed "reasonable" only where "its costs are not clearly disproportionate to the benefits that it will produce.").

### D. Move Plaintiff to a Dual-Pharmacist Store

Defendant also argues it cannot be held liable for failing to move Plaintiff to a dual-pharmacist store.

Defendant asserts that the undisputed evidence at trial demonstrated that "even in multiple pharmacists stores, there are times that [a pharmacist would be] alone," Tr. at 610:14-23; 256:20-15; 687:1-7; 712:4-11, and that the arrangement would not be workable "under Rite Aid's business model, which requires that immunizations be offered to patients upon request." Def. Mem. L. p. 23. Defendant further argues that such an arrangement would be unreasonable as a matter of law because it would require Rite Aid to shift Plaintiff's immunizing tasks to one of his co-workers. *Id.*

> Plaintiff counters:
>
> [T]he evidence established that Rite Aid's own Immunization Program document provided a procedure which would have provided Plaintiff with an accommodation that would have allowed him to continue in his position without having to administer immunizations. [Ex. P- 3, p. 31 (Bate Stamp P D-00081)]. That document provided for the use of appointments in one immunizer stores. [*Id.*]. "[A] reasonable and fair minded" jury might well conclude that the use of appointments, in accordance with Rite Aid's Immunization Program, was a reasonable accommodation Rite Aid could have made available to Plaintiff. Second, District Pharmacy Manager Spinks testified that there were 7 stores in the district in which Plaintiff worked with dual pharmacist coverage. [Tr. p. 286, 1. 3 - p. 291, 1. 2, p. 721, 1. 8-21]. Certainly, "a reasonable and fair minded" jury use this information to reach the conclusion that Plaintiff might have been accommodated by assignment to a store or stores with dual coverage, notwithstanding the possibility that there would be times when both pharmacists were not on duty [Dkt. No. 125, p. 8], since appointments could be used on those occasions, and Mr. Spinks never actually testified that such an assignment would not have been a reasonable accommodation [Tr. p. 711, 1. 24 - p. 712, 1. 11].

Pl. Mem. L. pp. 24-25. Defendant replies, arguing, *inter alia,* that Plaintiff failed to offer evidence of any available dual-pharmacist store positions.

The Court finds that while shifting some non-essential job duties to existing personnel may be a reasonable accommodation, Plaintiff offered no evidence indicating that a position existed in a dual-pharmacist store such to allow another pharmacist to perform the immunizing duties while Plaintiff was at work. "An ADA plaintiff does not satisfy [his] burden to identify a potential accommodation merely by reciting the formula that [his] employer could have reassigned [him]. Instead, [he] must demonstrate the existence, at or around the time

when accommodation was sought, of an existing vacant position to which [he] could have been reassigned."

*McBride*, 583 F.3d at 97. "[A]n employer need not reassign an employee if no position is vacant. Nor is the employer obliged to create a new position to accommodate the employee." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999)(citation omitted). Because there was no proof that a position was available at a dual-pharmacist store at the relevant time, the desire for an assignment to a dual-pharmacist store could not have been the basis of an reasonable accommodation.

Because Plaintiff failed to meet his burden of demonstrating that a reasonable accommodation existed, Defendant is entitled to a JMOL dismissing Plaintiff's ADA failure to accommodate claim.

### 5. ADA Wrongful Termination Claim

Next, Defendant argues that Plaintiff failed to present sufficient evidence for the Jury to reasonably conclude that Plaintiff proved his ADA wrongful termination claim. The Court disagrees.

To establish a *prima facie* case of wrongful termination under the ADA, a plaintiff must show that he (1) suffers from a disability within the meaning of the ADA, (2) was otherwise qualified to perform his job, and (3) suffered an adverse employment action because of his disability. *Fasan v. McRoberts Protective Agency Inc.*, 2015 WL 1285909, at *6 (E.D.N.Y. Mar. 20, 2015). Defendant argues that Plaintiff failed to establish the first two elements of his *prima facie* case because he did not have an ADA disability, and because performing immunizations was an essential function needed to be performed to qualify him for of the position. Defendant further argues that, even if Plaintiff did established the first two elements, he did not prove his termination was caused by his trypanophobia. On this last point, Defendant argues that the record showed that Plaintiff's only comparator—a non-disabled pharmacist who refused to become a certified immunizer—was also terminated. Tr. 272-273; 683-684. Defendant also argues that even if Plaintiff had met his *prima facie* burden, he offered no evidence to rebut Rite Aid's legitimate business reason for his discharge—*i.e.*, his inability to perform an

essential function of his job. Def. Mem. L. p. 25 (citing *Prewitt*, 2015 WL 712787, at *13 (Walgreen "made a business decision to market vaccinations," and the decision to terminate a pharmacist for failing to perform this function was not discriminatory)).

For the reasons discussed above, the evidence was sufficient for the Jury to reasonably conclude that Plaintiff satisfied the first two elements of his *prima facie* case. As to the third element, the evidence showed that another pharmacist "who gave a doctor's note who said they had a fear of needles" and refused to attend the immunization training was also terminated. Tr. pp. 682-84. While this pharmacist did not claim to have trypanophobia or make a claim under the ADA, the Jury could reasonably have concluded that Rite Aid's decision to terminate both pharmacists was because of their respective needle phobias. Hence, there was sufficient evidence to satisfy Plaintiff's burden of establishing his *prima facie* case.

Further, while Defendant was free to argue that Plaintiff and this other pharmacist were fired for the legitimate business reason of refusing to perform an essential function of their job (*i.e.* performing immunizations) and not because Rite Aid had a discriminatory animus toward the disability, Plaintiff was free to the argue the opposite. The Court finds that there was sufficient evidence to allow a reasonable jury to find for Plaintiff on this issue. Accordingly, Defendant's Rule 50(b) motion in this regard is denied.

### 6. ADA Retaliation Claim

Defendant also argues that Plaintiff failed to prove his ADA Retaliation claim. The Court disagrees.

To prove a *prima facie* retaliation claim under the ADA, a plaintiff must show that (1) he engaged in protected activity, (2) the employer was aware of this activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection between that adverse action and the protected activity. *Campbell v. New York City Transit Auth.*, 2015 WL 1349820, at *16 (E.D.N.Y. Mar. 26, 2015). As with principal discrimination claims, once a *prima facie* retaliation case has been established, the burden shifts to the

24

defendant who must then assert a non-discriminatory reason for such adverse action. *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 205-06 (2d Cir. 2006).

Defendant argues that the claim fails "because the only allegedly retaliatory conduct on the part of Rite Aid was directly related to Plaintiff's purported accommodation request, and any attempt to 'bootstrap' a failure-to-accommodate claim into a separate and viable disability retaliation claim must fail, as a matter of law." Def. Mem. L, p. 26. However, the the Court finds that evidence was sufficient for the Jury to reasonably conclude that there was a causal connection between Plaintiff's protected activity of requesting an accommodation and his discharge - an adverse action separate from the failure to accommodate. Thus, the motion fails on this ground.

Defendant next contends that "Plaintiff offered no evidence to rebut Rite Aid's legitimate business reason for his discharge." Def. Mem. L. p. 26. However, as evidenced by the instructions to the Jury, that was precisely the question the Jury was asked to resolve. That is, whether there was a a causal connection between Plaintiff's discharge and his protected activity. As indicated above, the Court finds that there was sufficient evidence to reach this conclusion. Accordingly, the motion on this ground is denied.

### 7. NYHRL Claim

Defendant asserts that Plaintiff failed to prove his NYHRL claim because he did not prove he was disabled within the meaning of the NYSHRL. The Court disagrees.

The NYSHRL defines "disability" to mean:

(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

N.Y. Exec. L. § 292(21).   Unlike the ADA, the NYSHRL "does not impose the requirement that the impairment substantially limit the individual's normal activities." *Krikelis v. Vassar College,* 581 F. Supp.2d 476, 486 (S.D.N.Y. 2008); *Phillips v. N.Y.C.,* 66 A.D.3d 170, 884 N.Y.S.2d 369, 373 (2009)(The NYSHRL provides broader protection than the ADA).

Even assuming, *arguendo,* that Plaintiff's trypanophobia was never demonstrated by medically accepted clinical or laboratory diagnostic techniques, and that his condition was not diagnosed or labeled as trypanophobia until after he saw Dr. Dattilio, there was sufficient evidence for the Jury to reasonably conclude that at the time of Plaintiff's discharge, defendant regarded Plaintiff as suffering from a disability within the meaning of the NYSHRL.  Moreover, for the reasons discussed above with regard to the evidence of Plaintiff's disability under the ADA, there was sufficient evidence for the Jury to reasonably conclude that Plaintiff suffered from a disability as defined under the NYSHRL.  Accordingly, the Rule 50(b) motion on this ground is denied.

### b.   Defendant's Rule 59 Motion

The Court will next discuss the issues raised in Defendant's Rule 59 motion.

### 1.      Evidence Related to Plaintiff's OCD

Defendant contends that it is entitled to a new trial because the Court erroneously admitted evidence of Plaintiff's Obsessive Compulsive Disorder ("OCD").   It argues that because Plaintiff was first diagnosed with OCD in March 2014, "[n]obody knew about Plaintiff's OCD before that date—not Plaintiff, not Plaintiff's treating physician, not Dr. Dattilio, and certainly not Rite Aid.  Plaintiff never asked Rite Aid to accommodate his OCD. In fact, Rite Aid had no clue until 2014 that Plaintiff suffered from anything beyond needle aversion. ... Rite Aid cannot be punished for failing to accommodate a disability it did not know about.  . . .  The jury should not  have been permitted to even consider whether in 2011 Rite Aid failed to accommodate a condition nobody would learn about for years to come."  Def. Mem. L. pp. 29-30.   Further, Defendant argues that the evidence that

26

Plaintiff suffers from OCD was "highly prejudicial" and may have caused the jury to base its decision not only on trypanophobia, but on the cumulative evidence of disability. *Id.* p. 30-31. The Court does not find that this evidentiary ruling entitles Defendant to a new trial.

Before the Court allowed the Jury to hear heard testimony from Dr. Dattilio, it asked him to explain the connection between Plaintiff' trypanophobia and obsessive compulsive behavior. [7] After hearing his explanation, the Court found the probative value of Dr. Dattilio's opinion that Plaintiff's trypanophobia was anchored in, or arose out of, his OCD did not exceed any prejudicial effect that would be caused by the testimony, and therefore allowed it under Fed. R. Evid. 403. *See* Tr. 373- 376.[8] Simply stated, the Jury was asked to decide whether Plaintiff's trypanophobia was the causative factor in Defendant's decisions. Whether the trypanophobia was anchored in, or influenced by, another condition did not change the Jury's task.

The arguments that Defendant makes now are the same as those made at trial. *See* Tr. 373-376. For

---

[7]Dr. Dattilio explained:

In this particular case, Plaintiff has obsessive compulsive disorder which is part of his personality disorder and was there prior to the development of any specific phobias that he experienced, namely fear of heights, fear of needles, blood, et cetera. So in this particular case, and I emphasize that, the OCD, Obsessive Compulsive Disorder, existed first and the other came second to that based on his experiences in his live and what manifest it or maintains it is the obsessive compulsive characteristics of his personality that contributes to him being resistant in certain areas.

Tr. p. 367, 1. 25 - p. 368,1. 10. Dr. Dattilio went on to explain on inquiry from Plaintiff' counsel that Plaintiff' "trypanophobia arises out of the OCD." Tr. p. 369, 1. 14-16.

[8]The Court stated:

I don't think the OCD really makes any difference. I think the whole thing is about the fear of needles even though it arises out of an underlying neurological -- he didn't really -- he skirted that one but arising out of a neurological problem that he calls Obsessive Compulsive Disorder and so I just think that's a background thing. I don't think that is any more telling on what the jury's decision is going to have to be in this case. So under 403 I'm going to rule that the probative value is not exceeded by the prejudicial effect and I'm going to allow him to testify to that.

Tr. p. 373. The Court found that while "this underlying diagnostic fact was discovered when Dr. Dattilio examined [Plaintiff] way after he was fired by Rite Aid, . . . that doesn't mean it can't come before the jury as the doctor's opinion as to how the trypanophobia was anchored in the obsessive compulsive disorder." Tr. p. 376.

the reasons articulated at trial, the Court does not find that the admission of Dr. Dattilio's testimony that Plaintiff suffers from OCD was so highly prejudicial as to deny Defendant a fair trial. Moreover, Defendant's argument on this point does not convince the Court that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice. The Rule 59 motion on this ground is denied.

### 2. Verdict Form

Defendant next argues that the Verdict Form "was plainly improper, significantly prejudicial, and resulted in a miscarriage of justice." Def. Mem. L. p. 31. In this regard, Defendant asserts that Question 1[9] of the Verdict Form "circumvented almost all of Plaintiff's *prima facie* burden [on his ADA wrongful discharge claim], requiring him to prove just one element for the cause of action, *i.e.*, whether 'he suffered an adverse employment action because of his disability.'" *Id.* Similarly, Defendant claims that Question 4[10] "lowered (if not

---

[9]Question 1 asked:

1.    Has Plaintiff Christopher Stevens proven by a preponderance of the evidence that he was discharged because of a disability in violation of the ADA?

(**NOTE**: Your answer to this question must take into account whether Rite Aid has proven by a preponderance of the evidence that providing an accommodation that would allow Plaintiff to perform the essential functions of his job, if such accommodation was required and exists, would constitute an undue hardship to the employer. If you find that Rite Aid has proven this, then you must answer this question "No.")

          Yes_____          No_____

[10]Question 4 asked:

4.    Has Plaintiff Christopher Stevens proven by a preponderance of the evidence that he was discharged because of a disability in violation of the Human Rights Law?

(**NOTE**: Your answer to this question must take into account whether Rite Aid has proven by a preponderance of the evidence that Plaintiff's disability, if you find one exists, prevented Plaintiff, either with or without a reasonable accommodation, from performing the essential job functions in a reasonable manner. If you find that Rite Aid has proven this, then you must answer this question "No.")

          Yes_____          No_____

28

outright eliminated) Plaintiff's evidentiary burden [on his NYSHRL wrongful discharge claim] and allowed the jury to find in his favor without requiring him to prove his *prima facie* case." *Id.*  Defendant further maintains that the "Notes" that accompanied Questions 1 & 4 "suggest[] it is Rite Aid's burden to prove that immunizing is an essential function of Plaintiff's job, as opposed to Plaintiff's burden to prove that immunizing could have been eliminated from his job as a reasonable accommodation because it is not an essential function." *Id.* p. 32.

Plaintiff responds that Defendant failed to preserve an objection to the Verdict Form by failing to formally lodge an objection before the matter was presented to the Jury.  Plaintiff further notes that " not only did Rite Aid's counsel fail to object to the Jury Form Questions upon which it now bases its motion, but he acquiesced to same." Pl. Mem. L. p.  (citing  Tr. p. 802).  Defendant replies that the Verdict Form was "so confusing that it led to a manifestly unjust verdict," thereby entitling Rite Aid to a new trial even if it did not formally object to the Verdict Form.  Def. Reply Mem. L, p. 11.

The motion in this regard is denied.  "To preserve for appeal any objection to the form or substance of questions on a special verdict form, a party must object before the jury has retired to deliberate." *Cash v. Cnty. of Erie*, 654 F.3d 324, 340 (2d Cir. 2011).  "[Defendant] failed to raise [its] present objection to the special verdict sheet prior to submission of this case to the jury. Therefore [its] objection is unpreserved." *Woods v. Oneida Cty.*, 575 Fed. Appx. 11, 11 (2d Cir. Sept. 24, 2014)(summary order).

Further, the Court finds no fundamental error in, or manifest injustice created by, the Verdict Form.  In assessing the appropriateness of special verdict questions, the Court "must read challenged questions 'in conjunction with the judge's charge to the jury.'" *Cash,* 654 F.3d at 340 (quoting *Shah v. Pan Am. World Servs., Inc.,* 148 F.3d 84, 96 (2d Cir. 1998)).  There is a "strong presumption that the jury in reaching its verdict complied with [the court's] instructions." *Bingham v. Zolt,* 66 F.3d 553, 563 (2d Cir.1995); *see Blueford v. Arkansas*, 566 U.S. ––––, ––––, 132 S. Ct. 2044, 2051, 182 L .Ed.2d 937 (2012)("'A jury is presumed to follow

its instructions.'") (quoting *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed.2d 727 (2000)) .

Here, the jury instructions charged the Jury on, *inter alia*, Plaintiff's burden of proving the elements of his ADA wrongful discharge claim. These elements included Plaintiff's burden of proving that he was able to perform the essential functions of his position with or without a reasonable accommodation; and Plaintiff's obligation of suggesting a reasonable accommodation to the employer. The Jury was further charged that if Plaintiff established the elements of his ADA wrongful discharge claim (including that a reasonable accommodation existed), the Defendant had the opportunity to prove by a preponderance of the evidence that an accommodation would constitute an undue hardship.

Question 1 simply asked the Jury whether Plaintiff proved that he was "discharged because of a disability in violation of the ADA." When read in conjunction with the Jury's charge, this question clearly incorporated all of the instructions the Court gave relative to the proving the claim. Defendant's argument that the question "circumvented almost all of Plaintiff's *prima facie* burden . . . requiring him to prove just one element . . ., *i.e.*, whether he suffered an adverse employment action because of his disability" is without merit. The argument ignores that the Verdict Form was given to the Jury after the Court charged the Jury, and is based on the improper proposition that the Verdict Sheet should be viewed in isolation. Further, the note accompanying Question 1 reminded the Jury that in reaching its ultimate conclusion on Plaintiff's ADA wrongful discharge claim, it had to take into account whether "Rite Aid has proven by a preponderance of the evidence that providing an accommodation that would allow Plaintiff to perform the essential functions of his job . . . would constitute an undue hardship to the employer." The Court fails to see how this note somehow shifted the burden to Defendant to prove anything other than that a proposed accommodation would constitute an undue hardship.

Similarly, the Court charged the Jury on Plaintiff's burden of proving the elements of his NYSHRL

wrongful discharge claim. This included instructions relative to Plaintiff's burden of proving: (a) that his disability prevented him from performing the particular activities involved in his job in a reasonable manner; (b) that he proposed and was refused an objectively reasonable accommodation; and (c) that the reasonable accommodation that he requested would not impose an undue hardship on the employer's business. The Jury was also charged that under the Human Rights Law, Rite Aid had the burden of proving that Plaintiff's disability, either with or without an accommodation, prevented him from performing the essential job functions in a reasonable manner.

When read in conjunction with the jury instructions, the Court fails to see how Question 4 circumvented Plaintiff's burden to prove the elements of his claim, or how the accompanying note required Defendant to prove anything other than that Plaintiff's disability prevented him from performing the essential job functions either with or without a reasonable accommodation.

The Rule 59 motion on this ground is denied.

### 3. Catch-All Reasons

Defendant argues that "[i]n *Sections IV.A-D* [of its Memorandum of Law], Rite Aid set forth myriad reasons it is entitled to judgment as a matter of law. Those same reasons support Rite Aid's alternate request for a new trial on the merits of Plaintiff's claims." Def. Mem. L. p. 33.

The Court declines Rite Aid's invitation to wade through and apply each of its Rule 50(b) arguments in the Rule 59 context. The motion on this ground is denied.

### 4. Remittitur or a New Trial on Damages

Defendant also seeks remittitur or a new trial on damages.

A court has discretion to order a new trial if the verdict appears to be seriously erroneous, and this "discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Lore*, 670 F.3d at 177

(quoting *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 433 (1996)); *see also Roberts v. United Parcel Serv., Inc.,* –––F. Supp.3d –––, 2015 WL 4509994, at *24 (E.D.N.Y. July 27, 2015) ("A trial court may grant remittitur where it deems a damages verdict excessive."). In considering motions for a new trial or remittitur on a state law claim, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." [*Stampf v. Long Island R.R. Co.,* 761 F.3d 192, 204 (2d. Cir. 2014)](alteration in original) (quoting *Gasperini,* 518 U.S. at 435); *see* [*Patterson v. Balsamico,* 440 F.3d 104, 119-20 (2d Cir. 2006)]. Under New York law, an award is excessive or inadequate "if it deviates materially from what would be reasonable compensation." *Stampf,* 761 F.3d at 204 (quoting N.Y. C.P.L.R. § 5501(c) ); *Lore,* 670 F.3d at 177; *Patterson,* 440 F.3d at 119 (noting that the state standard requires "a more exacting review" than the federal standard). In reviewing the same motion on a federal claim, a court's review of a compensatory damage award is "narrow," and a jury's award may be set aside as excessive only when the award is "so high as to shock the judicial conscience." [*Leo v. Long Island R.R. Co.,* 307 F.R.D. 314, 321-22 (S.D.N.Y. 2015)](internal quotation marks and citation omitted); *see also* [*Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 162 (2d Cir. 2014)](noting compensatory damage award may not be set aside as excessive unless it is "so high as to shock the judicial conscience and constitute a denial of justice")(quoting *DiSorbo v. Hoy,* 343 F.3d 172, 183 (2d Cir.2003))). Under both standards, a court should look to awards in comparable cases, bearing in mind the unique facts and circumstances of each case. *See Stampf,* 761 F.3d at 204; *Dotson v. City of Syracuse,* 549 F. App'x 6, 8 (2d Cir. 2013); *Tretola v. Cty. of Nassau,* 14 F.Supp.3d 58, 83 (E.D.N.Y. 2014) (quoting *Scala v. Moore McCormack Lines,* 985 F.2d 680, 684 (2d Cir. 1993)). Where, as here, the jury's damages award was not segregated between the state and federal claims, courts typically adhere to the standard of review which provides the most complete recovery. *See Singleton v. City of New York,* 496 F.Supp.2d 390, 393 (S.D.N.Y. 2007) (citing *Magee v. U.S. Lines, Inc.,* 976 F.2d 821, 822 (2d Cir.1992)) *aff'd,* 308 F. App'x 521 (2d Cir. 2009).

*Graham,* 2015 WL 5258741, at *24.

### A. Compensatory Damages

"As 'awards for mental and emotional distress are inherently speculative' and the judicial system 'has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable and proportionate,' greater scrutiny is given to large jury awards for mental and emotional harm to ensure that they are in line with comparable cases." *Graham,* 2015 WL 5258741, at *25 (quoting *Turley,* 774 F.3d at 162). "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" *Olsen v. Cty. of Nassau,* 615 F. Supp.2d 35, 46 (E.D.N.Y. 2009) (citation omitted). "Garden-variety" emotional distress claims arise where the evidence of harm was presented primarily through

the testimony of the plaintiff, who describes his or her distress in vague or conclusory terms and fails to describe the severity or consequences of the injury; "significant" (or "substantial") emotional distress claims arises where there is evidence or more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses; and "egregious" emotional distress claims arises where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected. *Wharton v. County of Nassau*, 2015 WL 4611974, at *11 (E.D.N.Y. July 30, 2015)(citing *Rainone v. Potter*, 388 F.Supp.2d 120, 122–23 (E.D.N.Y. 2005)); *see Olsen*, 615 F. Supp.2d at 46 (Garden variety emotional distress claims "typically lack extraordinary circumstances and are not supported by any medical corroboration.")(interior quotation marks and citation omitted).

Defendant argues that the jury's verdict of $900,000 in compensatory damages is not supported by the evidence at trial, contending: "Plaintiff's alleged damages were solely for garden-variety emotional distress and are far beyond the maximum damages supported by the evidence at trial." Def. Mem. L. p. 34. Plaintiff counters that his emotional damages are supported by his own testimony about the emotional toll that his termination placed on him, particularly due to the facts that he was no longer able to financially provide for his family which was very troubling for him because he had a difficult childhood growing up in poverty; and by his wife's testimony that Plaintiff could not eat, lost weight to the extent that he "looked like, you know, a cancer patient," often woke up "thrashing around," had sleepless nights, and had nightmares - symptoms she described as "profound." Tr. p. 196. Plaintiff argues that based on the Jury's $900.000.00 compensatory damage award, "the evidence in this case supports a finding that Mr. Stevens' claim for emotional distress fell somewhere on the continuum between 'significant' and 'egregious,' thereby justifying the Jury's award of $900,000 in compensatory damages in this case." Pl. Mem. L. p. 34.

Here, there was no medical testimony or evidence corroborating the emotional distress that Plaintiff

suffered, nor was there evidence of any medical or psychological treatment obtained by Plaintiff to address his

distress and its symptoms. While Plaintiff's and his wife's testimony about the emotional effects of a discharge

at age 57 was compelling, it did not elevate it beyond the "garden variety" category. "Courts have sanctioned

jury damages ranging from $30,000 to $125,000 for 'garden-variety' emotional distress." *Wharton*, 2015 WL

4611974, at *12; *see Roberts v. United Parcel Service, Inc.*, --- F. Supp.3d ----, 2015 WL 4509994, at *24

(E.D.N.Y. July 27, 2015)(Stating in a hostile work environment case: "'Garden variety' [ emotional distress]

claims generally merit awards of approximately $30,000 – $125,000."); *MacMillan v. Millennium Broadway*

*Hotel*, 873 F. Supp.2d 546, 559 (S.D.N.Y.2012) (finding jury's award of $125,000 to be excessive under Title VII

and NYCHRL); *Olsen*, 615 F. Supp.2d at 46 (Noting case that "'[g]arden variety' emotional distress claims

generally merit $30,000 to $125,000 awards." )(citation omitted); see also *Patterson,* 440 F.3d at 120 (approving

award for $100,000 (approximately $122,000 in 2015 dollars) in hostile work environment and intentional

infliction of emotional distress case, where only emotional harm was "garden variety"); *Meacham v. Knolls*

*Atomic Power Lab.,* 381 F.3d 56, 78 (2d Cir. 2004) (upholding award of $125,000 (approximately $167,000 in

2015 dollars) for emotional distress, including "shock, nightmares, sleeplessness, humiliation, and other

subjective distress" resulting from employment discrimination) *vacated on other grounds sub nom. KAPL, Inc. v.*

*Meacham,* 544 U.S. 957 (2005); *Stampf,* 761 F.3d at 208 (ordering remittitur or new trial on damages on

malicious prosecution claim resulting from false arrest at work unless plaintiff accepted award of $100,000 for

past emotional harm and $20,000 in future emotional harm, noting the incident caused plaintiff emotional

distress resulting in shame, decline of interpersonal relationships, alcoholism, and trouble sleeping without

medication); *Graham*, 2015 WL 5258741, at *24-*26 (declining to order remittitur or a new trial as to damages

where jury awarded $150,000 for compensatory damages for a headache, some wrist pain, and "garden variety"

emotional damages on plaintiff's false arrest claim); *see Watson v. E.S. Sutton, Inc.*, 2005 WL 2170659, at *16 (S.D.N.Y. Sept. 6, 2005) *aff'd*, 225 F. App'x 3 (2d Cir. 2006) ("The range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000.").

The Court finds that the Jury's $900,000.00 compensatory damages award is so high as to shock the judicial conscience, and deviates materially from what would be reasonable compensation.  Because of the amount of the award and the evidence presented at trial about the effects of Plaintiff's discharge on his emotional state, the Court finds that a reasonable emotional distress award would be at the higher end of the range of reasonable verdicts for garden variety emotional distress claims.  Therefore, Defendant's motion for a new trial on the issue of Plaintiff's compensatory damages is granted unless Plaintiff files and serves, on or before September 29, 2015, a written acceptance of remittitur of the award of compensatory damages to $125,000.00.

### B.  Front and Back Pay Awards

Defendant argues that the Jury's front- and back-pay awards were flawed and excessive because (1) Plaintiff fail to mitigate his damages, (2) the evidence did not support a back-pay award of $485,633, and (3) the evidence did not support a front-pay award at all. Def. Mem. L. pp. 37-40.

As to mitigation, the Jury heard evidence of Plaintiff's attempts to find employment, and was instructed on Plaintiff's duty to use reasonable diligence to mitigate his damages and Defendant's burden of proving the damages that Plaintiff could have mitigated.  Defendant's current argument that Plaintiff did not use reasonable diligence in these efforts goes to the weight of the evidence presented at trial, but it does not indicate that Plaintiff failed as a matter of law to mitigate his damages. The Court will not disturb the Jury's determination on this issue.

Likewise, Defendant's arguments that the jury's front- and back-pay awards were unsupported is grounded in its position that Plaintiff failed adequately to mitigate his damages. In this regard, Defendant argues that Plaintiff failed to mitigate his damages because he failed to take desensitization training which would have allowed him to become a certified immunizer and, presumably, likely to find employment as a pharmacist. Again, this argument again goes to the weight the evidence, but does not show that Plaintiff failed as a matter of law to mitigate his damages. And again, the Court will not disturb the Jury's determination on this issue. Defendant's motion for a new trial or remittitur of the front and back pay awards is denied.

c. Plaintiff's Rule 59 Motion

Plaintiff moves pursuant to Fed. R. Civ. P. 59(e) to amend the judgment to add pre- and post-judgment interest to the damages award. Plaintiff contends that "prejudgment interest should be set at a rate deemed appropriate by the court and should accrue from the date of termination through the date of judgment." Pl. Mem. L. p. 2. Likewise, Plaintiff "requests that the Court amend its judgment to include an award for post judgment interest at a rate it determines appropriate." Id. p. 4. Defendant opposes the award as premature because the Court stayed execution of the Judgment pending adjudication of Defendant's appeals to the Second Circuit Court of Appeals. Def. Mem. L. in Opp., p. 2. Defendant further argues that Plaintiff "must not be awarded prejudgment interest on plaintiffs non-pecuniary compensatory damages under any circumstances insofar as such damages are already grossly excessive and, thus, the interests of fairness and full compensation' would not be furthered by so awarding, notwithstanding defendants' current application seeking remittitur." Id. p. 3. In the alternative, Defendant argues that if pre- or post-judgment interest is imposed, the Court should apply a modification of the federal post-judgment interest rate specified in 28 U.S.C. § 1961(a) for pre-judgment interest, that is the average rate of return on one-year Treasury bills calculated on an annual (not weekly) basis.

The stay of execution of the Judgment pending the Second Circuit's decision does not affect the

36

calculation of interest on the damages awards. Because only execution is stayed, the assessment of interest will be purely academic if Defendant prevails on appeal. Conversely, if Defendant does not prevail, interest will be assessed for the same time periods as are in issue here. The Court sees no value in delaying the determination.

Because the Court has issued a decision granting a new trial or remittitur of the compensatory damages award, that portion of Plaintiff's motion is denied with leave to renew.

The decision whether to award prejudgment interest, and the rate to be applied if such interest is granted, are matters ordinarily left to the discretion of the district court. *See Gierlinger v.. Gleason*, 160 F.3d 858, 873 (2d Cir.1998); *Gonzalez v. Bratton*, 147 F. Supp.2d 180, 213 (S.D.N.Y. 2001), *aff'd*, 48 Fed. Appx. 363 (2002). However, "[t]o the extent ... that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest." *Sharkey v. Lasmo*, 214 F.3d 371, 375 (2d Cir. 2000); *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993).

Because there is no federal statute that purports to control the rate of prejudgment interest, courts generally use the rate set forth in 28 U.S.C. § 1961. *Jones v. Unum Life Ins. Co. of America*, 223 F.3d 130, 139 -140 (2d Cir. 2000). Section 1961 establishes the rate of interest that is to be paid "on any money judgment in a civil case recovered in a district court," linking that rate to the rate of interest the government pays on money it borrows by means of Treasury bills. *See* 28 U.S.C. § 1961(a).

Nevertheless, "the suitability of that post-judgment rate for an award of prejudgment interest will depend on the circumstances of the individual case, and the court need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government." *Jones,* 223 F.3d at 140. As long as the award of prejudgment interest "roughly and fairly compensates the plaintiff," the Court has discretion in determining the method for calculating the interest. *Tusino v. International Broth. of Teamsters*, 169 Fed. Appx.

39, 44 (2d Cir. 2006).

Taking these factors into consideration, the Court determines that it will apply the federal interest rate based on the rate of return on one-year Treasury bills for the relevant time period. *See* 28 U.S.C. § 1961(a). In this regard, the total back pay award is to be divided pro rata over the back pay period. The back pay period is from the date of discharge to the date of judgment. The average annual Treasury bill rate of interest for the years of the back pay period are to be applied to the back pay award for each of the pro rata periods. The interest is be compounded annually for the entire back pay period. *See Saulpaugh*, 4 F.3d at 145.

Plaintiff's counsel is directed to prepare a proposed Order for prejudgment interest using the method of calculation just discussed, and present it to the Court and Defense counsel. Defense counsel will have two (2) weeks to object to the calculation, and, absent objection, the Court will sign the order.

Post-judgment interest on the lost future earning award is to be calculated in accordance with 28 U.S.C. § 1961(a). Interest will be calculated from the date of judgment until paid.

V.      CONCLUSION

For the reasons discussed above, Defendant's motion for judgment as a matter of law or, in the alternative, for a new trial [ dkt. # 108] is GRANTED IN PART and DENIED IN PART. Defendant's motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) is granted DISMISSING Plaintiff's ADA failure to accommodate claim. The Rule 50(b) motion is denied in all other respects. Defendant's motion for a new trial pursuant to Fed. R. Civ. P. 59 is granted on the issue of Plaintiff's compensatory damages unless Plaintiff files and serves, on or before September 29, 2015, a written acceptance of remittitur of the award of compensatory damages to $125,000.00. The motion is denied in all other respects.

Plaintiff's motion to amend the judgment pursuant to Fed. R. Civ. P. 59 [dkt. # 111] is GRANTED IN PART and DENIED IN PART. That much of the motion seeking pre-judgment interest on the back-pay award is

granted as set forth more fully above; that much of the motion seeking pre-judgment interest on a compensatory damages award is denied with leave to renew; and that much of the motion seeking post-judgment is granted as set forth above.

IT IS SO ORDERED.

Dated:September 23, 2015

Thomas J. McAvoy
Senior, U.S. District Judge